## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **Estate of Renato Martí,** | : | **Case No. 1:19-cv-980** |
| **c/o Gerhardstein & Branch Co. LPA** | : | |
| **441 Vine Street, Suite 3400** | : | |
| **Cincinnati, Ohio 45202,** | : | **Judge** |
| | : | |
| **Plaintiff,** | : | **COMPLAINT** |
| **v.** | : | |
| | : | |
| **Delphine Nichole Rice, LPN,** | : | |
| **C/O Hamilton County Justice Center** | : | |
| **900 Sycamore Street** | : | |
| **Cincinnati, Ohio 45202** | : | |
| | : | |
| **and** | : | |
| | : | |
| **Jason Spiers, LPN,** | : | |
| **C/O Hamilton County Justice Center** | : | |
| **900 Sycamore Street** | : | |
| **Cincinnati, Ohio 45202** | : | |
| | : | |
| **and** | : | |
| | : | |
| **NaphCare, Inc.** | : | |
| **2090 Columbiana Road, Suite 4000** | : | |
| **Birmingham, AL 35216-2158** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

## I. PRELIMINARY STATEMENT

1.      This civil rights action challenges the Defendants' failure to provide adequate medical

care to Renato Martí while he was in custody at the Hamilton County Justice Center ("HCJC" or

"Jail").  Mr. Martí should have never been admitted into the Justice Center because he had a

serious head injury.  When Mr. Martí was brought to the Jail, he was unable to stand on his own

and unable to speak.  Defendant Rice, an LPN, looked at the wound on the back of Mr. Martí's

head but did not assess him, medically screen him, or treat him. Mr. Martí was admitted into the Jail without a proper medical screening and put in a holding cell to sober up. After 15 hours he did not "sober up" so Nurse Rice looked at him again and diagnosed him as "psych" and sent him to the psychiatric unit without any medical evaluation or treatment for his obvious bleeding head injury. Defendant Nurse Spiers also saw Mr. Martí and cleaned off the dried blood on his head but did not treat or examine the open lacerations. The Defendants knew about the risks of head trauma, were aware of Mr. Martí's head injury, ignored his obvious deterioration, and failed to timely provide adequate medical care to Mr. Martí before his death. As a result of the Defendants' failure to provide Mr. Martí with appropriate medical care he experienced 24 hours of excruciating pain and suffering before his senseless and preventable death. Plaintiff brings this action as administrator of Renato Martí's estate to secure fair compensation and to prevent similar, unnecessary suffering and deaths in the future.

## II. JURISDICTION

2.      Jurisdiction over claims arising from Defendants' violation of the Civil Rights Act is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (3) and (4).

3.      Jurisdiction over the state law claim is conferred upon this Court by 28 U.S.C. § 1367.

4.      Venue is proper in this division in that the events complained of occurred within the geographic confines of this division.

## III. PARTIES

5.      Plaintiff is Estate of Renato Martí. Defendant Hamilton County is a unit of local government organized under the laws of the State of Ohio.

6.      Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.

7.     Defendant NaphCare, Inc. is a corporation and was at all times relevant to this action the medical provider under contract with Hamilton County, providing medical services at the Hamilton County Justice Center ("HCJC" or "Jail"). NaphCare is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.

8.     Defendant Nurse Delphia Rice, LPN was at all times relevant to this action an agent or employee of NaphCare working as a licensed practical nurse at the Hamilton County Justice Center. Defendant Rice is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. She is sued in both his individual and official capacities.

9.     Defendant Nurse Jason Spiers, LPN was at all times relevant to this action an agent or employee of NaphCare working as a licensed practical nurse at the Hamilton County Justice Center. Defendant Spiers is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. She is sued in both his individual and official capacities.

## IV. FACTS

### A. Background

10.     Renato Martí was a 58 year old man when he died on November 20, 2017. He was survived by his daughter and ☐ grandchildren.

11.     Mr. Martí was suffering from an obvious lethal head injury and should never have been admitted into the jail. He needed immediate emergency neurological treatment for a fractured skill. He clearly had a serious lethal brain injury that needed immediate medical treatment to save his life. Defendant Rice should have been declined his admission to the jail and sent him immediately to the hospital.

12.     It was obvious to all the officers who saw him that the back of his head was covered in dried blood. In addition, it would be obvious to both defendants that he was covered in abrasions

and contusions, and his skull was fractured. The skull fracture was so bad it could have been felt upon examination.

13.     Mr. Martí also suffered from obvious injuries that covered his body.  He had abrasions and bruises on his neck, back, right shoulder left arm, left elbow, wright wrist, left hand, left hip, left buttock, left thigh, back of his left knee, right leg, left leg, left shin, and left foot.

14.     He also had 10 broken ribs (three on the right side and seven on the left side).  Both lungs were bleeding.  These injuries which would have been obvious upon examination had either nurse screened him and evaluated his injuries.

15.     All of these injuries caused him to experience excruciating pain, have an altered mental state, and make him appear confused, unsteady on his feet, and unable to follow commands.

16.     The first nurse to see Mr. Martí was Defendant Nurse Rice.  The intake officers called her to assess his head injury which they noticed when he came into the jail.

17.     At approximately 5 am on November 19, 2017, Nurse Rice knew Mr. Martí had a bloody head wound, was stumbling, confused, not alert to verbal stimuli, and had an altered mental state.

18.     From her training, Nurse Rice knew that a severe head injury could be fatal and needed immediate medical care.  She also knew that Hamilton County Jail Medical protocols require medical staff to screen all inmates before admittance to the jail.

19.     Nurse Rice did not take a medical history from Mr. Martí or ask him any questions.  She assumed he only spoke Spanish.  She knew that NaphCare provides a medical translator service but did not access it.  She knew Spanish speaking staff were available at the jail to interpret for her, but she did not seek their assistance.  She took no medical history, asked no questions, and did not screen Mr. Martí.  Nurse Rice did not measure Mr. Martí's vital signs, nor did she complete or sign an Initial Intake Health Screening Form for Mr. Martí.

20.     Nurse Rice examined Mr. Martí's head wound and saw his skull had dried blood, contusions and abrasions.  Other than looking, at the wound, she did not assess, evaluate, or examine Mr. Martí. She did not treat Mr. Martí's head wound.

21.     In response to knowing Mr. Martí's serious medical condition – having a recent severe head injury -- she did not call a registered nurse, a physician, a supervisor, or for transportation to the hospital.  She did not perform her required duty to medically assess Mr. Martí before admission.  She did not ask him questions, perform an exam, obtain a blood alcohol reading, take vitals, or examine the obvious wounds all over his body.  Instead, she recklessly, wantonly, and without training or ability, and acting outside the scope of her LPN license, diagnosed Mr. Martí as being intoxicated and allowed him to be admitted to the jail.  Nurse Rice provided no treatment for his injuries.  Nor did she have any other medical provider do so.

22.     After Nurse Rice diagnosed him as intoxicated she did not assess him for alcohol withdrawal, take vitals, or follow Hamilton County Jail or NaphCare protocols for alcohol withdrawal.  She did not even start a medical chart or document her findings.

23.     Mr. Martí was transferred to a holding cell to allow him to sober up.

24.     Nurse Rice was required by jail policies to alert a jail supervisor when an incoming inmate had a wound, was disoriented, had an arrest injury, or had a head trauma.  Nurse Rice knew that Mr. Martí met all four criteria, yet she did not inform a jail supervisor.  Had she done so, the jail supervisor would have denied admission to the jail and sent Mr. Martí to the hospital.  By hiding these facts from the jail supervision, Nurse Rice increased the risk of harm to Mr. Martí.  She knew Mr. Martí was in no condition to help himself, to speak, or to communicate his medical needs.  Instead of having him treated at a hospital, she sent him to a holding cell to "sober up."

25.     At approximately 8:00 p.m., after 15 hours in the holding cell, the officers realized that Mr. Martí should no longer be intoxicated, yet he was no better.  They saw his head wound and they saw blood on the wall of his cell.  The officers observed Mr. Martí sporadically opening his eyes, looking in different directions, and struggle to keep his eyes open. Mr. Martí was shaky. The officers and their sergeant sought immediate medical care for Mr. Martí.

26.     Nurse Rice came to Mr. Martí's holding cell.  The officers told her that "something was off" with Mr. Martí, that he could not communicate, and that his eyes were "going in different directions."

27.     Nurse Rice knew that after 15 hours Mr. Martí would not still be showing signs of intoxication.  She knew his head wound was bleeding.  She saw a laceration that was 3-4 inches long.  She knew he was unable to respond to her questions.  She suspected part of his communication problem was a language barrier.  Yet, after a Spanish speaking officer was unable to get Mr. Martí to communicate with her, she decided to diagnose him as having a psychiatric problem.

28.     Nurse Rice knew that Mr. Martí was showing obvious signs of brain injury and no longer showing signs of intoxication.  A reasonable LPN would have called for assistance from her supervisor, a registered nurse or a physician.  Nurse Rice did take any reasonable steps to get medical treatment for Mr. Martí.  The actions she took placed him in great harm from the progressive brain injury – she diagnosed him as having a behavioral or "psych" problem and sent him to the psychiatric unit saying, "he's psych, he is good."

29.      She did not start a medical chart or document her findings.

30.     The sergeant, not satisfied with Nurse Rice's failure to assess Mr. Martí, clean his wound, or even take vitals, ordered the deputies to take Mr. Martí to the medical unit for an evaluation.

Unable to walk, a wheelchair was used to transport him to medical, but Mr. Martí even had difficulty sitting up during the transport.

31.     At approximately 8:30 p.m., Defendant Nurse Jason Spiers looked at Mr. Martí and saw that his eyes were "kind of sluggish to react."  He knew that Mr. Martí was unresponsive to verbal stimuli. Nurse Spiers moistened the dried blood on his head with a spray bottle in an attempt to remove the blood.  Mr. Martí groaned during the cleaning.  Nurse Spiers pushed on his wound causing him to moan.  When Nurse Spiers palpated the wound, it was obvious from touching his skull that it was fractured.  He saw a contusion and two lacerations on his scalp that were 1-2 days old.

32.     Nurse Spiers's diagnoses of Mr. Martí were beyond the scope of his license.  Knowing that Mr. Martí was suffering the obvious signs of a serious and potentially lethal head injury, Nurse Spiers should have obtained immediate medical care for him.  Instead, he further diagnosed him as having a behavioral issue and agreed with Nurse Rice that he should be sent to the psychiatric unit.

33.     Nurse Spiers was unable to find Mr. Martí's chart or document his findings in the computer.  This is because Nurse Rice performed no medical screening had been done and did not start a chart in the computer.

34.     After this medical visit, the sergeant called Nurse Spiers to report that no initial medical assessment had been done for Mr. Martí. The sergeant also told Nurse Spiers that Nurse Rice had diagnosed Mr. Martí as "psych."  Nurse Spiers took no action in response.

35.     While in the mental health unit a fellow inmate tried to get medical attention for Mr. Martí.  The inmate thought something was wrong with Mr. Martí, that he had been banging on the cell door and had been acting funny.  He told an officer that he thought someone should look

at him. The officer responded that they would check on him.  No one did from medical

responded to Mr. Martí that night

36.     At 5:30 a.m. on November 20, 2019 Mr. Martí was found dead in his cell. He could not

be revived.  He was pronounced dead at 7:50 a.m.  The autopsy showed that he died of blunt

force trauma to his skull within hours of the trauma being inflicted.  There was no alcohol in his

body at the time of his death.   Mr. Martí spent 24 hours slowly dying in the Hamilton County

jail without receiving any medical care.

37.     Defendants Rice and Spiers knew that Mr. Martí was had a serious life-threatening recent

head injury that was still bleeding after 15 hours in the jail.  They each made diagnoses outside

the scope of their LPN licenses.  They each failed to assess, treat, or arrange for more qualified

provider to treat Mr. Martí. Their actions, sending him to the psychiatric unit without any

medical assessment, chart, or treatment increased the risk of harm to Mr. Martí.  Without

medical care, it was foreseeable and obvious to Defendants that Mr. Martí would die.

**B.  Policies, Practices, and Culpable Conduct**

38.     The Defendants knew Mr. Martí was at a serious risk of harm if his head injury was not

treated.

39.     The Defendants knew that inmates with head injuries required immediate medical

treatment.

40.     It was foreseeable that by not properly assessing the effects and the extend of Mr. Martí's

head injury, not referring Mr. Martí to the hospital, clearing him for booking, and delaying

treatment, the Defendants reduced Mr. Martí's chances of survival.

41.     The Defendants acted intentionally, knowingly, unreasonably, negligently, recklessly,

and with deliberate indifference to the rights and safety of Mr. Martí when they utterly failed to

8

provide any kind of medical care in response to an obvious medical risk, placed Mr. Martí in a holding cell and then a psychiatric cell and left him there for extended periods of time without adequate supervision and medical care.

42.     The policies, customs, patterns, and practices of NaphCare were the moving force behind the constitutional deprivations suffered by Mr. Martí at the Jail and they include:

     (a) The failure to have a proper system for screening inmates with head injuries so that they could be safely transferred to a hospital;

     (b) The failure to ensure that the initial medical screening is executed by a medical professional, and that all of the observations are recorded;

     (b) The failure to have a proper system for monitoring the vital signs of deterioration in an inmates' condition, especially when an inmate has a known injury or has been determined to have a mental health issue effecting the inmate's behavior;

     (c) The failure to utilize and to use appropriate observation methods for mentally ill persons and persons with injuries that might be life threatening.

43. The failure by all of the Defendants to properly obtain a diagnosis, assess the severity, monitor and treat the symptoms of the head injury was negligent, knowing, intentional, reckless, wanton and deliberately indifferent to the serious medical needs of Mr. Martí.

44. The actions of the Defendants reflect an arbitrary abuse of government power, which shocks the conscience.

45. At all times relevant to this action, Defendant NaphCare failed to train and supervise the Defendant nurses in properly caring for and treating inmates with serious medical needs.  All Defendants simply ignored the obvious risks of harm to Mr. Martí and the reasonable

response to his known medical needs of timely transferring Mr. Martí to the hospital for his injury to be accessed and treated.

46. NaphCare policy makers were deliberately indifferent to the serious medical needs of Mr. Martí by failing to train the nurses and implement jail policies, practices, customs and usages that adequately addressed the obvious and known health and safety risks to inmates entering the Jail with obvious head wounds.

47. Mr. Martí's harm was preventable with adequate medical care and medical treatment, which was not provided by Defendants.

**C.  Injury to Mr. Martí and His Family**

48. As a direct and proximate result of Defendants' actions, Mr. Martí endured physical pain and suffering, emotional distress and anguish which ultimately resulted in his death.

49. As a further direct and proximate result of Mr. Martí's wrongful death, his survivors and/or heirs have suffered damages, including but not limited to the loss of his support, services, and society, including lost companionship, care, assistance, attention, advice, counsel, guidance, instruction, training, education, and the loss of a prospective inheritance.

50. As a further direct and proximate result of Mr. Martí's wrongful death, his survivors, next of kin, and/or heirs have suffered damages, including but not limited to, grief, depression, and severe emotional distress.  They have incurred funeral bills.

## V. FIRST CAUSE OF ACTION – 42 U.S.C. § 1983

51. Plaintiff incorporates paragraphs 1 through 50 as if fully written herein.

52. Defendants have, under color of law, deprived Renato Martí of rights, privileges and immunities secured to him by the Fourth and Fourteenth Amendment of the United States

Constitution, including but not limited to, the right to adequate medical care when incarcerated as a pretrial detainee.

53. Defendant NaphCare failed to adequately train and supervise the medical staff in the admission, assessment, monitoring, and treatment of inmates in serious medical need.

54. The rules, regulations, customs, policies and procedures of the Defendant NaphCare regarding the treatment and management of persons requiring specialty medical care were inadequate, unreasonable, and deliberately indifferent and were the moving force behind the constitutional deprivations suffered by Renato Martí.

## VI. SECOND CAUSE OF ACTION – WRONGFUL DEATH

55. Defendants Rice, Jason, and NaphCare's actions caused the wrongful death of Renato Martí resulting in damages recoverable under O.R.C. § 2125.02.

## IX. JURY DEMAND

56. Plaintiff requests a jury trial on all claims triable to a jury.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A. Award Plaintiff compensatory damages in an amount to be shown at trial;

B. Award punitive damages against the Defendants in an amount to be shown at trial;

C. Award Plaintiff reasonable attorney's fees and costs under 42 U.S.C. § 1988;

D. Award Plaintiff prejudgment interest;

E. Grant to the Plaintiff such additional relief as the Court deems just and proper.

Respectfully submitted,

s/ Jennifer L. Branch
Jennifer L. Branch (0038893)
Trial Attorney for Plaintiff
Gerhardstein & Branch, Co LPA

441 Vine Street, Suite 3400
Cincinnati, Ohio 45202
(513) 621-9100 Phone
(513) 345-5543 Fax
jbranch@gbfirm.com