**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **Estate of Renato Martí,** | Case No. 1:19-cv-980 |
| Plaintiff, | |
| | Judge Michael Barrett |
| v. | Magistrate Karen L. Litkovitz |
| **Delphine Rice, et al.** | |
| Defendant. | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Jacqueline Greene (0092733)
Rebecca P. Salley (0097269)
Alphonse A. Gerhardstein (0032053)
FRIEDMAN GILBERT + GERHARDSTEIN
441 Vine Street, Suite 3400
Cincinnati, Ohio 45202
T: (513) 572-4200
F: (216) 621-0427
jacqueline@FGGfirm.com
rebecca@FGGfirm.com
al@FGGfirm.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 2

    I.   Defendant NaphCare's Policies, Practices, and Customs in Hamilton County Detention Center Create Foreseeable Risks of Serious Harm to Patients in the Jail. .................................. 3

    II.   Defendant Rice Ignores Mr. Marti's Deteriorating Condition and Head Injury .............. 16

    III.   Defendant Spiers Fails to Report or Record His Encounter with Mr. Marti .................. 18

    IV.   Marti Continues to Deteriorate and Dies Due to Delay in Evaluation and Care. ............ 20

    V.   Defendant Spiers Falsified Records and Failed to Report to Investigators. .................... 23

    VI.   NaphCare Fails to Adequately Investigate Marti's Death. ................................................. 24

ARGUMENT ........................................................................................................................ 26

    I.   Summary Judgment Standard ............................................................................................ 26

    II.   Plaintiff's Claims Against Defendants Rice and Spiers Must Proceed to Trial. ............. 26

       A. Plaintiff Has Presented Genuine Disputes of Material Fact as to Whether Defendants Rice and Spiers Violated Renato Marti's Constitutional Rights. ............................................. 26

       B. Plaintiff Has Presented Genuine Disputes of Material Fact as to Whether Defendants Rice and Spiers Were Medically Negligent. ........................................................................ 45

    III.   Defendant NaphCare is Liable for Renato Marti's Injuries Under the U.S. Constitution and Ohio Law. ..................................................................................................................... 47

       A. Defendant NaphCare is Liable for the Medical Negligence of its Employees ................ 47

       B. Defendant NaphCare is Liable Under *Monell*. .............................................................. 48

    IV.   Plaintiff is Entitled to Punitive Damages. ........................................................................ 59

CONCLUSION ..................................................................................................................... 60

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144, 167-168 (1970) ……………………………………………………47

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 249 (1986) …………………………………………………………24

*Anderson v. Massillon*,
    134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 34 …………………………56

*Aycox v. Columbus Bd. Of Educ.*,
    10th Dist. Franklin No. 03AP–1285, 2005-Ohio-69, ¶ 31…………………………44

*Blackmore*,
    390 F.3d at 899-900 …………………………………………………………………27

*Brawner v. Scott County, Tenn.*,
    14 F.4th 585, 596 (6th Cir. 2021) …………………………………………..26,28,50

*Brown v. Shaner*,
    172 F.3d 927, 931 (6th Cir. 1999) ………………………………………………..52

*Broyles v. Corr. Med. Servs., Inc.*,
    No. 08-1638, 2009 WL 3154241, at *2 (6th Cir. Jan. 23, 2009) ………………………45

*Bruni v. Tatsumi*,
    46 Ohio St.2d 127, 346 N.E.2d 673 (1976) ………………………………………42

*Burgess v. Fischer*,
    735 F.3d 462, 478 (6th Cir. 2013) …………………………………………………46

*City of Canton, Ohio v. Harris*,
    489 U.S. 378, 388 fn. 8 (1989) ……………………………………………25,45,52

*City of Revere v. Massachusetts General Hosp.*,
    463 U.S. 239, 243-245 (1983) ……………………………………………………25

*Clark v. Johnston*,
    413 F.App'x 804, 819 (6th Cir. 2011) ……………………………………………23

*Connick v. Thompson*,
    563 U.S. 51, 67 (2011) ………………………………………………………………55

*Cromer v. Children's Hosp. Med. Ctr. of Akron*,
    142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 29 …………………………...42

*Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*,
    455 F.3d 690, 700 (6th Cir. 2006) ………………………………………………………52

*Evans v. Ohio State Univ.*,
    112 Ohio App.3d 724, 739, 680 N.E. 2d 161 (10th Dist. 1996) ……………………..44

*Farmer v. Brennan*,
    511 U.S. 825, 836 (1994) …………………………………………………………………26

*Ford v. County of Grand Traverse*,
    535 F.3d 483, 495 (6th Cir. 2008) ………………………………………………………45

*Garner v. Memphis Police Dept.*,
    8 F.3d 358, 365-366 (6th Cir. 1993) ……………………………………………………46

*Greene v. Crawford County*,
    22 F.4th at 609, 611 …………………………………………………………………..36

*Harrison v. Ash*,
    539 F.3d 510, 524 (6th Cir. 2008) ………………………………………………………24

*Hartman v. Great Seneca Fin. Corp.*,
    569 F.3d 606, 611 (6th Cir. 2009) ………………………………………………………23

*Howell v. NaphCare, Inc.*,
    No. 1:19-CV-373, 2022 WL 740928, at *7 (S.D. Ohio Mar. 11, 2022) ………………29

*Jackson v. City of Cleveland*,
    925 F.3d 793, 828 (6th Cir. 2019) ………………………………………………………46

*Kingsley v. Hendrickson*,
    576 U.S. 389 (2015) ………………………………………………………………………25

*Lane v. Wexford Health Sources*,
    No. 2:10-cv-389, 2010 WL 5069849, *2 (S.D. Ohio Dec. 6, 2010) …………………..56

*Loudin v. Radiology & Imaging Servs., Inc.*,
    128 Ohio St.3d 555, 2011-Ohio-1817, 948 N.E.2d 944, ¶ 13 ………………………42

*MacConnell v. NaphCare, Inc.*,
    No. 3:13-cv-00034, 2013 WL 5236616, *3 (S.D. Ohio Sept. 17, 2013) ................45

*Matulin v. Village of Lodi*,
    862 F.2d 609, 613 (6th Cir. 1988) ........................................................... 46

*McCullum v. Tepe*,
    693 F.3d 696 (6th Cir. 2012) ....................................................................24

*Menifee v. Ohio Welding Products, Inc.*,
    15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984) .............................................42

*Monell v. Dept. of Social Serv.*,
    436 U.S. 658 (1978) ...............................................................................43

*Moskovitz v. Mt. Sinai Med. Ctr.*,
    69 Ohio St.3d 638, 635 N.E.2d 331 (1994) ................................................56

*North v. Cuyahoga County*,
    754 F.App'x 380, 384 fn. 2 (6th Cir. 2018) ................................................46

*Oklahoma v. Tuttle*,
    471 U.S. 808, 833 n.9 (1985) ..................................................................46

*Osborne v. Lyles*,
    63 Ohio St.3d 326, 329 (1992) ................................................................44

*Paige v. Coyner*,
    614 F.3d 273, 284 (6th Cir. 2010) ............................................................46

*Powers v. Hamilton Cnty. Public Defender*,
    501 F.3d 592, 608 (6th Cir. 2007) ............................................................46

*Ramage v. Cent. Ohio Emergency Serv., Inc.*,
    64 Ohio St.3d 97, 592 N.E.2d 828 (1992) ..................................................42

*Shadrick v. Hopkins County, Ky.*,
    805 F.3d 724, 740 (6th Cir. 2015) ............................................................52

*Shepard Claims Serv. v. William Darrah & Assocs.*,
    796 F.2d 190, 193 (6th Cir. 1986) ............................................................23

*Smith v. Wade*,
    461 U.S. 30, 56 (1983 ...........................................................................56

*Street v. Corrections Corp. of Am.*,
　　102 F.3d 810, 817-818 (6th Cir. 1996) …………………………………………45

*Telepo v. Martin*,
　　257 F.R.D. 76, 77 (M.D.Pa.2009) ………………………………………………56

*Thompson v. McNeill*,
　　53 Ohio St.3d 182, 105-106 (1991) ……………………………………………26

*Trozzi v. Lake County, Ohio*,
　　29 F.4th 745, 755 (6th Cir. 2022) ……………………………………………..36, 31

*Villella v. Waikem Motors*,
　　45 Ohio St.3d 36, 37, 543 N.E.2d 464 (1989) …………………………………56

*Westlake v. Lucas*,
　　537 F.2d 857, 860 n.5 (6th Cir. 1976) …………………………………………37

**Other Authorities**

Fed. R. Civ. P. 56(a)

## INTRODUCTION

This case concerns the repeated failures of NaphCare staff, including Defendants Jason Spiers, LPN, and Delphine Rice, LPN, to obtain and provide constitutionally adequate, non-negligent medical evaluation and care for fifty-eight-year-old Renato Marti, who was admitted by NaphCare staff to the Hamilton County Justice Center around 5:00AM on November 19, 2017. Defendant Delphine Rice observed Marti suffering from an obvious, blood-matted head wound and several symptoms of traumatic brain injury, including unsteadiness on his feet, disorientation and altered mental status, and the inability to verbally respond to intake staff, including an inability to describe how he received his head injury. Rather than appropriately refusing to accept Mr. Marti's admission to the jail and referring him for emergency hospital care, Rice permitted his admission to the jail.

As a result of Defendants' actions, including the policies, practices, and customs of NaphCare and the failures of NaphCare to properly train and supervise their LPNs, Mr. Marti was then left to suffer in an intake holding cell for approximately fifteen hours throughout the day of November 19 as his condition worsened. Though concerned correctional deputies intervened and attempted to seek medical treatment for Mr. Marti around 8:00PM on November 19, their concerns were dismissed by the Defendant NaphCare LPNs, who failed to perform proper assessments or seek proper guidance from qualified advanced providers. After again being dismissed by Rice as "mental health," Marti was taken by deputies to the Medical Unit, where his obviously severe medical condition and brain injury symptoms, including unequal pupils, apparent sensitivity to light, and nonverbal presentation, were dismissed by LPN Jason Spiers. Spiers cleaned dried blood from (but did not dress or bandage) Marti's head wound, ignored abnormal findings from a purported neurological check, and failed to seek guidance for Mr. Marti from qualified advanced providers, even after he learned that Mr. Marti had been in a holding cell for a prolonged period

1

of time and that no medical screening or assessment had been performed on Mr. Marti. Spiers instructed deputies to take him to Mental Health housing, where he knew Marti would receive no further medical attention.

Ultimately, both Rice and Spiers dismissed Mr. Marti's serious medical symptoms as a "psych" issue and banished him to the Mental Health Unit, where he languished without access to medical care for nine more hours, while his treatable and recoverable brain injury turned fatal. Mr. Marti was found unresponsive in his cell around 5:25AM on November 20, 2017, and he was subsequently pronounced dead shortly over 24 hours after he was admitted to the jail. On November 18, 2019, Plaintiff filed a Complaint alleging violations of Mr. Marti's Fourteenth Amendment right to adequate medical care as a pretrial detainee, *Monell* claims against Defendant NaphCare, and wrongful death under Ohio law. (Doc. 1, PageID#10-11).

Defendants filed their Motion for Summary Judgment on June 24, 2022, on behalf of Defendants Rice, Spiers, and NaphCare. However, Defendants' Motion fails to accept the facts in the light most favorable to Plaintiff. Because there are disputes of fact precluding summary judgment on all of Plaintiff's claims, summary judgment must be denied on all claims, and this case must proceed to trial.

## STATEMENT OF FACTS

Around 3:50am on November 19, 2017, Cincinnati police officers responded to a call regarding an individual who was knocking on the door of an apartment that was not his. There, the officers found fifty-eight-year-old grandfather Renato Marti on the landing of the apartment building. Mr. Marti was arrested for Disorderly Conduct and complied with being handcuffed by the officers. The officers transported Mr. Marti to the Hamilton County Detention Center ("HCDC" or "the jail").

Upon arrival to the jail, Officer Linda Borowicz realized Mr. Marti had a wound on his head. The wound was immediately brought to the attention of the jail's intake and booking nurse, Defendant Delphine Rice. LPN Rice failed to take any action to address the obvious wound on Marti's head and medically cleared him for admission to the jail. Over the next twenty-four hours, Mr. Marti's condition openly and obviously deteriorated, leading Hamilton County Sheriff's Office ("HCSO") jail deputies to recognize his obviously abnormal condition and to request medical attention for Mr. Marti. Though deputies sought medical care on Mr. Marti's behalf from both Nurse Rice and Defendant Nurse Jason Spiers, the two nurses provided only cursory attention to Mr. Marti. They flagrantly disregarded basic standards of care and practice, ignored objective signs of medical distress, and actively delayed Marti's access to medical care, despite multiple opportunities to get him the emergency medical care he desperately needed. The delay caused by Rice and Spiers directly resulted in Mr. Marti's death from severe brain injuries, including skull fracture, subdural hemorrhage, and contrecoups contusions caused by blunt force trauma to his head.

I.   **Defendant NaphCare's Policies, Practices, and Customs in Hamilton County Detention Center Create Foreseeable Risks of Serious Harm to Patients in the Jail.**

In November 2017, medical services at HCDC were provided under contract with Defendant NaphCare, an Alabama-based private business providing correctional health care in several states. Prisoners at the jail are completely dependent upon the jail staff, including NaphCare medical staff, to access medical care. However, Defendant NaphCare's policies and practices are inadequate to ensure that patients receive the treatment they need, and create a risk of substantial harm to patients with serious medical needs, including Renato Marti.

Defendants Rice and Spiers were both licensed practical nurses ("LPNs") employed by NaphCare at HCDC at all times relevant to Plaintiff's claims. LPNs have a very limited scope of

practice, governed by state licensing requirements. An LPN's scope of practice in the state of Ohio is to "[provide] nursing care requiring the application of basic knowledge of the biological, physical, behavioral, social, and nursing sciences at the direction of" a registered nurse ("RN"), physician, physician's assistant, or another authorized provider. (State of Ohio Board of Nursing Scopes of Practice: RNs and LPNs, Doc. 64, PageID#2889) LPNs have a "dependent" practice, which means they are "authorized to practice **only** when the practice is directed by" an authorized provider. *Id.* (emphasis in original). LPNs are not permitted to diagnose or supervise other LPNs. *Id.*

It is always the responsibility of an RN or other advanced provider to analyze data and information collected through observation, to formulate a nursing care plan, and to make clinical decisions. (Ohio Board of Nursing Scopes of Practice: RNs and LPNs, Doc. 64, PageID#2889; Perdikakis Tr., Doc. 85, PageID#1406, 1406). In fact, LPNs are explicitly prohibited by the State of Ohio from "[e]ngaging in nursing practice without RN or authorized health care provider direction," "[a]ssessing health status for the purposes of providing nursing care," and supervising the practice of nursing. (Ohio Board of Nursing Scopes of Practice: RNs and LPNs, Doc. 64, PageID#2889). As such, LPNs must report their observations to an advanced provider, and "have to be able to contact" an RN to do so. (Perdikakis Tr., Doc. 85, PageID#1402). LPNs at the jail are allowed to independently pass medication, make observations, and give reports to advanced clinical providers, take vitals, give injections, draw blood, and perform wound care. (Perdikakis Tr., Doc. 85, PageID#1400).

When any arrestee arrives to be taken into custody at HCDC, the HCSO Initial Intake Health Assessment and NaphCare Receiving Screening are crucial screening tools for NaphCare staff to ensure that each individual's emergent medical or mental health needs or serious medical

conditions are swiftly identified and managed. To avoid the admission of prisoners who need emergency medical attention and/or medical treatment beyond what can be provided at the jail, NaphCare uses Prebooking Refusal Guidelines to trigger immediate refusal of prisoners with certain medical conditions. (Rice Tr., Doc. 81, PageID#3069-3070). If present, these conditions are supposed to result in medical staff immediately refusing that individual's entry to the jail, and referral to a hospital for emergency care. These conditions include significantly altered mental status, history of falls greater than twenty feet, acute head injury with loss of consciousness prior to or at arrest; wounds involving bone or bodily structures; and seizures with "significant recent head trauma." (*Id.*) HCSO policy clearly provides that "the decision of the medical staff is final when refusing an inmate and cannot be overruled by any Jail Service employee." (HCSO H.1. Inmate Intake Procedure, Doc. 102-1, PageID#2785). Rice admitted Mr. Marti to the jail despite his presentation at the search wall with altered mental status and visible head injury.

Medical staff are also responsible for completing the Receiving Screening as soon as possible with each new person admitted to the jail. The Receiving Screening requires medical staff to take and record vital signs, and for nurses to record, in relevant part: history of head injury in the past 72 hours; signs of illness, injury bleeding or pain; obvious signs of abrasions, cuts, bruises, trauma; medical and mental health history; alcohol use; appearance of unsteadiness, confusion, lethargy, slurred speech, stupor, and/or tremors; orientation to person, place and time; and incoherence or verbal non-responsiveness.[1] (Ex. 56, 2014 Marti Receiving Screening-

---

[1] Plaintiff's Motion for Leave to File Exhibits under Seal or for Order to File on Public Docket (Doc. 99), filed July 14, 2022, is pending. This brief contains redactions of references to the documents and contents of such documents which Defendants contend are subject to the protective order, as discussed in Plaintiff's Motion (Doc. 99). Plaintiff will file those documents and an unredacted brief under seal should the Court so order; should the Court order that those documents and their contents be filed publicly, Plaintiff will refile this brief without redactions and will file all referenced exhibits on the public docket.

Confidential). Rice admitted Mr. Marti to the jail despite his presentation at the search wall with many of these symptoms.

Despite the alleged prohibition on admitting prisoners with altered mental status, medical staff at HCDC have a practice of permitting highly intoxicated individuals to be removed from medical intake screening process, by which prisoners "come in and go straight to a cell because they're intoxicated." (Rice IA Tr., Doc. 109-1, PageID#3044; Spence Tr., Doc. 88, PageID#2192; Spiers Tr., Doc. 87, PageID#2095). Defendant NaphCare's practice at the jail of allowing incoming prisoners to "sleep it off"—without an appropriate screening and monitoring mechanism to rule out serious medical conditions—creates a significant risk of serious injury or death, as it did in Mr. Marti's case. This practice is at odds with NaphCare's written policy on Intoxication, Detoxification, and Withdrawal, as well as national standards for conducting jail intake. (Ex. 50, NaphCare Intoxication, Detoxification, and Withdrawal Policy). That policy states that an individual who presents with symptoms of intoxication or drug or alcohol withdrawal, including drowsiness, odor of alcohol, slurred speech, disorientation to person, place, or time, lack of coordination of movements, and change in pupil size, should be referred to medical staff for evaluation. (*Id.*) Individuals "exhibiting mild to moderate symptoms of withdrawal or acute intoxication" are to be kept under observation by an advanced clinical provider, and "[i]ndividuals at risk for progression to more severe levels of withdrawal are kept under constant observation by healthcare staff." (*Id.*) NaphCare policy requires medical staff to "work in conjunction [with the jail] . . .to ensure that security considerations do not compromise decisions and actions regarding necessary health care for patients." (Ex. 62, NaphCare Health Care Autonomy Policy)

The National Commission on Correctional Health Care ("NCCHC"), the primary licensing and professional standards organization for jail medical providers, issues periodic guidance on its

standards. NaphCare LPNs are expected to incorporate knowledge of NCCHC standards into their practice and their continuing education. (Ex. 31 LPN Job Description; Boal Tr., Doc. 96, PageID#2602). In 2013, NaphCare published the following advisory question and response:

> *The nurses who do receiving screening at our county jail need guidance on "when is an inmate too intoxicated to screen?" We know that we need to get a set of vitals and ask if there is any significant medical history or allergies, but there are varying thoughts on doing the actual screen. When inmates are intoxicated you really don't get an accurate screen because they just want to go to sleep.*

> You raise an interesting problem, but one that has a clear solution. The first step in the receiving screening (see J-E-02) is medical clearance, which assesses whether the person should immediately go to the hospital. If you decide to accept him or her into the jail, and since you really do not know what health conditions this person has, you should isolate the individual from the rest of the intake population, but be sure that he or she is closely monitored by custody and health staff. Many deaths of intoxicated individuals occur in jails. [. . .]

(NCCHC Receiving Screening FAQs, Doc. 113-1, PageID#3133). NCHCC also issued guidance elaborating on 2008 Standards that the receiving screening take place "as soon as possible" and "promptly […] without delay." (*Id.*) The updated 2013 guidance emphasized that "[i]ndividuals should not be released from the intake area until the receiving screening is completed." The guidance further states that "it is not acceptable to wait to start the screenings until correctional staff completes the admission process." (*Id.*)

Nurses may encounter a wide variety of medical and mental health issues in the jail setting and must be adequately equipped to provide care of many medical issues. (Rice Dep., Doc. 86, PageID#1689-1691; Spiers Dep. Doc. 87, 1979). NaphCare uses a set of nursing protocols which provide specific guidance for observation and evaluations, follow-up steps, and referrals to be completed. Nursing protocols provide guidance to keep LPNs within their scope of practice and represent NaphCare standard of care. (Perdikakis Tr., Doc. 85, PageID#1478). Nursing protocols are available to medical staff at all times through the electronic record-keeping system, TechCare,

which all medical staff are expected to competently use. (Ex. 31, LPN Job Description; Boal Tr.,
Doc. 96, PageID#2599).  LPNs are trained that if a patient complaint is not covered by a protocol,
they should contact the provider for further instructions and/or orders. (Ex. 33, "Nursing Protocols
101" Presentation). They are further trained to "complete the [TechCare nursing protocol] form in
its entirety, including vital signs." (*Id.*) As a general rule, LPNs were trained "when in doubt, call
the provider." (*Id.*; Spiers Tr., Doc. #87, PageID#2107-2108).

Despite this clear instruction, LPNs at the jail routinely use their own judgment as to when
they will refer to a nursing protocol and are given discretion to determine whether medical
complaints merit treatment or care. (Spiers Tr., Doc. 87, PageID#1963-1964; Rice Tr., Doc. 86,
PageID#1762 ("It wasn't very often" that Rice used nursing protocols in TechCare); Perdikakis
Tr., Doc. 85, PageID#1486-1487). If an LPN decides there is "nothing to" a complaint—which is
effectively a diagnosis of malingering or faking, or a diagnosis of a non-serious medical need—
she is given discretion not to document the encounter. (Boal Tr., Doc. 96, PageID#2691-2692).

Documentation and record-keeping practices used by NaphCare employees at HCDC do
not comport with NaphCare's own training and policy. NaphCare LPNs, according to their job
description, are expected to "[t]ake and document all patient history and vital signs, assist with
examination and/or treatments, and report all changes in patients' conditions." (Ex. 31). NaphCare
training modules for medical staff state that timely documentation is that which occurs "during
and after patient care" to avoid problematic charting issues. (Ex. 54, LPN Job Description)
Documentation that is "noted and verbally communicated between shifts and disciplines, reduces
the likelihood" of delayed and fragmented care. (Ex. 54, NaphCare "Documentation" Module).
NaphCare training instructs LPNs to make precise and comprehensive notes, including granular

information such as the measurements of a wound, surface textures, anatomic locations, abnormal appearances, and physiologic sounds. (*Id.*).

However, despite these written materials, NaphCare LPNs at HCDC report that actual and practices and unwritten policies differ: the documentation of a patient visit is "up to the nurse's discretion" and that documentation would not be completed if the LPN determined "there's nothing found to the complaint," Boal Tr., Doc. 96, PageID#2691-2692, effectively permitting LPNs to diagnose faking, malingering, or otherwise as non-serious medical needs, and then permitting those LPNs to forgo documentation of the complaint, any examination, and any diagnosis. (Perdikakis Tr., Doc. 85, PageID#1495 (Documentation "is based on the LPNs determination of what is relevant."))

LPNs are able to make decisions about special housing assignments, including medical and mental health housing. (Perdikakis Tr., Doc. 85, PageID#1521-1522). LPNs can make crucial decisions regarding access to care when they decide to send an individual to the Medical Unit, for medical observation, or the Mental Health Unit, which is not staffed by medical providers and lacks medical observation. (Perdikakis Tr., Doc. 85, PageID#1557; Speer Tr. 2311, 2314-2315 ("At night shift, the medical staff is down in medical. They don't have someone stationed in mental health at night. . .if there's a situation where we need a nurse, we have to go down and get them from the medical unit[.]")) For this reason, it is the duty of LPNs to rule out medical causes of abnormal behavior before ascribing it to a mental health issue and making housing assignments. (Perdikakis Tr., Doc. 85, PageID#1558). These special housing assignments are supposed to be made only once the nurse has completed the relevant medical and mental health screenings. (*Id.* at PageID#1521-1523). HCSO policy and procedure also require that "[a]ny inmate thought to be at risk of detoxification problems shall be placed under medically directed supervision immediately,"

and that medical staff "shall decide the proper housing location of any inmate thought to be at risk of detoxification problems." (HCSO Procedure E.7 "Detoxification of Inmates," Doc. 103, PageID#2810).

Thus, for all the reasons stated above, NaphCare gives its LPNs at HCDC discretion to deny further follow-up evaluation or care to prisoners who have not been diagnosed or assessed by a properly licensed medical provider.

Defendant NaphCare also failed to train and supervise LPNs to execute the responsibilities they were expected to perform at their jobs. Nurses hired by NaphCare go through an orientation and a shadowing period. (Spiers Tr., Doc. 87, PageID#1964; Rice Tr., Doc. 86, PageID#1697). At the time of Mr. Marti's death, Delphine Rice had only worked at HCDC for a month. (Rice IA Tr., Doc. 109-1, PageID#3041-3042). She had not yet completed NaphCare University training modules when she was assigned to manage the jail's intake area by herself. (Perdikakis Tr., Doc. 85, PageID#1599).

In all, Defendant NaphCare has failed to train and supervise its LPNs to follow the NaphCare nursing protocols, to follow documentation procedures, to consult with advanced practitioners when necessary, when and how to prioritize patients for immediate attention or referral, when to reject incoming prisoners at intake, and to rule out medical causes of abnormal behavior before making a mental health diagnosis, and generally, to not act outside the scope of their licensure by making diagnoses at all. NaphCare practices and unwritten policies instead permit, and even depend, on NaphCare LPNs at HCDC to diagnose, exceeding the scopes of their licenses. This is especially true with regard to potentially intoxicated prisoners, determining housing for prisoners in medical, mental health, or other units, and/or for prisoners at intake who should be evaluated by an advanced practitioner and/or declined for admission to the jail.

## I.      Defendant Rice Learns of Marti's Head Injury and Admits Him to the Jail

Cincinnati police officers responded to a call regarding an individual who was knocking on the door of an apartment that was not his. There, Cincinnati Police Officers Guy Abrams and Linda Borowicz found fifty-eight-year-old grandfather Renato Marti on the landing of the apartment building. Mr. Marti was taken into custody by Abrams and Borowicz around 3:58AM on November 19, 2017 and transported to HCDC. Mr. Marti appeared confused and possibly intoxicated, but he greeted the officers by smiling and saying "Hi, how are you doing?" (Borowicz Body Worn Camera, Doc. 100, filed conventionally, 3:00-3:05). Unbeknownst to Abrams and Borowicz, Mr. Marti's apartment was in the same complex, in the building next door. Mr. Marti was arrested for Disorderly Conduct and complied with being handcuffed by the officers, who noticed he had problems with balance when he was escorted down the stairs. (Borowicz Tr., Doc. 76, PageID#294; Abrams Tr., Doc. 77, PageID#376).

As she opened the door of the cruiser to escort Marti into the jail, Officer Borowicz exclaimed "You know what, he looks like he has a big cut on his head!" (Cruiser Cam Video, Doc. 100, filed conventionally, 39:05-39:19). She thought perhaps Mr. Marti had been injured in a fall. (*Id.*; Borowicz Tr., Doc. 76, PageID#283). Officers Abrams and Borowicz led Mr. Marti into HCDC, where they knew a medical professional would be available in the booking area to examine Mr. Marti and to determine whether he could be safely admitted to the jail. Borowicz and Abrams remained at the jail through the intake process and were available to take Mr. Marti to the hospital if medical staff refused his admission to the jail. (Borowicz Tr., Doc. 76, PageID#317-318)

Mr. Marti was escorted by HCDC staff to the search wall. Security footage at the search wall shows Mr. Marti standing unsteadily and losing his balance. (Intake Booking Video, Doc. 100, conventionally filed, 4:58AM-5:10AM) HCDC Deputy Michael Crawford attempted to conduct the Initial Intake Health Screening Form, a tool used by intake deputies to screen for

serious and urgent medical needs, including "recent head trauma", "open cuts/wounds," and observations of disorientation, apparent intoxication, and obvious pain. (Marti Inmate Jacket, Doc. 82, PageID#2779). HCSO policy provides that if the answers to any of the questions on the form is "Yes," then the corrections staff "shall notify the medical staff immediately" and may only continue with the intake process "[i]f the medical staff decides the arrestee does not need immediate medical treatment[.]" (HCSO H..2. Medical Screening of Inmates at Intake, Doc. 102-2, PageID#2794). Deputy Crawford called over Deputy Hernandez, who spoke Spanish, and attempted to perform the health screening form with Marti in Spanish. (Crawford Tr., Doc. 80, PageID#742, 744). Deputies Crawford and Hernandez can be seen on surveillance video pointing at the back of Mr. Marti's head, toward his obvious wound:



*Figure 1: L-R Renato Marti, Deputy Hernandez, and Michael Crawford at the search wall.*
*CPD Officers Guy Abrams and Linda Borowicz look on in the background.*
*Screenshot from Intake Booking Video, Doc. #110-1, PageID#3067*

In keeping with HCSO policy, Crawford immediately walked toward the medical office to ask the intake nurse—Defendant LPN Delphine Rice—to examine Marti, while Deputy Hernandez continued to try to steady Mr. Marti and assist him with standing. (Intake Booking Video, Doc. 100, conventionally filed).

LPN Rice can be seen on surveillance video examining Mr. Marti's head for less than fifteen seconds. (Intake Booking Video, Doc. 100, conventionally filed, 5:02:00AM-5:03:00AM; Rice Tr., Doc. 86, PageID#1797-1798). Rice did not examine Mr. Marti's pupils or assess his ocular function. (Rice Tr., Doc. 86, PageID#1803). Mr. Marti's jail booking photo, taken immediately before Rice saw him at the search wall, shows that his pupils were not equal when he

entered the jail (Deputy Randall Spence later described his eyes as "pointing different directions."

Spence Tr., Doc. 88, PageID#2258):



*Figure 2: Booking Photo (Marti Booking Photo, Doc. 106-2, PageID#2886).*

Marti, who had cataracts and a "cloudy" appearance to his left eye, presented with unequal

pupils. Yet Rice did not test Mr. Marti for orientation to person, place, and time, nor did she take

any vital signs. (Rice Tr., Doc. 86, PageID#1803). Despite his obvious head injury, Rice did not

consult the NaphCare "Head Injury" nursing protocol or the "Abrasion/Laceration/Wound"

nursing protocol, nor did she take any of the actions listed as the appropriate "plan of care" in

either protocol. (Rice Tr., Doc. 85, 1592-1595). Rice did not contact any advanced provider about

Mr. Marti. (*Id.*) Rice made the decision that Mr. Marti would not go to the emergency room or

receive further medical attention and advised the deputies that they could continue with the intake

process. (Rice Tr., Doc. 86, PageID#1806). Instead, Rice diagnosed Marti—outside the scope of her licensure—as potentially intoxicated. (Rice Internal Affairs Tr., Doc. 109-1, PageID#3040). Rice knew Mr. Marti was not communicating normally, and presented with a "flat affect," and also diagnosed Mr. Marti—again, outside of the scope of her licensure—as "a psych patient." (*Id.*, PageID#3044-3045). But Rice also believed that he might not be communicating because he could not speak English. (*Id.*) Nonetheless, she failed to implement the intoxication nursing protocol or to initiate any medical monitoring, and took no steps to seek evaluation of any kind for Marti, including the mental health screening or a referral for a mental health assessment. (Perdikakis Tr., Doc. 85, PageID#1593; Rice Tr., Doc. 86, PageID#1776, 1826-1828). Rice never attempted to use the language translation service available to medical staff. (Rice IA Tr., Doc. 109-1, PageID#3045). She permitted him to be admitted to the jail.

Rice watched Mr. Marti get escorted to a holding cell visible through intake area doorway, and she remained in the vicinity of Mr. Marti's cell for the remainder of her shift. (Rice Tr., Doc. 86, PageID#1807). NaphCare expects that when LPNs are called to see a patient at the search wall, the LPN should document their observations even when the individual is not immediately brought to the nurse's desk to complete a Receiving Screening. (Perdikakis Tr., Doc. 85, PageID#1497-1499). (LPNs should record "pertinent information," i.e. "anything relative to why [the LPN] was called to the wall [by deputies] in the first place. We typically don't go to the wall for every patient, so there must have been a reason.") For the remaining two hours of her shift, until approximately 7:00AM, Rice did not approach Mr. Marti for further observation, did not make any notes or records about Mr. Marti or his injury, did not implement any nursing protocols, did not schedule any follow-up observations or examinations, did not notify or consult with any advanced provider or supervisor, did not contact the Medical Unit, and did not communicate with any incoming

15

medical staff during shift change about Mr. Marti or his condition. (Rice Tr., Doc. 86, PageID#1809; Perdikakis Tr., Doc. 85, PageID#1592-1595). She knew it was important to communicate between shifts at intake "who's left in the tank" and who had not been seen by medical yet. (Rice Tr., Doc. 86, PageID#1839-1840).

## II. Defendant Rice Ignores Mr. Marti's Deteriorating Condition and Head Injury

At 8:00PM, around fifteen hours after Rice admitted Mr. Marti to the jail, Deputy Kristi Mulla was escorting prisoners from intake to other housing assignments when she noticed that there was no jail folder and housing assignment for Mr. Marti. (Mulla Vol. I Tr., Doc. 82, PageID#1103). Mulla, a trained former Emergency Medical Technician ("EMT"), called fellow Deputy Randall Spence to the cell, and the two deputies attempted to talk with Mr. Marti. (*Id.*;Mulla Vol. III Tr., Doc. 84, PageID#1308) When the deputies realized Marti was not able to communicate, and was behaving abnormally, they quickly notified their shift supervisor, Sgt. Christopher Henn, who radioed for assistance to try to expedite Rice's response to the cell. (Henn Tr., Doc. 81, PageID#897). Rice responded to the cell around 8:07PM. (Rice Tr., Doc. 86, PageID#1845).

Though Defendants allege that it was Rice who initiated this second contact with Mr. Marti, all correctional staff involved in the events testified that they sought out the attention of Defendant Rice. (Henn Tr., Doc. 81, PageID#896 ("We had an officer bring the nurse over."); Mulla Vol. 1, Doc. 82, PageID#1103; Spence IA Tr., Doc. 106-1, PageID#2871). Mulla, Spence, and Henn realized that Mr. Marti had blood on the back of his head, and that his hair was noticeably matted with blood over a several-inch area at the back of his head. (Mulla IA Tr., Doc. 102-3, PageID#2800; Mulla Drawing, Doc. 103-2, PageID#2811) The correctional officers then also realized that there was blood on the wall and on the cot, which they brought to the attention of

16

Rice, who had returned to HCDC for a new shift at 7:00PM. (Henn Tr., Doc. 81, PageID# 914; Rice Tr., Doc. 86, PageID1836-1837).

Sgt. Henn described Marti as sitting "leaned forward and kind of opening and closing his eyes." (Henn Tr., Doc. 81, PageID#902). When deputies attempted to speak with Marti, it was "almost as if he didn't hear us, or he didn't understand what we were saying." (Henn Tr., Doc. 81, PageID#907). Mulla observed similarly that "[t]he nurse came over and started trying to talk to him. He still wasn't even really looking at us...He was opening his eyes, but he wasn't—it was like we weren't there." (Mulla IA Tr., Doc. 102-3, PageID#2799). Deputy Spence described Mr. Marti as "disoriented" with a "thousand-yard stare." (Spence Tr., Doc. 88, PageID#2196). Henn recognized that Marti's nonverbal presentation did not necessarily indicate refusal to cooperate, but rather that he may have been "unable . . . to give any response." (Henn Tr., Doc. 81, PageID#901).

In response, Rice did not physically inspect Marti's head injury. (Mulla IA Tr., Doc. 102-3, PageID#2801-2802). She also did not take any vitals, including blood pressure, pulse, or pupil examination. (Rice IA Tr., Doc. 109-1, 3047-3048; Rice Tr., Doc. 86, 1848). Rice knew Marti was not intoxicated by this point. (Rice IA Tr., Doc. 109-1, 3047-3048). She recognized that Marti had a change in mental status, was less mobile, and still non-communicative. (Rice Tr., Doc. 86, PageID#1859). Rice told the officers that she had seen Mr. Marti "last night when he came in" on third shift and further reported a new diagnosis she apparently had reached, beyond the scope of her LPN license, telling them "he's psych...he's good." (Mulla IA Tr., Doc. 102-3, PageID#2800). Deputy Mulla, who was responsible for moving prisoners to cell assignments made by medical staff, took this to mean that Nurse Rice had already completed an initial assessment and mental health screening on Mr. Marti, which she later learned was not the case. (Mulla IA Tr., Doc. 102-

17

3, PageID#2801). Rice did not complete a Receiving Screening on Mr. Marti at this second opportunity to do so. (Rice Tr., Doc. 86, PageID#1848). The deputies, having seen while Rice was present that Mr. Marti was shaky on his feet and not able to walk, retrieved a wheelchair and placed him in it. (Spence Tr., Doc. 88, PageID#2212-2213; Rice Tr., Doc. 86, PageID#1847). Rice then walked away without providing any direction to the deputies regarding Marti or that he should be housed "in psych." (Mulla Tr. Vol. 2, Doc. 83, PageID#1215, 1217). Establishing the obviousness of Mr. Marti's serious medical needs, Deputies Mulla, Spence, and Henn decided, after Rice left, they were not satisfied with the lack of attention Rice had shown to Marti, and they wanted to seek a "second opinion" from another nurse. (Mulla Tr. Vol. 2, Doc. 83, PageID#1211-1212; Mulla Tr. Vol. 3, Doc. 84, PageID#1247; Spence Tr., Doc. 88, PageID#2197.) Mulla "wasn't comfortable with the way [Rice] responded." (Mulla Tr. Vol. 2, Doc. 83, PageID#1211). Sgt. Henn wanted to be certain that the deputies took Marti to the medical unit: "I advised them, via the radio, on their way, to make sure they went to medical before they went anywhere else with Mr. Marti." (Henn Tr., Doc. 81, PageID#897).

### III. Defendant Spiers Fails to Report or Record His Encounter with Mr. Marti

Mulla, Spence, and another deputy arrived at the Medical Unit with Mr. Marti around 8:15PM. Mulla saw that Defendant LPN Spiers was the only medical staff on the unit and told Spiers that she "[had] a guy with dried blood on his head" who "is not acting right." (Mulla Tr., Doc. 82, PageID#1206-1207). LPN Spiers looked at Marti's eyes and said "yeah, they are kind of sluggish to react." (Mulla IA Tr., Doc. 102-3, PageID#2800). Spiers brought Marti into an exam room. Because Marti was squeezing his eyes shut, Spiers manually forced them open. (Mulla IA Tr., Doc. 102-3, PageID#2800-2801). He looked at Marti's eyes and told deputies that while Marti had cataracts in one eye, the other eye was reactive to light. (Mulla IA Tr., Doc. 102-3, PageID#2801). Spiers cleaned the back of Marti's head. The back of his head had an identifiable

round wound, appearing "bruised or [..] discolored a lot" with several scabs on his head. (Mulla Tr. Vol. 3, Doc. 84, PageID#1260-1261). Marti did not respond or speak throughout the encounter. In fact, the only noise Mr. Marti made was "moaning and groaning" the entire time Spiers cleaned his head, which appeared to be indications of pain. (Mulla Tr. Vol. 3, Doc. 84, PageID#1262). Mulla observed a "puddle" of blood dripping from Mr. Marti's head. (*Id.*) Spiers ended the encounter by reporting his diagnosis of Marti, which was beyond the scope of his LPN license, telling the officers, "This is probably behavioral. Just go ahead and take him down to psych." (Mulla Tr., Doc. 82, PageID#1029).

Spiers did not take vitals, including blood pressure, which is an important indicator of internal bleeding. (Spiers Tr., Doc. 87, PageID#2079; Raore Rep., Doc. 112-5, PageID#3127). Spiers did not offer or administer any pain medication or provide any bandages or gauze to cover Marti's wound. (Spiers Tr., Doc. 87, PageID#2076). He did not schedule any follow-up appointments, perform any follow-up observations, communicate to any other medical staff the need for follow-up observations, or take any action to ensure that Marti was medically monitored despite his obviously abnormal condition. (*Id.;* Perdikakis Tr., Doc. 85, PageID#1595). Spiers did not conduct a mental health screening. (Spiers Tr., Doc. 87, PageID#2079). Spiers did not reference or initiate the Head Injury nursing protocol or the Abrasion/Laceration/Wound nursing protocol, nor did he take the steps identified as part of an appropriate plan of care in either of those protocols. (Spiers Tr., Doc. 87, PageID#2076; Perdikakis Tr., PageID#1595). Spiers knew that no medical or mental health providers were staffed to the Mental Health Unit when he cleared Marti to be housed there, and it would cause further delay in Marti accessing further medical treatment. (Spiers, Doc. 87, PageID#1958, 2084).

Deputy Mulla, who had an "uneasy" feeling about the situation, returned to the intake area and saw Marti's jail folder had no medical stamp, which was routinely placed on folders when a Receiving Screening had been completed. (Mulla Tr. Vol. 3, Doc. 84, PageID#1283-1284). Upon this discovery, Mulla "called Jason [Spiers] and [] told him, 'I guess [Rice] didn't do an initial assessment down here. That's why nothing was charted. But she stated she saw him. She knew about the head injury and said he was psych." (Mulla IA Tr., Doc. 102-3, PageID#2802). Spiers did nothing with this information—he did not communicate with Rice, or any medical staff in intake, at any time during his shift, about Mr. Marti's condition. (Rice Tr., Doc. 86, PageID#1860). Spiers did not inquire about Marti's prolonged time in intake. He did not take any action to ensure that Marti's initial assessment was completed, or to inquire about changes in Marti's physical or mental condition since he entered the jail. (*Id.*)

### IV.  Marti Continues to Deteriorate and Dies Due to Delay in Evaluation and Care.

Deputies Christopher Speer and Doug Besl were assigned to third shift in the Mental Health Unit from 11:00PM on November 19, 2017 to 7:00AM on November 20, 2017. Because it was a Sunday night, there was no mental health nursing staff on the unit. (Speer Tr., Doc. 89, PageID#2315; Besl Tr., Doc. 78, PageID#431). While correctional deputies in the Mental Health Unit perform rounds every thirty minutes, those rounds consist of a "quick check" to ensure no one is harming themselves or in "obvious distress." (Besl, Doc. 78, PageID#450). Deputies in the Mental Health Unit can reasonably expect that individuals moved into the unit have been seen by medical staff. (Speer Tr., Doc. 89, PageID#2322). Deputies receive a roster created by medical staff of individuals on detoxification monitoring or other special observation, like suicide watch, and medical staff come on to the unit to perform "detox checks." (Speer, Doc. 89, PageID##2337, 2351; Besl, Doc. 78, PageID#432-433).

Because alcohol withdrawal "is very quick in its onset and can be pretty lethal," Speer knew that prisoners going through detoxification are often housed in the medical unit. (Speer, Doc. 89, PageID#2398). If a person on detoxification protocol was moved to the Mental Health Unit, Speer was accustomed to getting "a heads up" from medical staff to "observe [a prisoner's] behavior" with instructions to "call [medical] immediately" to report any changes in the person's condition. (*Id.*) No such communication happened between Defendants Rice and Spiers and Mental Health Unit deputies regarding Mr. Marti. Knowing these risks, Deputy Speer would have watched Mr. Marti more closely had he received instruction from medical staff to do so. (Speer Tr., Doc. 89, PageID#2401 ("If someone had said, hey, this guy is withdrawing from alcohol, you bet I'd have been much more adamant about 'hey, I want to check this guy every 20 minutes or something like that, just to make sure.")) The deputies were also accustomed to being notified by medical staff if prisoners on the unit were being monitored for head injuries, and witnessed medical staff coming on to the unit to perform neuro checks, including pupil checks and verbal assessments, on prisoners with head injuries. (Besl Tr., Doc. 78, PageID#434). No such notification concerning any of the diagnoses by Rice and Spiers were made to correctional staff on the Mental Health Unit, and so no observation was initiated for Mr. Marti.

Besl and Speer learned at shift change from other deputies that Mr. Marti was "acting a little strange." (Speer Tr., Doc. 89, PageID#2361). They had not had previous interaction with Mr. Marti, Besl, Doc. 78, PageID#446-447, and received no notification from medical staff that Marti needed any kind of special monitoring. (Speer Tr., Doc. 89, PageID#2399). At the beginning of third shift, Mr. Marti was standing at the door of his cell and occasionally pushing on it, until about 1:00AM. (Speer Tr., Doc. 89, PageID#2328,2362; Besl Tr., Doc. 78, PageID#471). Besl saw Marti "[j]ust standing at the door and looking out in to the pod" on several of his rounds. (Besl Tr., Doc.

78, PageID#471). After that, Speer and Besl observed Marti sitting up on his bed, then eventually laying down by around 3:00AM. (Speer Tr., Doc. 89, PageID#2328; Besl Tr., Doc. 78, PageID#437). Besl noted at that time that Marti "was laying in an awkward position" but he saw that Mr. Marti "was breathing adequately" so did not suspect a medical emergency. (Besl Tr., Doc. 78, PageID#476-477).

Speer observed that Mr. Marti was still breathing as he completed a round between 4:35AM and 4:45AM. (Speer Tr., Doc. 89, PageID#2404). A little after 5:00 AM, Besl began another round, and noticed that Mr. Marti was still in the same position, but this time noticed he did not appear to be breathing. Besl called out to Mr. Marti and shined his flashlight into the cell to try to rouse him. He received no response and so he entered the cell he nudged Mr. Marti with his foot, and realized that his ankle was stiff and Mr. Marti was not breathing. Besl immediately got the attention of Deputy Speer in the control room. Besl radioed out the code for an unresponsive prisoner at 5:26AM. (Speer Tr., Doc. 89, PageID#466-467). LPNs Spiers and Lindsey Boal responded to begin CPR, but it was too late. First responders were unable to resuscitate Mr. Marti, and ceased life-saving measures at 6:06AM. (Death Record and Coroner's Report, Coroner's Subpoena Response, Doc. 111-2, PageID#3074).

Mr. Marti's autopsy showed that his cause of death was skull fracture, epidural hemorrhage, subdural hemorrhage, and contrecoup cerebral contusions. (Coroner's Subpoena Response, Doc. 111-2, PageID#3076). Had Mr. Marti been provided with evaluation and care at any point up to and including the time when he was banging on the door in the early morning hours of November 20—just hours before his death—he likely would have survived. In fact, had he been evaluated and provided with care by a qualified provider even up until the time of Spiers' encounter with Mr. Marti in the medical unit, Mr. Marti likely would have survived with full recovery. (Raore

Rep., Doc. 112-5, PageID#3127-3139). Because Mr. Marti was provided with no attention, his previously mild traumatic injury became a sever traumatic injury, and the delay and failure to provide care caused his death. (*Id.* at PageID#3128-3129).

### V. Defendant Spiers Falsified Records and Failed to Report to Investigators.

Spiers was later interviewed by HCSO internal investigators at the jail at 8:16AM the morning of Mr. Marti's death. (Spiers Tr., Doc. 87, PageID#2075). After recounting the emergency response to Mr. Marti's cell, Spiers was asked whether there was "anything else that you think we might need to know, or that we didn't ask you that you thought we might ask you?" (Spiers IA Tr.; Doc. 104-1, PageID#2820). Spiers had not disclosed to Sgt. Burke at this point that he had, in fact, seen Mr. Marti the night before, and knew that Mr. Marti had presented to him with a bloody head injury. Spiers responded to the question about what else they might need to know, not by disclosing this information but instead saying, "Not that I can think of." Spiers told investigators he knew "nothing" about Mr. Marti's medical history until he was specifically asked whether he had treated Mr. Marti since he got to the jail. (Spiers IA Tr.; Doc. 104-1, PageID#2821). Finally, Spiers admitted to investigators, "I saw him last night. Corrections brought him up just to have him checked out." He told investigators Mr. Marti had "[n]o complaints" and "was alert." He told investigators he did a "quick assessment" and a neuro exam before telling the corrections officers Marti "was good to go." (Spiers IA Tr.; Doc. 104-1, PageID#2821). Spiers omitted his knowledge of Mr. Marti's head injury, mobility issues and inability to ambulate, and nonverbal presentation. 2079).

At 8:51AM,[2] *after* Marti's death and *after* his interview with HCSO investigators, Defendant LPN Jason Spiers made a late entry progress note into Mr. Marti's TechCare medical chart. (Spiers Tr. Dep. PageID#2093; Ex. 37, 2017 Marti Medical Records). It was the first record or documentation of any kind made by NaphCare staff since Mr. Marti had entered the jail more than 24 hours earlier. "Inmate assessed. Pt alert and oriented x3 with no complaints or apparent distress. PEARLA. Pt was forcing eyes closed when told by corrections to open eyes. When inmate open eyes to this nurse, he responded appropriately." The progress note failed to include any mention of the wound on Mr. Marti's head, or that Spiers had observed the wound during the encounter. It failed to include any mention that Mr. Marti did not ambulate into the medical unit and was brought in a wheelchair. It did not note that Mr. Marti remained nonverbal throughout the encounter, and instead falsified in his entry that Marti was oriented, alert, and in no distress, and responded appropriately.

## VI. NaphCare Fails to Adequately Investigate Marti's Death.

On November 21, 2017, the day after Mr. Marti's death, intake supervisor Sgt. Donald Pierce emailed HSA Perdikakis, asking if "there [was] any way possible to move Nurse Delphine Rice to a location other than Intake," and relayed officer concerns that Rice was not fully examining entering prisoners. (Ex. 64, Nov. 21 Emails ("I have had several officers tell me she just glances and says they are fine to come.") Perdikakis responded, "I think it is reckless and offensive that you would imply in any way that [Rice] is responsible for the death of that inmate, especially in an email that is able to be pulled at any time by the parties involved. We have no idea how that inmate died at this point so to blame on nurse is highly premature." (*Id.*) Yet in the months

---

[2] The Late Entry note is timestamped at 7:51AM Central Standard Time. Defendants' counsel represented that this is due to the records being produced by NaphCare headquarters in Alabama, which is in the Central time zone. Jason Spiers confirmed that this record was made at 8:51AM Eastern Time. (Spiers Tr. Dep. PageID#2092-2093)

following Marti's death, neither Delphine Rice nor Jason Spiers was *ever* interviewed by NaphCare about their interactions with Marti. (Rice IA Tr., Doc. 109-1, PageID#3050-3051). Neither Rice nor Spiers was ever asked to participate in or cooperate with any investigation by NaphCare into Mr. Marti's death. (Spiers Tr., Doc. 87, PageID#2108-2110). Spiers was never interviewed by NaphCare or any of his supervisors about Marti's death, nor did he have any conversations with HSA Perdikakis about Marti's death other than to notify her that it occurred. (*Id.*) In the Physician Death Summary created pursuant to NaphCare's "Inmate Death" policy, NaphCare's reviewing physician relied only on Spiers' falsified note in TechCare to determine that Marti was "evaluated by an LPN by talking with and observing this Inmate acting normally." (Ex. GB005782-89, Dec. 20, 2017 Mortality Review). The Summary concluded that cause of death "is nearly impossible to determine at this time from the facts documented."  (*Id.*) The reviewing physician made the following recommendations:

1)  Assess all inmates with accurate and timely documentation
2)  Reassessment of all inmates with abnormal findings promptly
3)  Educate staff that not all abnormal behaviors are strictly psychiatric in nature

The physician found that the circumstances of Mr. Marti's death could have been prevented by "full assessments of the newly incarcerated" and "medical evaluation first of any behavior thought to be abnormal to rule out a medical cause of behavior change." (*Id.*)

Despite these failures leading to Marti's death, Spiers never received any discipline, reprimand, or even verbal counseling from NaphCare supervisors about the deficiencies in care and multiple oversights leading to the delay in care for Mr. Marti. (Perdikakis Tr., Doc. 85, PageID#1591). Rice was never disciplined for her conduct in relation to Renato Marti either. (Perdikakis Tr., Doc. 85, PageID#1599). Rice was ultimately terminated from NaphCare due to performance deficiencies in June 2018, after incurring repeated written reprimands and disciplinary warnings relating to sub-par patient care. (Ex. 58, Delphine Rice Discharge Notice).

# ARGUMENT

## I.    Summary Judgment Standard

Summary judgment is appropriate when the evidence, "taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law." *Hartman v. Great Seneca Fin. Corp.*, 569 F.3d 606, 611 (6th Cir. 2009). See Fed. R. Civ. P. 56(a). "[T]he federal courts have a strong preference for trials on the merits." *Clark v. Johnston*, 413 F.App'x 804, 819 (6th Cir. 2011), citing *Shepard Claims Serv. v. William Darrah & Assocs.*, 796 F.2d 190, 193 (6th Cir. 1986).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Courts should refrain from making determinations of fact on summary judgment. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.  In this case, there are significant and genuine disputes of material fact regarding all of Plaintiff's claims, and for that reason, summary judgment must be denied.

## II.    Plaintiff's Claims Against Defendants Rice and Spiers Must Proceed to Trial.

Defendants Rice and Spiers' unconstitutional actions caused Renato Marti's injuries, and ultimately, his death. Disputed facts underlie all of Plaintiff's claims, and for this reason, this case must proceed to trial.

### A.  Plaintiff Has Presented Genuine Disputes of Material Fact as to Whether Defendants Rice and Spiers Violated Renato Marti's Constitutional Rights.

Defendants Rice and Spiers violated Renato Marti's constitutional rights when they denied him adequate medical treatment. In an attempt to avoid trial, Defendants argue that Plaintiff's constitutional claims fail because neither Defendant Rice nor Spiers subjectively believed Mr.

Marti was suffering from a serious medical need and thus did not act with deliberate indifference. However, Defendants fail to accept the facts in Plaintiff's favor, and misstate the Sixth Circuit standard for such claims. Plaintiff has produced evidence demonstrating Mr. Marti's serious medical needs, and evidence demonstrating that Defendants Rice and Spiers displayed deliberate indifference to those serious medical needs, in violation of Plaintiff's constitutional rights.

As a preliminary matter, it is worth noting that these Defendants have not moved for summary judgment on the basis that they are entitled to qualified immunity. This is because, as private employees of a private corporation, they are not entitled to any such immunity. *Harrison v. Ash*, 539 F.3d 510, 524 (6th Cir. 2008); *McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012). Thus, the *only* question is whether Plaintiff has demonstrated that there is a dispute of fact as to whether Defendants' actions violated the Constitution.

The constitutional claims in this case concern the deliberate indifference of Defendants to the medical needs of Mr. Marti, a pretrial detainee, and the resultant failure to provide him with adequate medical care. As an initial matter, Defendants state that the analysis of Plaintiff's Fourteenth Amendment Due Process claim is "identical to that owed under the Eighth Amendment." (Motion For Summary Judgment, Doc. 91, PageID#2552). This does not reflect current case law in the Sixth Circuit, and the distinction is important.

Prior to *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court had not established what standard applied to the constitutional claims of pretrial detainees. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 fn. 8 (1989) (reserving decision on the question), citing *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 243-245 (1983). It was only in the *absence* of a standard that the Court analogized to the Eighth Amendment claims of post-conviction prisoners, because as a matter of due process, pretrial detainees must be treated "at least" as well

27

as prisoners. *Revere*, 463 U.S. at 244. However, as explained in *Kingsley*, while the Eighth Amendment protects a prisoner from cruel and unusual punishments, a pretrial detainee "cannot be punished *at all*." *Kingsley*, 576 U.S. at 400 (emphasis added). Thus, the Court found that the standard applicable to a pretrial detainee's Fourteenth Amendment claim was an objective one, rather than the subjective Eighth Amendment standard. *Id*. at 397.

*Kingsley* concerned excessive force, however the Court's "clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment" demonstrated that it was "no longer tenable" to continue to apply the Eighth Amendment standard to "constitutionally distinct groups" in any context. *Brawner v. Scott County, Tenn*., 14 F.4th 585, 596 (6th Cir. 2021). Accordingly, in *Brawner*, the Sixth Circuit applied this standard for the first time to pretrial detainee medical claims. There, the Sixth Circuit held that to satisfy the objective Fourteenth Amendment standard, the defendant must have acted "recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id*. at 596, citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). This is the Second Restatement of Torts definition of civil tort recklessness and is an objective standard. *See Farmer*, 511 U.S. at 836, citing Prosser and Keeton § 34, pp. 213-214; Restatement (Second) of Torts § 500 (1965). This standard has been in use for more than fifty years and was adopted, for example, by the state of Ohio to define civil tort recklessness more than thirty years ago. *Thompson v. McNeill*, 53 Ohio St.3d 182, 105-106 (1991). Thus, it is clear that this standard is not new but long established. It requires "more than negligence but less than subjective intent," *Brawner*, 14 F.4th at 596 (internal citations omitted), so Defendants' focus on lack of subjective intent to harm or punish is insufficient.

To meet Plaintiff's burden to show that the Defendants violated his constitutional right to adequate medical care, Plaintiff must demonstrate "(1) that [Marti] had an objectively serious medical need; and (2) that [the defendant's] action (or lack of action) was intentional (not accidental) and [he or she] either (a) acted intentionally to ignore [Marti's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [Marti], even though a reasonable official in [the defendant's] position would have known that the serious medical need posed an excessive risk to [Marti's] health or safety." *Id.* at 597. As explained in *Trozzi v. Lake County, Ohio*, 29 F.4th 745, 755 (6th Cir. 2022), this does allow for the "consideration of an official's actual knowledge of the relevant circumstances."

### 1. There Are Genuine Disputes of Material Fact Precluding Summary Judgment Because Plaintiff Had a Sufficiently Serious Medical Need.

Defendants do not make an explicit argument as to the first element of the claim—whether Mr. Marti had an objectively serious medical need—but because Defendants repeatedly describe Mr. Marti's injury as a "small head abrasion," it is prudent for Plaintiff to briefly address this element. Mr. Marti died due to significant head trauma, skull fracture, and subdural hemorrhage— a brain bleed. A traumatic brain injury resulting in death is indisputably a serious medical need. Where an injury or illness is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention… the plaintiff need not present verifying medical evidence." *Blackmore*, 390 F.3d at 899-900. Where the injury or illness is nonobvious, verifying medical evidence is used to demonstrate the detrimental effect of the delay in treatment. *Id.* at 898.

There is uncontroverted evidence that lay persons—including multiple correctional officers who interacted with Mr. Marti and repeatedly attempted to get him medical attention and who were concerned about the attention provided by Rice and Spiers—were able to recognize the obvious severity of Mr. Marti's condition. *See* Stmt. of Facts, §§ II-IV, *supra*. The Defendant

nurses have likewise admitted that the symptoms they observed in Mr. Marti could indicate a serious medical need. *See* Argument §§II.A.2.a-b, *infra*.

Further, or in the alternative, Plaintiff has also presented verifying medical evidence that the delay in treatment caused unnecessary or preventable harm. As explained by Plaintiff's expert neurosurgeon, Dr. Bethwel Raore, the Defendants' inaction directly resulted in Mr. Marti's death:

> The medical guidelines for the assessment and management of skull fracture, epidural hemorrhage, contrecoup cerebral contusions, and blunt impact of head clearly emphasize the great importance of early diagnosis and prompt aggressive treatment through surgical intervention. This principle has long been established. Nurse Rice's and Spiers' delay, and utter failure, in referring Mr. Marti for appropriate evaluation by a qualified medical practitioner and their failure to permit him to access treatment, caused his death.

Raore Rep., Doc. 112-5, PageID#3128. Plainly, Dr. Raore concluded that, "[h]ad Mr. Marti received appropriate treatment, he would still be alive today." (*Id.* at PageID#3129). Dr. Raore further stated that, "Mr. Marti's injuries were totally recoverable if he had been appropriately evaluated and managed at or around the time of the booking encounter by Nurse Rice, or at or around the time he was evaluated by Nurse Spiers and sent to the mental health unit, or at any point in time in between. Likewise, Mr. Marti more likely than not would have survived if he had been evaluated and treated at the time he was banging on the cell in the early morning hours of November 20." (Raore Report, Doc. 112-5, PageID#3127). As a result, whether his condition is treated as obvious or nonobvious, Plaintiff has demonstrated a triable issue of fact that must go to a jury because there is evidence that the delay caused unnecessary or preventable harm to Mr. Marti. This evidence is more than sufficient to demonstrate that Mr. Marti's medical need was objectively serious, and provides further context for the flagrant disregard of risk to his life by the Defendants.

2. **There Are Genuine Disputes of Material Fact Precluding Summary Judgment Because Plaintiff Has Presented Evidence that Defendants Rice and Spiers Acted with Deliberate Indifference.**

The question here is whether Plaintiff has presented evidence that a jury could rely on to find that Defendants "recklessly failed to act reasonably to mitigate" a risk that "a reasonable official… would have known." *Brawner*, 14 F.4th at 597; *Greene*, 22 F.4th at 609. Defendants Rice and Spiers argue they are entitled to summary judgment because (a) they provided adequate attention to Mr. Marti in light of their "mistaken" understanding of his condition and (b) they claim they lacked subjective intent to "ignore" or "punish" him. However, their analysis both misstates the evidentiary standard required to show deliberate indifference and fails to take the facts in the light most favorable to Plaintiff.

It was obvious to any reasonable person, and should have been to any reasonable nurse, that Mr. Marti was suffering from an untreated head injury and had a serious medical need. (Mulla IA Tr., Doc. 102-3, PageID#2801) ("There was no real initial assessment, which means [Rice] saw him on the search wall and accepted him regardless of the head wound. . .[Marti] should have been refused from the jump. He shouldn't have been admitted to the jail.") Defendants disregard key evidence of their knowledge of the risks associated with Marti's untreated head injury and the objective evidence of Marti's serious and deteriorating condition captured on video and in witness testimony.

a. *Defendant Rice Acted with Deliberate Indifference.*

Defendants argue that Rice was not deliberately indifferent because there is "[n]o evidence that she had any ill will or hatred towards Mr. Marti" and "[n]othing about her conduct was tantamount to punishment that unnecessarily and wantonly inflicted pain on Mr. Marti." (Motion

For Summary Judgment, Doc. 91, PageID#2558). But this is not the standard Plaintiff is required to meet.

Plaintiff has provided ample evidence to meet the applicable standard—that Rice "acted recklessly in the face of an unjustifiably high risk that [was] either known or so obvious that it should [have been] known to a reasonable official in the [Rice's] position." Defendant Rice failed to mitigate obvious risks to Mr. Marti of serious injury or death on multiple occasions and "failed to confirm that [Marti's] symptoms were not indicative of a different and more serious condition." *Howell v. NaphCare, Inc.*, No. 1:19-CV-373, 2022 WL 740928, at *7 (S.D. Ohio Mar. 11, 2022). Rice was aware of and had the following information about the risks:

- Rice was aware that internal bleeding, subdural hemorrhage, traumatic brain injuries, and certain other head injuries are serious medical conditions. Rice Tr.., Doc. 86, PageID#1725-1726.

- Rice knew Marti had dried blood and an abrasion on his scalp. *Id.* at PageID#1798-1799.

- Rice knew it is important to search for the source and cause of bleeding. Rice IA Tr.

- Rice observed Mr. Marti having balance problems at the search wall and knew he was not walking stably. Rice Tr., Doc. 86, PageID#1802; 1898.

- Rice knew that a neurological check is an important test to observe whether a person is suffering from a head injury. *Id.* at PageID#1858.

- Rice was familiar with Glascow Coma Scale (GCS) and that it involves measuring ability of the patient to follow commands, the patient's balance, and whether the patient has dilated or fixed pupils. *Id.* at PageID#1745-1746.

- Rice knew pupil inequality and reactivity was an important thing to observe as part of a neurological check, and that proper procedure for checking pupils involved shining a penlight into the eyes. Rice knew she had a penlight accessible to her to perform a pupil check and did not use it on Mr. Marti. Rice *Id.* at PageID#1857.

- Rice knew that taking a person's blood pressure can determine if the patient is suffering from subdural hemorrhage or internal bleeding. *Id.* at PageID#1856.

- Rice knew that internal injuries could be more extensive than what can be observed externally, particularly in the case of internal bleeding. *Id.* at PageID#1750.

- Rice knew CT scans are used to assess head injury, but could not be performed at the jail. A person in need of a CT would need to go to a hospital or offsite provider. *Id.* at PageID#1743-1744.

- Rice knew that to successfully observe the patient's orientation to person, place, and time that verbal communication or speech was required. *Id.* at PageID#1748.

- Rice knew she could not identify the cause of Marti's non-verbal presentation. *Id.* at PageID#1816; *Id.* at PageID#1896-1897.

- Rice knew she could not rule out that Mr. Marti had speech difficulties or slurred speech indicating a severe medical condition. *Id.* at PageID#1803.

- Rice knew that Marti was put in the "drunk tank" without even receiving wound care for the obvious bloody injury on his head or a plan for monitoring his condition.  *Id.* at PageID#1708, 1696.

- Rice agreed it was "probable" that she was supposed to record the objective observation portion of a person's TechCare file even if that individual was taken to a "drunk tank" cell. Rice Tr., Doc. 86, PageID#1827

- Rice knew Mr. Marti's condition had deteriorated and that he had a change in mental status when she saw him again around 7:15pm on November 19, 2017, and that he was having more problems with mobility and balance. Rice Tr., Doc. 86, PageID#1850, 1859.

- When Rice saw Marti at 7:15pm, new drops of blood were visible in the area where Mr. Marti's head laid. Spence Tr., Doc. 88, PageID# 2216.

- Rice knew that after 15 hours in a holding cell, Marti should not be exhibiting signs of intoxication. Rice Tr., Doc. 86, PageID#1838.

- Rice knew that if a person is verbally non-communicative it could be a sign of severe intoxication. *Id.* at PageID#1805.

- Rice knew that individuals showing signs of severe intoxication needed to be placed on Detoxification protocols. *Id.* at PageID#1703-1709.

- Rice knew severe intoxication, alcohol poisoning, or detoxification can cause death or rapid degeneration of a person's health. *Id.* at PageID#1705.

- Rice knew that individuals at risk for alcohol withdrawal are supposed to be placed under constant observation by medical staff. *Id.* at PageID#1708.

- Rice was aware that individuals who came into the jail and reported having been in a car accident were to be refused admission to the jail categorically and immediately sent to the emergency room. *Id.* at PageID#1737.

- Rice knew that the cause of an injury is important to know in order to evaluate the severity of an injury. *Id.* at PageID#1749.

- Rice knew she could not rule out that Marti had been in a car accident or that he had been assaulted. *Id*. at PageID#1811-1812.

- Rice knew that if Marti was sent to the mental health unit at night, there was no provider to see him. Rice Tr., Doc. 86, PageID#1849-1850.

Defendants rely on *Howell v. NaphCare* to support the proposition that Rice's subjective belief about Mr. Marti's condition, "mistaken or not," insulates Rice from liability. (Motion For Summary Judgment, Doc. 91, PageID#2562). Defendants argue that Rice had a subjective understanding that Marti was having a "psychiatric episode," and that Rice "tended to what [she] believed was Mr. Marti's psychiatric episode." (Motion For Summary Judgment, Doc. 91, PageID#2562-2563). First, the record does not reflect that this was, in fact, Rice's subjective belief at the time she encountered Marti. Second, the relevant inquiry focuses not simply on what Rice alleges she believed, but also on what Rice *should* have known to constitute an excessive risk, and on what inferences can be drawn concerning her subjective knowledge of the risk based on information in the record. *Trozzi v. Lake County, Ohio*, 29 F.4th 745, 755 (6th Cir. 2022) (looking "to what the particular officer actually knew to gauge what a reasonable officer would have understood about the detainee's condition.") Third, even if Rice did (improperly and beyond the scope of her license) diagnose a "psychiatric episode," she failed to act in any way to secure care or treatment for that condition, or any other medical issue, and provided less than constitutionally adequate care.

Rice was never interviewed by NaphCare following Marti's death, was never asked to provide a statement about her interactions with Marti and did not make *any* contemporaneous records regarding her true subjective understanding of Marti's condition. In the months and years following Mr. Marti's death, Rice has provided testimony and statements clearly indicating that while she perceived several distinct possible causes for Marti's condition, she took no action to

determine the actual source of his symptoms but proceeded to diagnose Marti—beyond the scope of her licensure—as "mental health" without assessment or consult.

Rice was interviewed by HCSO investigator Sgt. Lee approximately five months after Marti's death. During that interview, Rice stated when she first saw Marti, she noticed his head injury and dried blood, though she did not attempt to locate the source of the blood. (Delphine Rice IA Transcript, Doc. 109-1, Page ID#3055). Marti "just seemed impaired. There was a language barrier. And possibly mental health was my opinion." (Rice IA Transcript, Doc. 109-1, Page ID#2981). She also told Sgt. Lee, "I didn't smell anything or anything, but he just appeared to be intoxicated." (*Id.*) She further stated that she could not determine why Marti was not responding to verbal communication but perhaps there was a language barrier and that Marti did not speak English. (He did.) She told Sgt. Lee, "I don't know if [Marti had trouble communicating] because he was intoxicated or the language barrier, because sometimes when someone doesn't understand English they'll just look at you." (Rice IA Transcript, Doc. 109-1, Page ID#3044-3045). She also told Sgt. Lee she believed that Mr. Marti had a "psych or mental issue" interfering with his ability to speak. (He did not.)

When Rice saw Marti for the second time, around 8:00PM, she noted that Marti's condition had not improved, and he was still not speaking or moving around the cell, and his head injury had continued to bleed. (Rice IA Transcript, Doc. 109-1, Page ID#2990). Rice did not perform the Mental Health Assessment She again ascribed his condition to a cultural issue rather than a medical one: "that's where the culture or language barrier may have played a part where, you know, he just didn't speak." *Id.* The fact that his serious medical need was not improving is sufficient for a jury to find that her failure to seek medical assistance was reckless. *Greene*, 22 F.4th at 611 (defendant knew detainee's condition "had not improved"). It was not reasonable for Rice to "provide

treatment pursuant to a diagnosis consistent with [Marti's] symptoms" because Rice, an LPN, could not diagnose Marti, had not ruled out any of the many possible causes of his abnormal behavior, did not consult an advanced provider about his worsening condition, and did not take any steps to ensure Marti received care for any of the causes she identified.

Defendants attempt to turn an objective symptom of Mr. Marti's traumatic brain injury—his inability to communicate verbally—into a reason that Defendants Rice and Spiers were justified in denying him care. (Motion For Summary Judgment, Doc. 91, PageID#2555) (arguing that Marti did not present a serious medical need because he "never complained of pain," "never complained of a headache," and "never stated he was unable to walk.") Defendants now raise for the first time an argument that Rice subjectively believed Mr. Marti was exerting his constitutional right to remain silent. (Motion For Summary Judgment, Doc. 91, PageID#2557). It is notable that Rice never, in her communications with deputies on November 19, 2017, or in her interview with HCSO, state that she believed Mr. Marti was "refusing" to speak, and admitted as much in her deposition. (Rice Tr., Doc. 86, PageID#1895-1896). ("I didn't necessarily say he refused, but he never answered. He was nonverbal…He just didn't answer. I can't say what the reason was…") She was also aware that speech difficulty and nonverbal presentation are symptoms of abnormal mental status.

NaphCare has protocols for head injury and wounds, as well as intake procedures for individuals suspected to need alcohol detoxification or mental health assessment. While there is evidence, examined more closely in Section III.B, *infra* that Defendant NaphCare practices and unwritten policies treat the use of nursing protocols as voluntary, Defendant Rice was aware that nursing protocols provide guidance for LPNs on how to proceed with certain medical issues and how to stay within their scope of practice. TechCare nursing protocols are also interactive and

provide alerts to LPNs if abnormal findings are entered into the chart: for instance, had Rice taken Marti's blood pressure and gotten abnormal results, TechCare would have automatically alerted her to take an action—like reporting to a provider—in order to address the abnormal finding. (Perdikakis Tr., Doc. 85, PageID#1417). Though a nurse's failure to follow nursing protocol is not alone dispositive evidence of deliberate indifference, the protocols reflect the knowledge base an LPN is expected to have and actions a reasonable LPN is expected to take. For instance, NaphCare expects its LPNs to know that head injuries can be fatal even if there is no open or obvious wound. (Perdikakis Tr., Doc. 85, PageID#1546-1547). Medical staff at the jail are expected to use the Glasgow Coma Scale (GCS) "if they even suspect a head injury." (Perdikakis Tr., Doc. 85, PageID# 1564). Nurse Rice did not initiate any NaphCare nursing protocols, implement any plan of action contained within those protocols, or give Mr. Marti access to a qualified provider who could provide him with the proper evaluation and treatment.

Despite her claim that she believed Marti to be intoxicated when she saw him at the search wall, Rice never implemented an alcohol withdrawal or detoxification plan of care or enter any information about Marti's suspected alcohol use in TechCare, which would have triggered close and constant monitoring of Mr. Marti's condition. Rice was aware that failing to implement a proper plan of care for detoxification could lead to death. (Rice Tr., Doc. 86, PageID#1704-1705). In fact, NaphCare supervisors gave written warnings to Rice on November 7 and November 10, 2017—within two weeks prior to Mr. Marti's entry to the jail—because she failed to accurately chart and implement proper detoxification procedures. (Ex. 64, Nov. 21 Emails; Ex. 65 Perdikakis Emails to Rice). Perdikakis warned Rice that if she did not check the correct box in a patient's TechCare chart to indicate an individual's recent alcohol use, that individual would not be placed on detox. (Ex. 65, Perdikakis Emails to Rice). Even just two weeks after Mr. Marti's death,

Rice had to be warned again that failing to document alcohol use history was "very dangerous." (*Id.*) Rice nonetheless never accessed TechCare during Marti's time at the jail, and never took any other step to implement monitoring of Marti's condition. (Ex. GB005827 Marti Chart Access).

Rice performed no wound care on Mr. Marti, and allowed him to be placed in a holding cell after a brief superficial examination of Marti's head injury and without performing proper sanitization and dressing of the wound on his head. Defendants now, for the first time and without any evidentiary support, raise the *ex post facto* justification that Defendant Rice did not evaluate Marti because she faced a "safety risk" by performing an adequate medical intake at the search wall. Video from the search wall shows plainly that Mr. Marti was never aggressive in any way, and that he was well under the control of the two or more jail deputies and two Cincinnati Police Department officers who stood within a few feet of him at all times during the intake process. Further, there is evidence that other nurses at the jail, when called to the search wall for bleeding and lacerations, "render care immediately right there," (Spence Tr., Doc. 88, PageID#2169-2170), send the individual to the medical unit for attention as soon as the individual is patted down, or choose to send the individual to the hospital. Mulla Vol 3. All of these options were available to Rice, yet she chose none of them. When she was called to see Mr. Marti fifteen hours later, Rice again failed to provide any physical examination of the injury, including palpation and inspection for fractures or other non-superficial injuries, despite being in a secured cell with multiple deputies. (Mulla Tr., PageID#1201-1202; Henn Doc. 81, PageID#922-923).

The fundamental role of the LPN, as described by NaphCare's own Health Services Director, is to make observations and report to an advanced provider. Rice abdicated this responsibility in all measurable ways. As an LPN, Rice had *no* latitude to diagnose Mr. Marti and substitute her own "plan of care"—which was, effectively, withholding care from Mr. Marti. She

failed to take vital signs at either encounter with Marti, and even after realizing that Mr. Marti was losing mobility, she did not check Marti's eyes or test his reflexes and gait—all of which are prescribed by NaphCare's Head Injury protocol. (Ex. 36, Head Injury Protocol). Instead, she told correctional staff, "He's good, he's psych."

Defendants allege that Rice acted reasonably because she directed correctional officers to take Marti to medical. However, this fact is in dispute: Deputy Mulla and Sgt. Henn testified that it was not Rice who sent Marti to medical to see Spiers, but instead the correctional officers, who talked amongst themselves and decided Mr. Marti needed further medical evaluation. It was the correctional officers, not Rice, who decided that Marti needed to go to the Medical Unit before being taken to the Mental Health Unit, where he would not be seen by a medical provider. (Mulla Tr. Vol. 2, Doc. 83, PageID#1211-1212; Mulla Tr. Vol. 3, Doc. 84, PageID#1247; Spence Tr., Doc. 88, PageID#2197; Henn Tr., Doc. 81, PageID#895-897, 916).

In *Greene v. Crawford County*, the Sixth Circuit denied summary judgment against a correctional supervisor who knew that a very ill prisoner "had yet to receive any basic medical attention" but still "did nothing to make sure that [the prisoner] had not taken a turn for the worse." *Greene*, 22 F.4th at 611. Even after Marti was taken up to the medical unit, Rice took none of the following steps, which she knew were expected of her by NaphCare training and policy and as reasonable steps to avoid further delay in care:

- To add information to Marti's medical records, including her objective observations from both encounters; Rice Tr., Doc. 86, PageID#1827
- To contact providers in the medical unit to report what she had observed—including Mr. Marti's deteriorating condition over time;
- To contact any advanced provider to report the observations she made during her two encounters with Mr. Marti and to get instruction for a proper plan of care

Rice's purported "treatment" of Mr. Marti, including glancing at his head wound for less than fifteen seconds, and the disputed claim that she—finally, over thirteen hours later—directed

officers to bring Mr. Marti to the medical unit, are easily "so woefully inadequate as to amount to no treatment at all" in the face of such severe symptoms. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). The Sixth Circuit has recognized that "[a]t a certain point, bare minimum observation ceases to be constitutionally adequate," *Greene*, 22 F.4th at 609, and that point is appropriately left "for the jury to determine." *Id.*

Rice's knowledge of known risks is subject to credibility challenges and a jury must be permitted to assess her testimony against the significant evidence from other witnesses and sources. Plaintiff has demonstrated a dispute of material fact as to whether Defendant Rice subjectively perceived the risk to Mr. Marti and disregarded that risk when she provided such a woefully inadequate response. Summary judgment on Plaintiff's constitutional claim against Rice must be denied.

### b. *Defendant Spiers Acted with Deliberate Indifference.*

Defendants also argue that Spiers was not deliberately indifferent because he did not subjectively perceive Mr. Marti to have a serious medical need when he encountered Marti on November 19, 2017. (Motion For Summary Judgment, Doc. 91, PageID#2559). Defendants argue that Spiers, like Rice—implicitly acknowledging his improper, beyond-licensure diagnosis—"concluded that Marti was experiencing a psychiatric episode, not a serious head injury." *Id.* at 27. There is a genuine dispute of fact as to whether Defendant Spiers acted with deliberate indifference to Marti's serious medical needs. Summary judgment on Plaintiff's constitutional claim must be denied. Spiers had knowledge of the risks:

- Spiers knew that NaphCare had a nursing protocol for head injury. Spiers Tr., Doc. 87, PageID#2000.

- Spiers knew that he was supposed to use a nursing protocol if there was one that applied to the patient's complaints. *Id.* at PageID#2001.

- Spiers knew he could make referrals to other providers. *Id.* at PageID#1998.

- Spiers knew he had access—and did access—Marti's records in TechCare from a 2014 incarceration. *Id*. at PageID#2070.

- Spiers knew that he should document "visual signs of distress and pain." *Id*. at PageID#2095.

- Spiers knew that a traumatic brain injury could cause a person to deteriorate to the point of death within 24 hours. *Id*. at PageID#2019-2020.

- Spiers knew internal bleeding may not be visible from a visual assessment. *Id*. at PageID#2123.

- Spiers knew that the cause and onset time of a head injury were important to understanding the severity of the injury. *Id*. at PageID#2086.

- Spiers knew that Marti had been in intake for a "long period of time." Spiers Tr., Doc. 87, PageID#2077-2078.

- Spiers knew Mr. Marti may be experiencing pain from a bleeding head wound. *Id*. at PageID#2095.

- Spiers knew that a person fails a neurological exam if their pupils are not the same size, if they are not able to move their extremities, or if the person is not reactive to light or overreactive to light. *Id*. at PageID#2021.

- Spiers knew that speech difficulty is a symptom of skull fracture. *Id*. at PageID#1986.

- Spiers knew that a person may be experiencing a serious medical condition despite not making any verbal complaints. *Id*. at PageID#2080.

- Spiers knew that acting confused or disoriented is a symptom of serious brain injury. *Id*. at PageID#1989.

- Spiers knew that problems with standing and balance could be the symptom of a serious brain injury. *Id*.

- Spiers knew that a person exhibiting light sensitivity with suspected skull fracture could be experiencing a serious medical condition. *Id*. at PageID#1986.

- Spiers knew that clenching the eyes shut is a sign of light sensitivity. *Id*. at PageID#2062.

- Spiers knew that abnormal blood pressure could be a sign of brain bleeding. *Id*. at PageID#2012-2013.

- Spiers knew brain damage could lead to physical and cognitive loss of function, loss of quality of life, and extreme discomfort and pain. *Id*. at PageID#1987.

- Spiers knew that a person with mild to moderate brain injury at increased risk of death required medical staff intervention to provide care. *Id*. at PageID#2027-2028.

- Spiers knew that failure to intervene to provide medical care to a person detoxifying increases the person's risk of death. *Id*. at PageID#2027.

41

- Spiers knew that there was no medical staff on the Mental Health Unit on the night he sent Marti there, and knew Marti would not see a mental health provider until the next day. *Id*. at PageID#2084.

- Spiers knew that he did not seek or receive informed consent from Mr. Marti, and Spiers testified that "based on the knowledge [he] had at that time" he did not seek informed consent from Mr. Marti because he was providing "emergency care of a patient who doesn't have the capacity to understand." *Id*. at PageID#2101-2102.

- Spiers knew that Mr. Marti was not competent to provide informed consent to treatment. *Id*. at PageID#2100-2101.

- Spiers knew that the officers who presented Mr. Marti to the medical unit did so because "there was something about his mental state that was concerning to them." *Id*. at PageID#2104.

- Spiers knew that someone with a normal mental state would be "alert, oriented, and able to converse." *Id*.

- Spiers knew it was unreasonable for medical staff to permit unreasonable delays before a patient could obtain necessary diagnostic work or treatment for serious health needs. *Id*. at PageID#1977.

- Spiers reviewed the Emergency Medical Report completed after Mr. Marti was found unresponsive. Knowing it omitted the injury he had previously found on Mr. Marti's head, Spiers signed the form without correction. *Id*. at PageID#2098-2099.

Spiers testified that he diagnosed Marti as not needing "a doctor's attention" because "[Marti] was able to look at me, follow some basic directions" and because "his head was not actively bleeding at that point." Spiers Dep. 175.

But Spiers' version of the facts do not comport with other witnesses' testimony of the encounter. Mulla described Spiers' interaction with Marti: "Jason tried to talk to him and interact with him. He still wasn't responding, wouldn't speak, wouldn't answer any questions, barely would look at you when you talked to him. He almost looked like a sleepy toddler or something, like trying to hold his eyes open." (Mulla Tr. Vol. 3, Doc. 84, PageID#1257; Mulla Tr., Vol. 3, Doc. 84, PageID#1270) Spiers pried Marti's eyes opens with his hands because Marti was clenching them shut, Spiers Tr., Doc. 87, PageID#2062—a sign, Spiers knew, that Marti may be experiencing light sensitivity and/or pain associated with a brain injury. Mulla watched Spiers

clean the dried blood from Marti's head using a clear liquid, which was running onto the floor and forming a "pink or red" puddle on the floor behind him. (Mulla Tr. Vol. 3, Doc. 84, PageID#1257-1258). Spiers used no bandaging or wound dressing on Mr. Marti's head. (*Id*., PageID#1259).

Defendants repeatedly argue that Spiers was not deliberately indifferent because he "performed a neuro check" by testing that the person's eyes are equal and reactive to light, that they are able to move all extremities, and that "their neurological function is intact." (Spiers Tr., Doc. 87, at PageID#2006-2007) However, the evidence, including expert testimony of Dr. Lawrence Mendel, shows that Spiers' interactions with Marti did not constitute a properly conducted neurological check, and it was impossible for Marti to pass the test. (Mendel Report, Doc. 112-3, PageID#3103, 3106). Mr. Marti remained seated in the wheelchair for the entire time he was in Spiers' presence, and Spiers did not test Marti's gait or ability to ambulate. Mulla Dep. Mr. Marti's pupils were visibly uneven upon his entry to the jail, and his pupils were also unequal due to cataracts in one eye. Spiers initially told deputies that Marti's eyes were "kind of sluggish to react." (Mulla IA Tr., Doc. 102-3, PageID#2800). Spiers knew that Marti had "cataracts in one eye, and the other eye is reacting fine"—a finding completely at odds with Defendants' claim that Spiers found Marti's pupils equal and reactive to light. (Motion For Summary Judgment, Doc. 91, PageID#2563). Spiers' late entry note stated that Marti was "aox3" or oriented to person, place, and time. Spiers could not have possibly made this determination, because Marti did not verbalize any response. (Mendel Report, Doc. 112-3, PageID#3106; Perdikakis Tr., Doc. 85, PageID#1601-1602 (A nonverbal person may be "alert" but "it would be difficult to say [a nonverbal person] is oriented.") (Mulla IA Tr., Doc. 102-3, PageID#2800; Mulla Tr. Vol. 3, Doc. 84, PageID#1259-1260). For example, in order to assess whether a person is oriented to time, the individual must indicate that they know the date, or what year it is. (Boal Tr., Doc.96, PageID#2609) Yet Spiers

43

claimed he was able to determine that Marti "was alert and oriented despite [Marti] not telling [Spiers] he knew where he was or why he was there." (Spiers Tr., Doc. 87, at PageID#2068).

Had he used the Head Injury protocol, Ex. 36, Spiers would have received instruction to call an advanced provider due to Marti's altered mental status, and to re-assess Mr. Marti in four hours. Spiers did not bandage Marti's head, did not administer any medication, and had no plan in place for treatment of Mr. Marti. (Spiers Tr., Doc. 87, PageID#2076-2077). He did not schedule any follow-up appointments with any medical or mental health provider, and had no plan to re-assess Marti's mental state in four hours. (*Id.*) He did not make any further checks on Marti that night. Instead, Spiers medically cleared Marti and instructed the deputies to take him to Mental Health housing. (Spiers Tr., Doc. 87, PageID#2073).

However, NaphCare LPNs are trained to complete mental health screening tools to guide their decisions, including as part of the receiving screening, as well as a full mental health intake screening. (Perdikakis Tr., Doc. 85, PageID#1559). It is the duty of a NaphCare nurse to rule out medical issues before housing individuals in the mental health unit. (Perdikakis Tr., Doc. 85, PageID#1558). Spiers reported accessing Mr. Marti's prior records, which would have indicated Marti had no history of "psychological episodes" or major mental health crises. (Marti Chart Access; Ex. 56, 2014 Receiving Screening), supporting the fact that Mr. Marti's condition was medical—and not psychological—in nature. Spiers nonetheless did not complete mental health screening questions or the full mental health screening, even after he discovered that no intake assessment had been completed. (Spiers Tr., Doc. 87, PageID#2070,2079). Spiers knew that the Mental Health Unit was not staffed with medical providers on the weekends, and that Marti would not have access to a mental health care provider—to confirm or discard a mental health

44

diagnosis—until the next morning, or at least twelve more hours. (Spiers Tr., Doc. 87, PageID#2084).

There are material disputes of fact concerning crucial information that Spiers claimed to rely on to conclude that Marti did not have a serious medical need and instead improperly diagnosing him with a psychological condition. Spiers also falsified and omitted key observations when he was interviewed by investigators and when he finally created documentation of his encounter with Marti, after he learned of Marti's death. These are credibility issues, and the determination of whether Spiers recklessly failed to mitigate a risk should be left to the jury. Summary judgment on Plaintiff's constitutional claim against Spiers must be denied.

### B. Plaintiff Has Presented Genuine Disputes of Material Fact as to Whether Defendants Rice and Spiers Were Medically Negligent.

Though this case addresses misconduct in a jail setting, Defendants Rice and Spiers are not entitled to any immunity from the state law claims, because they are not employees of a political subdivision. R.C. § 2744.03(A); R.C. § 2744.01(F). For this reason, the Defendants have not raised Ohio statutory immunity as a defense to Plaintiff's state law claims.

As a result, Defendants must argue that Plaintiff's medical negligence claims fail on their merits for this Court to grant summary judgment. A cause of action for negligence requires proof of (1) a duty requiring the defendant to conform to a certain standard of conduct, (2) breach of that duty, (3) a causal connection between the breach and injury, and (4) damages. *See Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984). The elements are the same for medical negligence. *Loudin v. Radiology & Imaging Servs., Inc*., 128 Ohio St.3d 555, 2011-Ohio-1817, 948 N.E.2d 944, ¶ 13. The standard of care applicable to medical professionals is to exercise the degree of care that a medical professional of ordinary skill, care, and diligence would exercise under similar circumstances. *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio

St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 29, citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976), at paragraph one of the syllabus. In a negligence action involving the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and, that the nurse's negligence, if any, was the proximate cause of the patient's injury. *Ramage v. Cent. Ohio Emergency Serv., Inc*., 64 Ohio St.3d 97, 592 N.E.2d 828 (1992), paragraph one of the syllabus. Because Defendant nurses Rice and Spiers negligently breached their duty of care to Mr. Marti, they are liable for his resulting death, and Plaintiff's claims must be allowed to proceed to a jury.

For the reasons outlined above in Sections II.A.2.*a-b*, the conduct of Defendants Rice and Spiers was at least negligent, resulting in Marti's death from an untreated brain injury. Defendants recast Spiers' cleaning of Mr. Marti's wound as an "additional precautionary step," but removing dried blood from the wound, without dressing it or applying antibiotics, did not even meet the baseline standard of care. (Ex. 57, Abrasion Laceration Wound Nursing Protocol). Rice and Spiers both deviated from the applicable standards of care in several ways, including failure to make contemporaneous recording of medical assessments, failure to use appropriate nursing protocols, failure to enact proper monitoring protocols, failure to consult advanced providers, and failure to rule out a medical cause of Mr. Marti's obviously abnormal behavior. (Mendel Report, Doc, 112-3, PageID#3103-3106; Raore Rep., Doc. 112-5, PageID#3128). There is a material dispute of fact as to what actions Defendants Rice and Speaks took, or failed to take, and whether their actions fell below the standard of care. Defendants' Motion for Summary Judgment must be denied with respect to Plaintiff's state law claims.

### III. Defendant NaphCare is Liable for Renato Marti's Injuries Under the U.S. Constitution and Ohio Law.

Defendant NaphCare is liable for the torts of its employees under Ohio law and is liable for the constitutional violations of its employees, pursuant to *Monell v. Dept. of Social Serv.*, 436 U.S. 658 (1978), because NaphCare's policies, customs, and practices were the moving force behind the constitutional violations Renato Marti suffered.

#### A. Defendant NaphCare is Liable for the Medical Negligence of its Employees

Defendant NaphCare is a private corporation and not a municipality, and thus is not entitled to immunity under Ohio law. Therefore, the usual rules of *respondeat superior* apply. Under Ohio law, it is well-established that an employer is liable for the tort of the employee so long as the employee is acting within the scope of employment. *Osborne v. Lyles*, 63 Ohio St.3d 326, 329 (1992). Defendants have made no argument that Defendants Rice and Spiers were not acting in the scope of their employment for Defendant NaphCare. Thus, as the employer of Defendants Rice and Spiers, Defendant NaphCare is liable for their tortious actions. For this reason, it is clear that as Plaintiff's state law claims against the individual NaphCare Defendants must survive summary judgment, likewise, the claim against Defendant NaphCare survives as well. Defendants have not argued otherwise.

However, Defendant NaphCare is also liable for its own tortious breach of duty. Under Ohio law, negligent training and supervision claims generally require proof of the following elements: (1) the existence of an employment relationship; (2) the employee was unfit or incompetent to perform the work for which she was expected to perform; (3) the employer knew or should have known that the employee was unfit and/or incompetent; (4) the employee's act or omission caused the plaintiff injury; and (5) the employer's negligence in supervising or training the employee was the proximate cause of the plaintiff's injuries. *Aycox v. Columbus Bd. Of Educ.*,

10th Dist. Franklin No. 03AP–1285, 2005-Ohio-69, ¶ 31; *Evans v. Ohio State Univ.*, 112 Ohio App.3d 724, 739, 680 N.E. 2d 161 (10th Dist. 1996).

The lack of fitness and incompetence of Defendants Rice and Spiers has been thoroughly documented, including their total failure to reference or complete nursing protocols, implement medical monitoring, consult with advanced providers, document and report their observations of Mr. Marti, and practicing outside the scope of their licensure by making errant diagnoses and denying treatment and care. These actions, and failures to act, were all outside the standard of care. (Mendel Report, Doc. 112-3, PageID#3103-3106). Further, Plaintiff has presented facts on which a jury could find that Defendant NaphCare negligently trained and supervised its staff. The first element, the employment relationship, is undisputed. The second and fourth elements, regarding each employee's incompetence and tortious harm to Plaintiff, is satisfied for all the reasons the state law claims against the individual Defendant nurses survive. The third and fifth elements concern Defendant NaphCare's knowledge and proximate cause. These are satisfied for all the reasons Defendant NaphCare will be liable under Monell, including but not limited to NaphCare's practice of routinely allowing and relying upon LPNs to use discretion, diagnose, and implement their own plan of care—or withholding of care—beyond the scope of their practice under Ohio law. Because Defendant NaphCare's policies and practices caused Marti's suffering and death, and because NaphCare failed to properly train and supervise its employees, summary judgment must be denied.

### B. Defendant NaphCare is Liable Under *Monell*.

Defendant NaphCare is liable for its policies and practices where they cause constitutional violations. To establish municipal liability under 42 U.S.C. § 1983 and *Monell*, Plaintiff must demonstrate that NaphCare's policy, custom, or procedure was the moving force behind the constitutional violations. *City of Canton v. Harris*, 489 U.S. 378 (1989); *Broyles v. Corr. Med.*

*Servs., Inc.*, No. 08-1638, 2009 WL 3154241, at *2 (6th Cir. Jan. 23, 2009), citing *Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008). *Street v. Corrections Corp. of Am.*, 102 F.3d 810, 817-818 (6th Cir. 1996), extended the holding in *Monell* to include private corporations who perform actions like those of a municipal or state government. Defendant NaphCare's responsibility to provide health services to patients in HCDC "is sufficient to trigger its potential § 1983 liability as a state actor." *MacConnell v. NaphCare, Inc.*, No. 3:13-cv-00034, 2013 WL 5236616, *3 (S.D. Ohio Sept. 17, 2013).

There are four general methods of proving a municipality's illegal policy or custom: the plaintiff may prove "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019), citing *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). The first two methods of demonstrating municipal liability are based on a policy itself being unconstitutional. The latter two are based on a failure to act that is deliberately indifferent to the rights of persons who come into contact with officials. *See North v. Cuyahoga County*, 754 F.App'x 380, 384 fn. 2 (6th Cir. 2018), citing *Garner v. Memphis Police Dept.*, 8 F.3d 358, 365-366 (6th Cir. 1993) (noting that the deliberate indifference test is used to analyze failure-to-train claims but not affirmative policy or custom claims).

Moving force causation is a question of fact for the jury. *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988); *Oklahoma v. Tuttle*, 471 U.S. 808, 833 n.9 (1985) (Brennan, J., concurring); *Powers v. Hamilton Cnty. Public Defender*, 501 F.3d 592, 608 (6th Cir. 2007).

Because Plaintiff's constitutional rights were violated and those violations occurred as a result of Defendant NaphCare's policies, practices, and customs, summary judgment must be denied.

### 1. Defendant NaphCare's Unwritten but Official Policies and Practices Caused Violations of Renato Marti's Constitutional Rights

"[T]o satisfy the *Monell* requirements a plaintiff must identify the policy, connect the policy to the [municipality] itself, and show that the particular injury was incurred because of the execution of that policy." *Jackson*, 925 F.3d at 829 (internal quotation omitted). However, a municipality "may be liable under *Monell* for a policy of permitting constitutional violations regardless of whether the policy is written." *Id.* at 830. "[C]ustoms, in contrast to official policies, do not receive 'formal approval,'" and instead are "'persistent and widespread . . . practices of . .. officials.'" *Monell*, 436 U.S. at 690-691; *Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010). "[P]olicy or custom does not have to be written law; it can be created 'by those whose edicts or acts may fairly be said to represent official policy.'" *Id.* "Congress included customs and usages" in 1983 because "[a]lthough not authorized by written law, such practices ... could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691, quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970). When liability is based on the policy itself, deliberate indifference is not necessary. *North*, 754 F.App'x at, 384 fn.2, citing Garner, 8 F.3d at 365-366.

Defendants argue that "[t]here is simply no evidence that NaphCare's training, policies, customs, protocols, or procedures led to the alleged constitutional deprivation." (Motion For Summary Judgment, Doc. 91, PageID#2567). The record reflects ample evidence that NaphCare policies, practices, and customs at HCDC led to Marti's death, including: failure to implement or consult nursing protocols, failure to contemporaneously record medical assessments and communicate about patient status amongst medical staff, failure to initiate medical observations,

failure to consult advanced providers, and LPNs routinely practicing, and diagnosing, outside the scope of their licensure. The practice and unwritten policies at HCDC of allowing LPNs to "use their own discretion in regard to assessing medical conditions and deciding when to consult doctors" and allowing LPNs to "evaluate patients without use of nursing protocols or guidance from advanced level providers" presented a highly foreseeable risk that people with serious medical conditions would be improperly diagnosed by LPNs, and experience unreasonable and unjustifiable delays in care. (Mendel Report, Doc. 112-3, PageID#3110). These practices are persistent in the jail and approved by NaphCare. NaphCare was aware of the persistent pattern of its LPNs failing to properly screen and document patient medical issues and was on notice that the practices of its LPNs could result in constitutionally deficient medical care. For instance, the Head Injury nursing protocol requires the LPN to record vital signs, and NaphCare nursing protocol training directs LPNs to "complete the form in its entirety, including vital signs." (PageID#2047). Spiers testified that he would not necessarily need to take vital signs even if he were presented with an individual who was "confused, disoriented, and present[ing] with a head injury" or "confused, disoriented, []with a bleeding head wound, and [] not able to speak." Spiers Tr., Doc. 87, PageID#2013-2014. Spiers testified that "[a]fter [an] evaluation, I will see what the protocol could do for them. If it's not going to do anything beneficial, I wouldn't do one for them," Spiers Tr., Doc. 87, PageID#2041, essentially deciding on a plan of care for a patient without recording observations or consulting an advanced provider. Health Services Administrator Perdikakis testified that it is within the discretion of an LPN whether to begin or forego the Head Injury protocol, even when an individual presents with "a goose egg on [their] head" or gash with blood on their head. Perdikakis Tr., Doc. 85, PageID#1482-1484. NaphCare was aware of, and endorsed these practices by LPNs. This practice creates a substantial and unjustifiable risk that individuals

with serious medical conditions, who need emergency medical help or the attention of an advanced provider, will be denied access to care, as Mr. Marti was.

Additionally, it was "very common" practice at the jail for individuals suspected of—or improperly diagnosed by LPNs to be experiencing—intoxication to be moved to a holding cell before they were adequately screened for medical issues, including those suspected of severe intoxication. Rice 189; Crawford 37-38; Spence 42-43. While corrections staff often chose to put people "in the tank" to sleep off intoxication, NaphCare staff had a duty to ensure that individuals were appropriately screened and that any obstruction to a prisoner's health needs was addressed with security staff. NaphCare policy states that gathering and documenting alcohol use history "[u]pon entry to the institution" is an "integral part" of the intake and booking process to ensure people at risk of withdrawal and/ or in need of detoxification are appropriately identified, managed, and monitored. (Ex. 50, Intoxication, Detoxification, and Withdrawal Policy). Both NaphCare and HCSO policy acknowledge the extreme risk of improperly monitored detoxification and withdrawal. (*Id.*; Ex. 42, HCSO Detoxification Policy ("[U]nsupervised detoxification by inmates can be a life-threatening condition" and thus requires immediate medical assessment to determine the proper protocol)).  Again, the practice of medical staff at HCDC does not reflect adherence to written policy, as LPNs at the jail are not expected to do more than "make rounds" at their discretion, to "check on" a person placed in holding cell due to exhibiting signs of intoxication, (Perdikakis Tr., Doc. 85, PageID#1524-1525), and Rice did not even take those precautions. In the case of Mr. Marti, though, Defendants improperly diagnosed him as intoxicated, screening and monitoring did not happen, and his erroneous placement in the intake cell as "drunk" without any follow up led to an unjustifiable and fatal delay in providing him emergency medical treatment.

The failure of NaphCare LPNs to use nursing protocols and document patient encounters created an unjustifiable and unmitigated risk of danger to patients. Timely documentation helps to "establish[] a baseline record for sequential comparison," "ensures that pertinent information has been obtained," allows for sharing of records and continuity of care with other providers, and helps direct appropriate treatment, including consulting advanced clinical providers. (Mendel Report, Doc. 112-3, PageID#3109). Particularly because the TechCare system is interactive and responsive to the entry of information like vital signs and symptoms, and can provide real-time feedback and direction to LPNs, the practice of timely and accurate entry of information into TechCare, whether by completion of screenings, assessments, protocols, or progress notes, is a crucial way to mitigate risk to patients in the jail. LPNs at the jail routinely used discretion in choosing not to make records of patient visits and complaints, as was the case with Marti.

NaphCare also had a practice and/or unwritten policy within the jail of allowing LPNs to operate in a supervisory capacity, despite the licensing prohibition on LPNs supervising nursing practice. Rice, who had only been at NaphCare for a month when Marti arrived at the jail, was supervised on multiple shifts by Jason Spiers, including the shifts during which she had patient encounters with Marti. Rice Tr., Doc. 86, PageID#1904. The night Mr. Marti died, Rice believed that Marti was sent upstairs to see a "supervisor[] in medical"—Jason Spiers. Rice Tr., Doc. 86, PageID#1904. She referred questions about prisoner medical issues to Spiers even though Spiers was not an advanced provider permitted to supervise nursing practice. This compounded Rice's lack of training and required created a substantial risk of LPNs—both Spiers and Rice—to practice beyond the scope of their licensure. The night of Mr. Marti's death, Rice was staffed alone in the jail's intake area, and Jason Spiers was the only medical staff member available when the deputies sought care for Mr. Marti. Neither LPN attempted to communicate with the other about Marti's

condition, and Spiers, with knowledge of the errors made by Rice in intake, deferred to the errant diagnosis of another LPN—a decision which a properly licensed, authorized medical care provider would not have made. (Mendel Report, Doc. 112-3, PageID#3105, 3106, 3110; Raore Rep. 7). NaphCare permitted LPNs to operate in a supervisory capacity "in the face of an unjustifiably high risk of harm that [was] either known or so obvious that it should be known." *Brawner*, 14 F.4th at 596.

*Monell* liability also lies where a Plaintiff presents by presenting evidence of "tolerance, acquiescence, or ratification of unconstitutional conduct by officials with final decision-making authority." *Meirs v. Ottawa Cnty.*, 821 F. App'x 445, 451 (6th Cir. 2020). "[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, [the municipality has] retained the authority to measure the official's conduct for conformance with their policies." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.* In other words, when the final policymaker reviews the employee's discretionary actions, he measures those actions against the municipality's official policies. If he approves the employee's actions and does not discipline or reprimand the employee, his approval is final and demonstrates that the employee followed official policy. In a ratification case, therefore, the municipality's liability is not based on the policymaker's ex post facto approval of the employee's actions. Rather, it is based on the municipality's existing policy, which the employee followed in carrying out his actions. The official's ratification merely confirmed that the employee was acting according to official policy.

Defendants do not dispute that the actions of Rice and Spiers, as pertaining to decisions they made regarding nursing protocols, documentation, and Mr. Marti's care, were consistent with

NaphCare policies, practices, and customs at HCDC.  NaphCare performed a review of Marti's death pursuant to the investigation protocol described in the "Patient Death" policy. (Ex. 62 Policy Manual; Dec. 20, 2017 Mortality Meeting Minutes). The Physician Death Summary was completed by the NaphCare medical director at HCDC, Dr. Curtis Everson. Though the Death Summary contained findings by Dr. Everson indicating that there were preventive health measures and recommendations for modification in protocol, procedure or approach which could be taken following Marti's death, NaphCare did not discipline Rice or Spiers in relation to their encounters with Mr. Marti. HSA Perdikakis, in deposition testimony, deferred to the judgment of Rice and Spiers because they acted based on what they thought was appropriate at the time. (Perdikakis Tr., Doc. 85, PageID#1596).  Further, no LPNs reported having been to any meetings where Mr. Marti or the treatment he received at the jail was a topic of discussion, or discussing Mr. Marti with supervisors, or receiving acknowledgment of Mr. Marti's death in the jail and how it could have been prevented. Spiers Tr., Doc. 87, PageID#2109; Boal Tr., Doc. 98, PageID#2749.

Plaintiff has presented sufficient evidence for a jury to find in Plaintiff's favor, and summary judgment on Plaintiff's Monell claim against NaphCare should be denied.

### 2. Defendant NaphCare's Policy and Practice of Inadequate Training and Supervision Caused the Constitutional Violations Renato Marti Suffered.

"To succeed on a failure to train or supervise claim, the plaintiff must prove that: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "When determining whether a municipality has adequately trained its employees, 'the focus must be on adequacy of the training program in relation to the tasks the

particular officers must perform." Jackson, 925 F.3d at 834 (quoting City of Canton, 489 U.S. at 390).

Defendants argue only that the deliberate indifference standard is not met because there is no evidence of a pattern of repeated constitutional violations. (Motion For Summary Judgment, Doc. 91, PageID#2568-2569). However, while there is evidence of a pattern here, demonstrating a pattern is not necessary for Plaintiff to prevail. While the deliberate indifference prong can be met "where the [entity] fails to act in response to repeated complaints of constitutional violations by its officers," (*Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)), this element is also met by showing that the municipality failed "to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." *Ellis*, 455 F.3d at 700-701. As already explained by the Sixth Circuit, it "is predictable that placing an LPN nurse lacking the specific tools to handle the situations she will inevitably confront in the jail setting will lead to violation of the constitutional rights of inmates." *Shadrick v. Hopkins County, Ky.*, 805 F.3d 724, 740 (6th Cir. 2015).

As in *Shadrick*, Defendant NaphCare relies on LPNs, who do not have the authority or training to diagnose medical conditions and puts those LPNs in a position where they are "routinely confronted with frequent and competing demands for medical care arising from the needs of numerous inmates suffering from maladies of varying severity." *Id.* The intake area of a jail, in particular, "is unpredictable and requires a wide range of assessment skills, attention to detail, and sound judgment." (Mendel Report, Doc. 112-3, PageID#3107). Due to the limitations of LPN knowledge, training, and scope of practice, "it is easily foreseeable that mistakes will be made, and adverse outcomes will occur" if an LPN assigned to intake lacks "substantial correctional

experience and understands the scope of practice and how to seek advice and consultation if abnormal findings are encountered[.]" (*Id.*)

On November 19, 2017, Rice was assigned to work in intake alone, despite NaphCare's knowledge that she engaged in inadequate and dangerous documentation practices, had previously failed to initiate monitoring procedures, and despite being poorly trained to safely perform this position. NaphCare training for LPNs has only two components: an on-site shadowing component and a series of corporate training modules done by computer, called NaphCare University. (Perdikakis Tr., Doc. 85, PageID#1461). Rice did not complete NaphCare University training prior to being placed in intake by herself, to manage crucial patient assessments. (Perdikakis Tr., Doc. 85, PageID#1599). Prior to her November 19, 2017 shift, and pursuant to NaphCare's training regimen, Rice had only completed three shifts, or 36 hours, of shadowing with another LPN. (Rice, Doc. 86, PageID#1698,1740). Thus, Rice had only been exposed to "case by case" situations at the intake area and was not properly trained on possible dangerous scenarios, including the removal of individuals from intake to "sleep it off" without adequate medical screening and observation, or how to make admissions decisions at the search wall when a patient is nonverbal, or how to rule out medical causes of abnormal behavior. *Id.*, PageID#1508-1509,1698. Rice testified that individuals who came into the jail and appeared intoxicated would be "handle[d] by the facility," "not necessarily NaphCare[,]" and could not remember being trained on alcohol withdrawal, substance abuse, or detoxification. (Rice Tr., Doc. 86, PageID#1694-1695). She was not trained on how to assess a person's level of intoxication. (*Id.*, PageID#1705). She had also repeatedly demonstrated inadequate documentation practices and responses to allegedly intoxicated prisoners, Ex. 65, Perdikakis-Rice Emails, and correctional staff raised concerns about

her repeatedly improperly admitting prisoners to the jail. (Ex. 64, Nov. 21, 2017 Perdikakis-Sgt. Pierce Emails re Rice).

NaphCare had also failed to ensure that she comple22ted NaphCare University trainings necessary to prevent constitutionally inadequate care. In fact, it was not until the week *following* Marti's death that Rice completed the following training modules: "Nursing Protocols," "Alcohol Detox and CIWA-Ar," "Documentation," and "TechCare 101: Tutorials." (Ex. 53, Rice Training Log). Rice did not complete the highly relevant training "When to Send a Patient to the ER" until February 2018. (Ex. 51). Had she received this training prior to her assignment to the intake area and her interactions with Mr. Marti, Rice would have had extensive instruction on recognizing the risks related to admitting an individual with a head injury, stressing the importance of patient checks every thirty minutes, use of Glascow Coma Scale and how to interpret scoring to test for brain injury, and that older and intoxicated individuals are at higher risk of intracranial hemorrhage. (Rice Tr., Doc. 86, 1744-1745; *see* Raore Rep., Doc. 112-5, PageID#3123, 3127 (identifying the importance of observing these factors to identify traumatic brain injury).

At intake as well as during other medical encounters at the jail, NaphCare has chosen to allow each individual LPN to use complete discretion over whether to follow, or even reference, the NaphCare nursing protocols, and to decide unilaterally whether a patient's complaint or observed condition merits care and treatment. NaphCare's training and supervision of its LPNs in this manner resulted in both Spiers and Rice failing to reference or utilize protocols which would have dictated that these LPNs seek guidance from an advanced clinical provider, which would have saved Marti's life. (Raore Rep., Doc. 112-5, PageID#3128). Likewise, NaphCare's training and supervision of its LPNs in this manner resulted in both Spiers and Rice making improper diagnoses for Marti, beyond the scope of their licenses.

In *Shadrick*, this reliance on LPNs, while both failing to train LPNs to stay in their scope of practice while responding to demands for medical care, and giving LPNs the discretion to choose whether to follow protocols, was found to reflect "deliberate indifference to the 'highly predicable consequence,' namely, violations of constitutional rights" because it was "so highly predicable that a poorly trained LPN nurse working in the jail setting 'utter[ly] lack[s] an ability to cope with constitutional situations'." *Shadrick*, 805 F.3d at 742, citing *Connick v. Thompson*, 563 U.S. 51, 67 (2011). For the same reasons, NaphCare's conduct demonstrates deliberate indifference here. Defendants do not argue otherwise, instead relying only on the absence of a pattern. Because there is a genuine dispute of material fact as to whether Defendant NaphCare's training and supervision of its nurses was inadequate to the tasks the nurses were required to perform while working at HCDC, summary judgment on Plaintiff's *Monell* claim against NaphCare must be denied.

### IV. Plaintiff is Entitled to Punitive Damages.

Finally, Defendants argue that Plaintiff is not entitled to punitive damages. An award of punitive damages under Ohio law requires something "more than mere negligence." *Preston v. Murty*, 32 Ohio St. 3d 334, 335, 512 N.E.2d 1174 (1987). To impose punitive damages, Plaintiff must demonstrate that Defendants Rice and Spiers either acted with "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Id.* at 336. For the same reasons a jury could find that Defendants Rice and Spiers acted with deliberate indifference, a jury could find that they were aware that their acts had a great probability of causing substantial harm to Marti and that they consciously disregarded his rights and safety. In fact, punitive damages, as a form of relief, "are generally consistent with § 1983 claims." *Lane v. Wexford Health Sources*, No. 2:10-cv-389, 2010 WL 5069849, *2 (S.D. Ohio

Dec. 6, 2010), citing *Telepo v. Martin*, 257 F.R.D. 76, 77 (M.D.Pa.2009). However, Ohio's standard for punitive damages is not as demanding as the constitutional claims. Ohio has found that recklessness satisfies the standard for punitive damages. *See Villella v. Waikem Motors*, 45 Ohio St.3d 36, 37, 543 N.E.2d 464 (1989) ("actual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross"), modified on other grounds by *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 635 N.E.2d 331 (1994). Notably, recklessness in Ohio law is an objective standard of recklessness and does not require subjective knowledge of the risk. *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 34. Thus, Plaintiff has established facts necessary to pursue punitive damages.

In addition, Plaintiff is entitled to punitive damages because a jury could find that Defendants acted with callous indifference to a federally protected right. *Smith v. Wade*, 461 U.S. 30, 56 (1983). For these reasons, summary judgment must be denied and Plaintiff must be allowed to take the issue punitive damages to trial.

## CONCLUSION

For all the reasons stated above, Plaintiff asks this Court to deny Defendants' Motion for Summary Judgment in its entirety and to permit this case to proceed to trial.

60

Respectfully submitted,

*/s/ Rebecca P. Salley*
Jacqueline Greene (0092733)
Rebecca P. Salley (0097269)
Alphonse A. Gerhardstein (0032053)
FRIEDMAN GILBERT + GERHARDSTEIN
441 Vine Street, Suite 3400
Cincinnati, Ohio 45202
T: (513) 572-4200
F: (216) 621-0427
jacqueline@FGGfirm.com
rebecca@FGGfirm.com
al@FGGfirm.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2022, a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Rebecca P. Salley*
Rebecca P. Salley
*One of the Attorneys for Plaintiff*