UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ESTATE OF RENATO MARTI,                         Case No. 1:19-cv-980
    Plaintiff,                                  Barrett, J.
                                                Litkovitz, M.J.

    vs.

DELPHINE NICHOLE RICE, *et al.*,                 **REPORT AND**
    Defendants.                                 **RECOMMENDATION**

       Renato Marti's estate initiated this civil rights action following his death, which occurred

while he was a pretrial detainee at the Hamilton County Justice Center (HCJC). This matter is

before the Court on the motion for summary judgment filed by defendants Delphine Rice, Jason

Spiers, and NaphCare, Inc. (Doc. 91); plaintiff's opposition (Doc. 114), as supplemented with

subsequent authority (Doc. 116); and defendants' reply (Doc. 121). Following this Court's

Order regarding the sealing of various documents (Doc. 127), plaintiff filed an unredacted copy

of its opposition. (Doc. 128-1).

**I. Factual Background**[1]

       This case concerns the alleged negligence and deliberate indifference of NaphCare and

two of its employees during an approximately 24-hour period at HCJC that ended in Mr. Marti's

death. NaphCare is a private corporation that provides medical services to HCJC inmates.

    A. <u>Arrest and first contact with Mr. Marti</u>

       On November 19, 2017, at around 3:50 a.m., Cincinnati police officers Linda Borowicz

and Guy Abrams responded to a call about an unknown man (Mr. Marti), who was knocking on

an apartment door that was not his. At that time, the officers suspected that Mr. Marti was

intoxicated, arrested him for disorderly conduct, and took him to HCJC. Mr. Marti did not resist

---

[1] The factual background is undisputed unless otherwise noted.

arrest.  Defendants state that Mr. Marti was not answering questions (Doc. 91 at PAGEID 2543), but Officer Borowicz testified that Mr. Marti responded to some of her questions appropriately and in English.  (*See* Doc. 76 at PAGEID 305).  The officers and Mr. Marti arrived at HCJC at approximately 5:00 a.m., at which point Officer Borowicz remarked that Mr. Marti had a head injury, suspecting that "he must have fell."  (Doc. 100, Ex. 26, Cruiser Cam Footage at 39:07).

Deputy Michael Crawford processed Mr. Marti at HCJC's search wall.  During this approximately 10-minute-long process, Mr. Marti appeared unstable and to be losing his balance (*See* Doc. 100, Ex. 18, Intake Booking Video at 4:54 a.m. to 5:10 a.m.).  Deputy Crawford attempted to complete an Initial Intake Health Screening Form, but Mr. Marti was not responsive.  Deputy Crawford enlisted the help of a Spanish-speaking deputy (Deputy Hernandez), who ultimately completed the screening form.  The form includes the "yes or no" questions: (1) "Recent head trauma?" and (2) "Do you have any open cuts/wounds/bite marks?" (*Id.*).  It also includes an area for the screener to circle applicable observations, including: (1) "Is the prisoner unconscious or disoriented?" and (2) "Does the prisoner appear to be intoxicated[?]" (Doc. 101-1 at PAGEID 2781).  Deputy Hernandez indicated "no" for all questions and noted no observations.

Deputy Crawford asked defendant Rice, a Licensed Practical Nurse (LPN), to examine Mr. Marti's head injury at the search wall, which she did for about 15 seconds.  (Doc. 100, Ex. 18, Intake Booking Video beginning at 5:02:20 a.m.).  Defendant Rice testified that she observed dried blood on a quarter-sized abrasion on Mr. Marti's head.  Defendant Rice also observed balance issues and lethargy, but she did not determine whether he was confused or had slurred speech, examine Mr. Marti's pupils, take vitals, or check for orientation to person place and time.

Defendant Rice concluded that Mr. Marti was likely intoxicated and decided that he did not need to go to the emergency room—indicating to deputies that they could continue the intake process. After the search wall, Mr. Marti went to a holding cell to sleep off his suspected intoxication. Defendants state that the supervising officer on duty made this decision, but Sgt. Christopher Henn's testimony does not confirm this. (*Compare* Doc. 91 at PAGEID 2545 *with* Henn Dep., Doc. 81 at PAGEID 933-34 (Sgt. Henn testified that while supervising deputies generally make this decision, he did not know who made the decision in Mr. Marti's case and that medical staff "definitely" made recommendations that officers followed)). Mr. Marti did not undergo a medical receiving screening prior to being taken to the holding cell. Defendant Rice did not document her observations, complete any nursing protocols (including those related to intoxication), contact any supervisor, or take any other actions related to Mr. Marti prior to the end of her shift, which was at 7:00 a.m. later that morning. There is no testimony or other evidence showing any actions taken by any individual toward Mr. Marti until sometime after 7:30 p.m. that evening.

B. Second contact with Mr. Marti

The parties disagree over who initiated the next contact with Mr. Marti. Defendants assert that defendant Rice initiated contact after returning on November 19, 2017 for her next 7:00 p.m. to 7:00 a.m. shift. (*See* Def. Rice Dep., Doc. 86 at PAGEID 1788, 1838). Plaintiff asserts that Deputy Kristi Mulla discovered at around 8:00 p.m. that Mr. Marti had not yet been given a housing assignment, realized Mr. Marti was not responsive, and notified fellow deputy Randal Spence and eventually their supervisor (Sgt. Henn); and only then did someone ask defendant Rice to check on Mr. Marti. (*See* Mulla Dep., Doc. 82 at PAGEID 1103; Henn Dep. Doc. 81 at PAGEID 896; Spence Interview, Doc. 106-1 at PAGEID 2871).

3

Deputies Hulla, Spence, and Sgt. Henn noticed blood in Mr. Marti's holding cell and Deputy Hulla noticed blood on his head. Mr. Marti was not agitated and did not respond verbally or with body language. "[Mr. Marti's] eyes would open and close. And [it was] almost as if he didn't hear us . . . or . . . understand what we were saying."). (Henn Dep., Doc. 81 at PAGEID 907). (*See also* Mulla Interview, Doc. 102-3 at PAGEID 2799 ("[Mr. Marti] was opening his eyes, but . . . it was like we weren't there."); Spence Dep., Doc. 88 at PAGEID 2204, referring to his internal interview, Doc. 106-1 at PAGEID 2871 ("[T]he only thing he ke[pt] doing [wa]s sporadically opening his eyes real big, trying to look around. His eyes were going in different directions like he [wa]s cross-eyed."); and PAGEID 2196 (Mr. Marti appeared "disoriented" with "a thousand-yard stare.")).

During this second interaction with Mr. Marti, defendant Rice observed but did not otherwise physically examine him or perform the receiving screening. Defendant Rice did not think that Mr. Marti was still intoxicated and noticed a change in mental status (less mobile, still non-communicative); but she did not take his vitals or check his eyes, reflexes, or gait. Defendant Rice suggested that Mr. Marti be "sent upstairs." (Def. Rice Dep., Doc. 86 at PAGEID 1788). The parties dispute what this meant. (*Compare* Doc. 86 at PAGEID 1849 ("I don't think I said mental health. . . .") *with* Mulla Interview, Doc. 102-3 at PAGEID 2800 ("[Defendant Rice] was like , yeah, he's psych. I seen him last night. You know, he's good. . . . Sergeant Henn was like, oh, no, oh, no. . . . . [W]e need to take him up to medical.")); Henn Dep., Doc. 81 at PAGEID 916 ("What I remember is [defendant Rice] . . . believed it was a mental health issue."). Several deputies felt Mr. Marti's condition warranted medical attention. (Mulla Dep. II, Doc. 83 at PAGEID 1211 (describing her discomfort with defendant Rice's response and that she and other deputies wanted a "second opinion"); Spence Dep., Doc. 88 at

PAGEID 2197 ("On the way [to the mental health unit], we made the decision to have another opinion from the medical staff and stop at the medical housing unit."); Henn Dep., Doc. 81 at PAGEID 897 ("I told [deputies] to take [Mr. Marti] to the medical department.  And I advised them, via the radio, on their way, to make sure they went to medical before they went anywhere else with Mr. Marti.").  Sheriff's deputies transported Mr. Marti to the medical unit by wheelchair.

    C. <u>Medical unit</u>

At approximately 8:15 p.m. that evening, Deputies Mulla and Spence arrived at the medical unit with Mr. Marti.  Defendant Spiers, an LPN, was the only medical staff member available at the unit.  Deputy Mulla communicated to defendant Spiers that Mr. Marti had blood on his head and was not acting right.  Defendant Spiers cleaned Mr. Marti's head wound with saline solution.  Defendant Spiers observed that Mr. Marti was clenching his eyes shut.  Mr. Marti was nonverbal throughout the encounter.  Defendant Spiers concluded that Mr. Marti had a non-serious abrasion on his head because it was not actively bleeding, and Mr. Marti could look at him and follow basic directions.  Without speaking to any other medical provider, defendant Spiers cleared Mr. Marti and told deputies to take Mr. Marti to the mental health unit.  Defendant Spiers knew that there would be no medical staff on duty in the mental health unit until the next day.  Defendant Spiers did not administer any medication to Mr. Marti, bandage his head wound, arrange follow-up care, take vitals, complete nursing protocols, or perform a mental health screening.  Defendant Spiers never communicated with Defendant Rice or any supervisor about Mr. Marti.  Shortly after his encounter with Mr. Marti, defendant Spiers learned that there was still no receiving screening in Mr. Marti's file.

    D. <u>Mental health unit</u>

Mr. Marti arrived at the mental health unit at around 8:30 p.m. that evening, where deputies Christopher Speer and Doug Besl were staffed beginning at 11:00 p.m. Because there was no indication that Mr. Marti was suicidal, he was to be checked every thirty minutes. Medical staff did not communicate to Deputies Speer and Besl how Mr. Marti had come to be housed in the mental health unit. Mr. Marti never communicated with Deputies Speer or Besl, even after Mr. Marti pushed the intercom several times to request assistance and occasionally pushed on the door. Deputies Speer and Besl noted nothing abnormal in their checks until around 3:00 a.m. the next morning, at which point Deputy Besl noted that Mr. Marti was laying in a somewhat awkward position but still breathing. The same was true at approximately 4:40 a.m. A little after 5:00 a.m., Deputy Besl noticed that Mr. Marti's position had not changed since his last round at approximately 3:00 a.m. This prompted deputy Besl to further investigate, whereupon he discovered that Mr. Marti was not breathing. Deputy Besl called an emergency code, and responders attempted to resuscitate Mr. Marti. Mr. Marti was pronounced dead at approximately 7:50 a.m. on November 20, 2017. The autopsy identified Mr. Marti's cause of death as skull fracture, epidural hemorrhage, subdural hemorrhage, and contrecoup cerebral contusions due to blunt impact of head.

After Mr. Marti was pronounced dead, and after being interviewed by internal investigators, defendant Spiers entered a late note into the medical record regarding Mr. Marti, which made no mention of Mr. Marti's head injury, nonverbal presentation, or inability to ambulate:

> Late entry, 11/19/2017-2030. Pt brought to medical by corrections. Corrections stated he was not acting right when he was removed from the tank. Inmate assessed. Pt alert and oriented x 3 with no complaints or apparent distress. Pt was forcing eyes closed when told by corrections to open eyes. When inmate opened eyes to this nurse, he responded appropriately.

6

(Spiers Dep., Doc. 87 at PAGEID 2093-94, referencing TechCare progress note (Doc. 128-5)).

NaphCare never interviewed defendant Spiers about Mr. Marti's death; defendant Spiers only notified NaphCare's Health Services Administrator, Maria Perdikakis, Registered Nurse (RN), that it occurred. NaphCare did not interview or take any statement from defendant Rice regarding Mr. Marti's death. Defendant Spiers did not participate in and was not aware of any meetings, reviews, or investigations regarding Mr. Marti's death by NaphCare. NaphCare did not discipline either defendant Rice or defendant Spiers in connection with Mr. Marti's death. NaphCare's November 20, 2017 internal "Death Summary" states that Mr. Marti "was noted to have been acting abnormally by the corrections staff. He was evaluated then by an LPN by talking with and observing this Inmate acting normally." (Doc. 128-18 at PAGEID 3600).[2] The Summary concludes with the following "Recommendations for Modifications in Protocol, Procedure or Approach . . . [:] 1) Assess all Inmates with accurate and timely documentation 2) Reassessment of all Inmates with abnormal findings promptly 3) Educate staff that not all abnormal behaviors are strictly psychiatric in nature." (*Id.* at PAGEID 3602).

D. LPN practice and NaphCare's written policies

LPNs are prohibited from "[e]ngaging in nursing practice without RN or authorized health care provider direction[,]" "[s]upervising . . . 'nursing practice[,]'" and "[a]ssessing health status for purposes of providing nursing care." (State of Ohio Board of Nursing, Scopes of Practice: Registered Nurses (RNs) and Licensed Practical Nurses (LPNs), Doc. 107-1 at PAGEID 2891). Given the "dependent" nature of the LPN practice, which is subject to direction from more advanced medical providers (*id.*), Nurse Perdikakis testified that LPNs at the jail "ha[d] to have access available to an RN" and that LPN functions were otherwise limited to

---

[2] The Death Summary lists "[a]ll information from Tech Care" as the material examined for its preparation. (*Id.* at PAGEID 3602). Defendant Spiers' late entry was the only note made regarding Mr. Marti.

7

"triage[,]" "observations[,]" "tak[ing] information[,]" "document[ing,]" and "initiat[ing] nurse

protocols."  (Doc. 85 at PAGEID 1402).

NaphCare used nursing protocols, which represent a national standard of jail medical care

and are designed to address patient needs and guide LPNs to remain within their scope of

practice.  These protocols were available in TechCare, software that NaphCare LPNs were

expected to be able to use independently.  NaphCare training materials instruct LPNs to

complete nursing protocols "in [their] entirety, including vital signs" and to "contact [a] Provider

for further instructions and/or orders" if an available protocol does not cover a given patient

issue.  (Doc. 128-3 at PAGEID 3364).  Among NaphCare's stated performance expectations for

the LPN position are to "[t]ake and document all patient history and vital signs . . . and report all

changes in patients' conditions."  (Doc. 128-2 at PAGEID 3348).  NaphCare's "Documentation

Module: Guidelines For Quality Documentation" indicated that "[a]ll documentation should be

completed during and after patient care to avoid charting issues. . . ."  (Doc. 128-9 at PAGEID

3387, 3389).

NaphCare's "Prebooking Refusal Guidelines" are used to identify situations in which

HCJC cannot provide adequate medical care.  (Doc. 111-1 at PAGEID 3069-70).  Among those

conditions include "[p]atients with . . . significantly altered mental status" and "[a]cute head

injury with loss of consciousness prior to or at arrest[.]"  (*Id.*).  NaphCare's "Receiving

Screening" includes pertinent questions such as "[o]bvious signs of abrasions[,]"  "[h]ave you . .

. had a head injury . . . in the past 72 hours[,]" "[a]ppears to be unsteady, confused, lethargic. .

.[,]" "oriented to person, place, and time[,]" and "verbally non-responsive?"  (Mr. Marti's 2014

Receiving Screening, Doc. 128-10 at PAGEID 3416-18).  The National Commission on

Correctional Health Care advises that the Receiving Screening should occur "as soon as

possible" and that "[i]ndividuals should not be released from the intake area until the receiving screening is completed."  (Doc. 113-1 at PAGEID 3133).  To the extent a person is too intoxicated to accurately answer the questions in the receiving screening, the Commission advises that intake nurses are to "be sure that [the person] is closely monitored by custody and health staff.  Many deaths of intoxicated individuals occur in jails.  Of course, a good detoxification protocol should be implemented as clinically indicated." (*Id.*).

## II.  Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A grant of summary judgment is proper unless the nonmoving party "establish[es] genuinely disputed material facts by 'citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence . . . of a genuine dispute.'"  *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 403 (6th Cir. 2019) (quoting Fed. R. Civ. P. 56(c)(1)).  The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party.  *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enters., Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial.  *Anderson*, 477 U.S. at 249.  The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

A fact is "material" if its resolution will affect the outcome of the lawsuit. *Beans v. City*

*of Massillon*, No. 5:15-cv-1475, 2016 WL 7492503, at *5 (N.D. Ohio Dec. 30, 2016), *aff'd*, No.

17-3088, 2017 WL 3726755 (6th Cir. 2017) (citing *Anderson*, 477 U.S. at 248). The party who

seeks summary judgment "bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of [the record] which it believes demonstrate

the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 322. To make its

determination, the court "need consider only the cited materials, but it may consider other

materials in the record." Fed. R. Civ. P. 56(c)(3). The party opposing a properly supported

motion for summary judgment "may not rest upon the mere allegations or denials of his

pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968).

## III. Analysis

### A. Constitutional claims: defendants Rice and Spiers

To prevail on a claim brought under § 1983, a plaintiff must demonstrate "(1) the

deprivation of a right secured by the Constitution or laws of the United States (2) caused by a

person acting under the color of state law." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th

Cir. 2010) (quoting *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009)).[3]

---

[3] Defendants make no argument that they are shielded from liability based on qualified immunity. *See McCullum v. Tepe*, 693 F.3d 696, 704 (6th Cir. 2012) ("[T]here does not appear to be any history of immunity for a private doctor working for the government, and the policies that animate our qualified-immunity cases do not justify our creating an immunity unknown to the common law.").

10

Plaintiff alleges that the individual defendants deprived Mr. Marti of his right to adequate medical care under the Fourteenth Amendment while incarcerated as a pretrial detainee.  Plaintiff also argues that NaphCare's customs or unwritten policies were the moving force behind this constitutional deprivation, and NaphCare failed to adequately train and supervise its LPNs.  *Cf. Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014) (a private corporation that provides medical services to prison inmates acts under color of state law and may be sued under § 1983).

Historically, the Sixth Circuit analyzed the deliberate indifference to serious medical needs claims of pretrial detainees under the same framework applied to convicted prisoners (i.e., the Eight Amendment).  *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018).  Under that framework, a deliberative indifference to serious medical needs claim:

> has an objective and a subjective component.  [*Id.* at 937-38].  To meet the objective component, the plaintiff must show that the medical need is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  To meet the subjective component, the plaintiff must show that "an official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Id.* at 837, 114 S. Ct. 1970.  An express intention to inflict unnecessary pain is not required. *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986).  Still, the plaintiff must demonstrate that the official was aware of facts from which an inference of substantial risk of serious harm to inmate health or safety could be drawn and that the official actually drew the inference. *Farmer*, 511 U.S. at 837, 114 S. Ct. 1970.

*Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585, 591 (6th Cir. 2021).

In *Kingsley v. Hendrickson*, the Supreme Court held that excessive force claims brought by pretrial detainees require a showing only that officers were objectively aware that their use of force was unreasonable.  576 U.S. 389, 396-97 (2015) ("[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable.").  Subsequently, in *Brawner*, the Sixth Circuit determined that *Kingsley*'s reasoning demonstrated

that pretrial detainees enjoyed a different constitutional status from convicted prisoners; as such, an identical analysis for pretrial detainees and convicted prisoners in the deliberate-indifference context was untenable.  14 F.4th at 592, 596.  In particular, the *Brawner* court concluded that the subjective prong of the deliberate indifference analysis "require[d] modification" as applied to pretrial detainees.  *Id.*  The *Brawner* court elaborated:

> Mere negligence is insufficient.  A defendant must have not only acted deliberately (not accidentally), but also recklessly "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Farmer*, 511 U.S. at 836, 114 S. Ct. 1970 (describing, and rejecting as inapplicable to Eighth Amendment deliberate-indifference claims, the civil standard for recklessness).  A pretrial detainee must prove "more than negligence but less than subjective intent—something akin to reckless disregard."  *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc); *see* [*Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017)] ("[T]he pretrial detainee must prove that the defendant-official acted [or failed to act] intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."); [*Griffith v. Franklin Cnty., Ky.*, 975 F.3d 554, 589 (6th Cir. 2020)] (Clay, J., concurring in part and dissenting in part) (explaining that a pretrial detainee must prove that the defendant acted "intentionally to ignore [her] serious medical need or recklessly failed to act with reasonable care to mitigate the risk that the serious medical need posed to the pretrial detainee, even though a reasonable official in the defendant's position would have known, or should have known, that the serious medical need posed an excessive risk to the pretrial detainee's health or safety").
> . . . .
>
> [To demonstrate a Fourteenth Amendment violation related to adequate medical care, the plaintiff] needed to present evidence from which a reasonable jury could find (1) that [the plaintiff] had an objectively serious medical need; and (2) that [the defendant's] action (or lack of action) was intentional (not accidental) and [the defendant] either (a) acted intentionally to ignore [the plaintiff]'s serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [the plaintiff], even though a reasonable official in [the defendant]'s position would have known that the serious medical need posed an excessive risk to [the plaintiff]'s health or safety.

*Id.* at 596-97.

Shortly after *Brawner*, in *Trozzi v. Lake County, Ohio*, the Sixth Circuit distilled a three-part test for inadequate medical care claims under the Fourteenth Amendment from *Brawner* and subsequent decisions—holding that such a claimant must show that:

> (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk.

29 F.4th 745, 757-58 (6th Cir. 2022).  The court in *Trozzi* reasoned that *Brawner*, while modifying the subjective prong, retained "consideration of an official's actual knowledge of the relevant circumstances." *Id.* at 755.  An officer's subjective knowledge may be "infer[red] from circumstantial evidence. . . ." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

### 1. Objectively serious medical need

Defendants do not focus on this element of plaintiff's deliberate indifference claims.  Defendants frequently, however, characterize Mr. Marti's head injury as an "abrasion."  (*See, e.g.*, Doc. 91 at PAGEID 2547, referring to Def. Spiers Dep., Doc. 87 at PAGEID 2053 ("a small abrasion").

Plaintiff has presented evidence, however, that creates a genuine issue of material fact as to whether Mr. Marti had an objectively serious medical need that was obvious to laypersons.  (*See, e.g.*, Doc. 100, Ex. 26, Cruiser Cam Footage at 39:07 (Officer Borowicz: "You know what, he looks like he has a big cut on his head.  He must have fell."); Doc. 100, Ex. 18, Intake Booking Video at 5:01:25 a.m. (Officer Hernandez points to Mr. Marti's head at the spot of the injury); Booking Photo, Doc. 106-2 (Mr. Marti's eyes are shown pointing in different directions); Spence Dep., Doc. 88 at PAGEID 2196, 2258-59 (testimony that Mr. Marti's eyes pointed in different directions; he appeared disoriented; and he had difficulty ambulating and a thousand-

13

yard stare); Henn Dep., Doc. 81 at PAGEID 896-87 (After noting that Mr. Marti was not communicating and there was blood in the holding cell, Sgt. Henn stated that he "advised [deputies] . . . to make sure they went to medical before they went anywhere else with Mr. Marti."); and Mulla Interview, Doc. 102-3 at PAGEID 2799-2800 (Deputy Mulla observed that "something didn't feel right[,]" Mr. Marti was "not acting right[,]" "[i]t looked like he had two lacerations on the back of his head[,]" and she was "appall[ed]" that Mr. Marti had been accepted at HCJC "regardless of the head wound.")).

Defendants also repeatedly emphasize that Mr. Marti's non-responsiveness was perceived by defendant Rice as willful. (*See, e.g.*, Doc. 91 at PAGEID 2557 ("Ms. Rice understood that inmates have a constitutional right to refuse to answer questions she asked. . . ."), referring to Rice Dep., Doc. 86 at PAGEID 1893). Plaintiff has presented evidence, however, that Mr. Marti's non-responsiveness was not willful. (*See, e.g.*, Henn Dep., Doc. 81 at PAGE ID 901, 907-08 (suggesting that Mr. Marti did not refuse to speak to HCJC personnel and, rather, he may have been unable to communicate because, for example, he did not employ body language); Mulla Interview, Doc. 102-3 at PAGEID 2799 ("[Mr. Marti] wasn't even really looking at us. . . . [I]t was like we weren't there."); Spence Dep., Doc. 88 at PAGEID 2196 (Mr. Marti "appear[ed] to be disoriented" with "a thousand-yard stare.")).

Where an injury or illness is "'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,' [*Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)], the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899-900 (6th Cir. 2004). "[A] reasonable person could find that [Mr. Marti's] medical need was serious because . . . laype[ople] recognized his

need for medical attention." *Abdiasiis v. Lewis*, No. 2:20-cv-3315, 2022 WL 2802412, at *4 (S.D. Ohio July 18, 2022).

In sum, plaintiff raises a genuine issue of material fact that Mr. Marti suffered from an objectively serious medical need. Even if the above evidence could not demonstrate that Mr. Marti's serious medical need was obvious to laypersons, plaintiff has submitted a neurosurgeon's opinion that the delay in assessing Mr. Marti's head injury caused his death, stating that the individual defendants' "delay, and utter failure, in referring Mr. Marti for appropriate evaluation by a qualified medical practitioner and their failure to permit him to access treatment, caused his death." (Raore Rep., Doc. 112-5 at PAGEID 3128). *See Blackmore*, 390 F.3d at 898 ("[A] 'verifying medical evidence' requirement is relevant to those claims involving minor maladies or non-obvious complaints of a serious need for medical care.").

### 2. Deliberate indifference

#### a. *Defendant Rice*

The second prong of the inadequate-medical-care analysis requires comparison between defendant Rice and a reasonable health care provider at the scene with the same information that defendant Rice had during the period in question, and a determination of whether that reasonable health care provider would have understood that Mr. Marti's medical needs subjected him to an excessive risk of harm. At her first encounter with Mr. Marti, defendant Rice noticed that he had a dried blood spot on his head the size of a quarter (Rice Dep., Doc. 86 at PAGEID 1798-1800), was having balance problems (*id.* at PAGEID 1802), and appeared lethargic (*id.* at PAGEID 1803). At her second encounter with Mr. Marti (approximately 15 hours later), he was having more problems with balance and mobility and still not communicating. (*Id.* at PAGEID 1850, 1859).

15

At this point, defendant Rice knew it was no longer reasonable to assume that Mr. Marti was intoxicated. (*Id.* at PAGEID 1838-39). Defendant Rice knew that internal injuries may be more extensive that what is externally observed, such as internal bleeding, and that symptoms of intoxication are common to other serious medical conditions. (*Id.* at PAGEID 1749-50; PAGEID 1803-04). (*See also* Perdikakis Dep., Doc. 85, PAGEID 1546-47 ("NaphCare expects its LPNs to know [that head injuries can be fatal even if there's no open or obvious wound] based on their medical training[.]")). Defendant Rice knew that it is important to determine the cause of injury and source of bleeding. (Doc. 86 at PAGEID 1748-49; Def. Rice Interview, Doc. 109-1 at PAGEID 3055).[4] Defendant Rice knew that neurological checks—including checking pupils, ability to follow commands, balance, and orientation to person, place, and time—were important to determining whether someone was suffering from a head injury. (Doc. 86 at PAGEID 1745-48, 1858). (*See also* Perdikakis Dep., Doc. 85 at PAGEID 1564 (the Glasgow Coma Scale was a tool for nurses to use "if they even suspect[ed] a head injury" or had nonverbal patients)). Defendant Rice also carried a penlight on her person during shifts, which was used for pupil checks. (Doc. 86 at PAGEID 1857). Defendant Rice knew that taking a person's blood pressure could help determine whether there is subdural hemorrhage or internal bleeding. (*Id.* at PAGEID 1856).

The foregoing evidence related to defendant Rice's knowledge of Mr. Marti's physical presentation and her subjective medical knowledge raises a genuine issue of material fact regarding whether a reasonable health care provider would have appreciated an unjustifiably high risk of harm.

---

[4] Defendant Rice testified, for instance, that detainees that had been in car accidents were categorically sent to the emergency room. (Doc. 86 at PAGEID 1736-37; *see also* Prebooking Refusal Guidelines, Doc. 111-1 at PAGEID 3071).

The third prong requires plaintiff to show that defendant Rice recklessly ignored this risk; i.e., defendant Rice did not simply "lack[] an awareness of the risk of her inaction. . . ." *Trozzi*, 29 F.4th at 758. Plaintiff has also raised a genuine issue of material fact on this prong of the analysis. Defendant Rice acknowledged that Mr. Marti was admitted to HCJC without knowing the source of his bloodied head. (Def. Rice Interview, Doc. 109-1 at PAGEID 3056). Defendant Rice also knew that severe intoxication or detox could require hospitalization and lead to death. (Def. Rice Dep., Doc. 86 at PAGEID 1704-05). Nevertheless, defendant Rice did not take Mr. Marti's vitals at either encounter (*id.* at PAGEID 1836) and either could not (because of his presentation) or did not perform available neurological checks to rule out a serious head injury at either encounter. (*Id.* at PAGEID 1748 (Defendant Rice testified that verbal responses are required to confirm orientation to person place and time) and PAGEID 1803 (Defendant Rice testified that at her first encounter with Mr. Marti, he did not speak, and she did not check Mr. Marti's pupils)). Defendant Rice also did not employ several relevant nursing protocols. (*Id.* at PAGEID 1703-09 (intoxification, withdrawal, and detoxification); PAGEID 1855-61 (head injury)). Defendant Rice did not communicate with other nurses about Mr. Marti prior to the end of her first shift, though she acknowledged that such communication was customary and helpful. (*Id.* at PAGEID 1808, 1839-40).

Defendants argue that the fact that defendant Rice alerted officers that Mr. Marti remained in the holding cell when she returned for her next shift shows that she went above and beyond her duty, and her actions are clearly inconsistent with deliberate indifference. As noted above, however, the parties offer competing evidence regarding who initiated the second contact with Mr. Marti and who, thereafter, finally recommended that Mr. Marti go to the medical unit. *See supra* pp. 3-5. In addition, NaphCare required nurses to document any pertinent information

after seeing an inmate at the wall because nurses were not always called to the wall (Perdikakis Dep., Doc. 85 at PAGEID 1498-99), but defendant Rice did not do this (Doc. 86 at PAGEID 1786), nor did she: perform the receiving screening; take vitals; check pupils, reflexes, or gait; or do any other testing after observing a change in Mr. Marti's condition at her second encounter with him (*id.* at PAGEID 1848, 1850-52; 1859 ("Q.  [W]ould you say that there was a change in mental status that was now involved?  A.  Yes.  The second time around, yes.")).  *See Greene v. Crawford Cnty., Mich.*, 22 F.4th 593, 611 (6th Cir. 2022) (evidence that the defendant knew that the detainee's condition had not improved created a genuine issue of material fact on the question of reckless disregard).

Finally, despite the proffered explanation for defendant Rice's various forms of inaction[5]—her belief that Mr. Marti was either intoxicated or "psych"—plaintiff has submitted evidence that defendant Rice ignored the risks associated with these *admittedly* perceived risks. (*See* Doc. 86 at PAGEID 1703-09, 1803-05 (Defendant Rice knew that verbally non-communicative patients may be severely intoxicated, which warranted detoxification protocols due to high risk of serious health conditions or death); PAGEID 1724 (Defendant Rice knew that a referral to a mental health provider may be warranted where a person is nonverbal)). Defendant Rice nevertheless did not take any action covered by nursing protocols related to either condition or record any of her observations.  While defendants rely heavily on the Court's opinion in *Howell v. NaphCare, Inc.* for the proposition that a mistaken diagnosis does not amount to deliberate indifference, they gloss over the following qualification: "unless it is both

---

[5] Defendants also state that defendant Rice's first encounter with Mr. Marti at the search wall was performed at the "risk of [her] safety"—perhaps to suggest that her inaction was justifiable.  (Doc. 91 at PAGEID 2538, 2567). Defendants cite no evidence of such risk, and none is apparent from the record.  (*See generally* Doc. 100, Ex. 18, Intake Booking Video (Mr. Marti does not appear aggressive); Spence Dep., Doc. 88 at PAGEID 2169-70 (testimony suggesting that examination of inmates at the search wall was not unprecedented)).

18

'clearly inconsistent' with the detainee's symptoms *and* reflective of a failure to rule out other explanations." No. 1:19-cv-373, 2022 WL 740928, at *7 (S.D. Ohio Mar. 11, 2022) (quoting *Britt v. Hamilton Cnty.*, No. 21-3424, 2022 WL 405847 (6th Cir. Feb. 10, 2022).[6] (*See also* Mendel Rep., Doc. 112-3 at PAGEID 3104 ("[Defendant] Rice made no effort to exclude a medical cause for Mr. Marti's failure to respond."); NaphCare Death Summary, Doc. 128-18 at PAGEID 3602 (indicating that review of Mr. Marti's case suggested "[t]he need for medical evaluation first of any behavior thought to be abnormal to rule out a medical cause of behavior change.")).

Plaintiff has presented evidence that defendant Rice knew the serious risks associated with head injuries and intoxication, yet she failed to take a series of actions within her license and duty to mitigate those risks. As such, plaintiff has raised a genuine issue of material fact regarding whether defendant Rice ignored a known, excessive risk of harm to Mr. Marti.

"At a certain point, bare minimum observation ceases to be constitutionally adequate." *Greene*, 22 F.4th at 609. *See also Abdiasiis*, 2022 WL 2802412, at *6 (a reasonable juror could find a nurse's treatment with "Gatorade and Ibuprofen" following multiple reports of severe symptoms so "woefully inadequate" to amount to "no treatment at all"). The evidence discussed above raises genuine issues of material fact regarding whether defendant Rice was deliberately indifferent to Mr. Marti's serious medical needs.

### b. *Defendant Spiers*

The Court next turns to whether a reasonable health care provider at the scene with the same information as defendant Spiers would have understood that Mr. Marti's condition posed

---

[6] This opinion followed a motion for relief from judgment based on an intervening decision (*Brawner*). The *Howell* Court acknowledged that its prior decision applied the wrong legal standard but concluded that the new standard did not change the result. *See id* at *1.

an excessive risk of harm.  Plaintiff has presented evidence that Deputy Mulla, who has a

paramedic certificate (Mulla Dep., Doc. 82 at PAGEID 1035), presented Mr. Marti to defendant

Spiers with her observations that Mr. Marti had "dried blood on his head" and was "not acting

right."  (Def. Spiers Dep., Doc. 87 at PAGEID 2049).  In her description of the encounter

between Mr. Marti and defendant Spiers, deputy Mulla observed that Mr. Marti "never spoke

any words[,]" including those that would indicate orientation to person, place, and time.  (Mulla

Dep. III, Doc. 84 at PAGEID 1264; *see also id.* at PAGEID 1270).  Deputy Mulla also described

seeing two lacerations in the center of a large, bruised area.  (*Id.* at PAGEID 1268).  Deputy

Mulla recalled that defendant Spiers, despite observing that the wound was at least a day old, did

not express concerns related to Mr. Marti's demeanor or condition or indicate that he would

consult with any other medical providers.  (*Id.* at PAGEID 1269).

Defendant Spiers observed Mr. Marti clenching his eyes shut and had to pry them open.

(Doc. 87 at PAGEID 2062).  Deputy Mulla recalled that Mr. Marti did not appear responsive to

defendant Spiers' touch and that defendant Spiers remarked that Mr. Marti's eyes were not

equally reactive.  (Mulla Dep. III, Doc. 84 at PAGEID 1271-72).  Defendant Spiers did not

secure Mr. Marti's informed consent to examine him because he did not think that Mr. Marti had

the "capacity to understand" but nevertheless needed "emergency care."  (Doc. 87 at PAGEID

2103).

Defendant Spiers acknowledged that a detainee could be suffering from a serious medical

condition without verbalizing a complaint.  (*Id.* at PAGEID 2080).  Defendant Spiers

acknowledged that speech difficulty and unequal pupils can be attendant to a skull fracture, and

that traumatic brain injuries can cause death within 24 hours.  (*Id.* at PAGEID 1986, 2019-20).

Defendant Spiers knew that Mr. Marti may have been experiencing pain from a bleeding head

20

wound (*id.* at PAGEID 2095), that a detainee fails a neurological exam if pupils are not the same size or overreactive to light (*id.* at PAGEID 2021), that Mr. Marti had been in intake for a long period of time (*id.* at PAGEID 2077-78), and that determining the onset of a head injury is crucial to determining its severity (*id.* at PAGEID 2086).  Defendant Spiers knew that a patient clenching his eyes shut could indicate either light sensitivity or extreme pain.  (*Id.* at PAGEID 2062).  Defendant knew that light sensitivity coupled with a possible skull fracture could indicate a serious medical condition.  (*Id.* at PAGEID 1986).

Defendant Spiers did not use a head injury nursing protocol, even though he did not know the cause of Mr. Marti's head injury and knew that injury onset timing may can be critical to related care.  (*Id.* at PAGEID 2085-86).  Defendant Spiers cleared Mr. Marti to go to the mental health unit without consulting a mental health provider, taking any vitals, or performing a mental health screening.  (*Id.* at PAGEID 2073, 2079).  Defendant Spiers knew that the mental health unit would not be staffed by a provider until the next morning.  (*Id.* at PAGEID 1958, 2084).  Shortly after seeing Mr. Marti, defendant Spiers knew both that he had a head injury and had yet to undergo an initial screening since his arrival at HCJC.  (*Id.* at PAGEID 2070-71).  Nevertheless, Defendant Spiers did not create any treatment plan for Mr. Marti, including medications of any kind or follow-up appointments with medical or mental health care providers.  (*Id.* at PAGEID 2076-77).  (*See also* Mendel Rep., Doc. 112-3 at PAGEID 3100  ("[Defendant] Spiers failed to exclude medical causes for Marti's condition.")).  Defendant Spiers did not record any of his observations or care for Mr. Marti until after Mr. Marti's death, and his eventual entry omits any reference to Mr. Marti's head injury, non-responsiveness, or the lack of receiving screening.  (*Id.* at PAGEID 2093-94, referencing TechCare progress note (Doc. 128-5)).

Defendants argue that defendant Spiers did not appreciate—let alone ignore—an excessive risk of harm because he observed Mr. Marti, cleaned his head wound, and determined him to be alert and oriented.  Plaintiff, however, has presented evidence that calls defendant Spiers' testimony about his actions into question.  Defendant Spiers testified that Mr. Marti "was alert and oriented" to person and place without confirming with Mr. Marti "where he was or why he was there[.]"  (Doc. 87 at PAGEID 2068).  One of plaintiff's experts, Dr. Lawrence Mendel, opined that defendant Spiers did not actually conduct a neurological check and that, even if he had, there was no way that Mr. Marti could have been found alert and oriented based on his condition.  (Doc. 112-3 at PAGEID 3103, 3106; *see also* Boal Tr., Doc. 98 at PAGEID 2704 (former NaphCare nurse testified that checking orientation to person, place, and time requires verbal responses)).  In addition, the timing of defendant Spiers' medical record notation—*after* Mr. Marti was pronounced dead and *after* being interviewed by internal investigators—coupled with the absence of any notations about Mr. Marti's head injury, nonverbal presentation, or inability to ambulate, call into question defendant Spiers' testimony about Mr. Marti's presentation on examination and whether defendant Spiers understood that Mr. Marti's medical condition posed an excessive risk of harm.

In view of the foregoing, there are genuine issues of material fact remaining regarding whether defendant Spiers was deliberately indifferent to Mr. Marti's serious medical needs.

B. <u>Medical negligence: defendants Rice and Spiers</u>

Defendants argue that the testimony of defendants Rice and Spiers and their supervisor, Nurse Perdikakis, establishes that they were not medically negligent under Ohio law. Defendants argue that defendant Rice exercised due diligence by "checking [Mr. Marti's] head wound and inquiring about his physical condition[,]" but that Mr. Marti's silence "eliminated

[her] ability to investigate the matter further. . . ."  (Doc. 91 at PAGEID 2570).  They also argue that Ms. Rice went above and beyond by alerting deputies to Mr. Marti's condition during her second shift with Mr. Marti.  With respect to defendant Spiers, defendants argue that he observed Mr. Marti's condition, cleaned his wound, assessed his eyes, and determined that he did not have a serious medical need.  Plaintiff argues in response that the individual defendants' conduct fell below the relevant standard of care established in two expert reports by failing to contemporaneously record their observations, consult advanced providers, and rule out other medical causes for Mr. Marti's behavior.  Defendants argue in reply that plaintiff's position implies that defendants Rice and Spiers, who are LPNs, should be held to a higher standard of care than is allowed under Ohio law.

Medical negligence claims have four elements under Ohio law: "(1) a duty running from the defendant to the plaintiff, (2) the defendant's breach of that duty, (3) damages sustained by the plaintiff, and (4) proximate causation of the damages by the defendant's breach of duty." *Loudin v. Radiology & Imaging Servs., Inc.*, 948 N.E.2d 944, 949 (Ohio 2011) (citation omitted).  Defendants' motion deals only with the second element: the individual defendants' breach of their duty of care, including the scope of that duty.

Plaintiff's expert, Dr. Mendel, has considerable correctional experience.  (*See* Doc. 112-3 at PAGEID 3096-97).  In his opinion, defendant Rice made two diagnoses (intoxication and mental illness) beyond the scope of her LPN license and failed to seek evaluation from a medical provider who was qualified to make such a diagnosis.  (*Id.* at PAGEID 3103).  Dr. Mendel opined that, notwithstanding her knowledge of Mr. Marti's head wound and the fact that he was not responding, defendant Rice did not use a head injury protocol, complete a neurological assessment, consult an advanced medical provider, or otherwise record her observations—all of

23

which would have been within the applicable standard of LPN care.  (*Id.* at PAGEID 3104-05).

Dr. Mendel also opined that to the extent that defendant Rice suspected intoxication, she did not

follow the applicable standard of care, which required either monitoring or transfer to a hospital.

(*Id.* at PAGEID 3105-06).

Dr. Mendel also opined that defendant Spiers' conclusion that Mr. Marti was suffering

from a mental health issue was a diagnosis beyond the scope of his LPN license—and one that

should not have been given prior to review of Mr. Marti's medical history or evaluation by an

advanced medical provider.  (*Id.*).  Dr. Mendel opined that defendant Spiers' evaluation of Mr.

Marti's mental status fell below the applicable standard of care, as did defendant Spiers' failure

to contemporaneously chart his observations, perform a legitimate neurological examination,

follow policies related to the re-checking of an uncovered and bleeding wound, or consult with

an advanced provider.  (*Id.* at PAGEID 3106).

Plaintiff also points to the report of Dr. Bethwel Raore, a neurosurgeon in clinical

practice.  (Doc. 112-5 at PAGEID 3120).  In Dr. Raore's opinion, defendants Rice and Spiers

had a duty to seek further evaluation for Mr. Marti by an advanced practitioner, and—at the very

least—contemporaneously record their observations of Mr. Marti.  (*Id.* at PAGEID 3128).  Dr.

Raore opined that the "necessary evaluation that Mr. Marti needed was within the training and

basic expectations of [the individual defendants] and their roles at the facility" but they "failed to

meet applicable standards of care."  (*Id.*).

In their reply, defendants cite the State of Ohio Board of Nursing's guidance regarding

the applicable scope of practice for LPNs.  (*See* Doc. 121 at PAGEID 3235, referring to Doc.

107-1).  Defendants cite two relevant examples of authorized LNP practice, but they omit the

following italicized language: "Collects and documents objective and subjective data and

observations about the patient. Contributes observations and health information to the nursing assessment *and reports all data to the RN or authorized directing health care provider*." (Doc. 107-1 at PAGEID 2891 (emphasis added)).

It is undisputed that the individual defendants did not contemporaneously (if at all) document their observations and report them to an advanced provider. Coupled with plaintiff's experts' reports and much of the evidence presented in connection with its Fourteenth Amendment deliberate indifference claims, plaintiff has raised a genuine issue of material fact as to whether defendants Rice and Spiers breached the applicable standard of care for purposes of plaintiff's medical negligence claims.

C. NaphCare's liability

Defendants argue that NaphCare cannot be held liable under § 1983 because plaintiff has not pointed to customs, policies, or practices that were the cause of the constitutional deprivation at issue. They argue that the evidence shows that defendants Rice and Spiers duly followed applicable NaphCare policy (i.e., observing Mr. Marti at the search wall, observing Mr. Marti in the holding cell, sending Mr. Marti to the medical unit, cleaning Mr. Marti's wound, and sending Mr. Marti to the mental health unit). Defendants also argue that NaphCare cannot be held liable for its failure to train, supervise, or correct its employees because plaintiff has not raised a genuine issue of material fact regarding NaphCare's deliberative indifference via a pattern of prior similar constitutional violations.

In response, plaintiff points to several customs or unwritten policies at HCJC that led to Mr. Marti's death: "failure to implement or consult nursing protocols, failure to contemporaneously record medical assessments and communicate about patient status amongst medical staff, failure to initiate medical observations, failure to consult advanced providers, and

25

LPNs routinely practicing, and diagnosing, outside the scope of their licensure." (Doc. 128-1 at PAGEID 3335-36). Plaintiff also argues that NaphCare is liable under § 1983 because a final policymaker reviewed and ratified the individual defendants' unconstitutional actions when it failed to discipline them.[7] Plaintiff also argues that NaphCare is liable under § 1983 for its failure to train or supervise its employees, and a history of similar constitutional violations is not necessary under these circumstances. In addition, plaintiff argues that NaphCare is not only liable pursuant to § 1983 but also under Ohio's common law doctrines of *respondeat superior* and negligent training and supervision.

With respect to liability under Ohio law, defendants argue in reply that plaintiff has not demonstrated a genuine issue of material fact with respect to the individual defendants' negligence for purposes of *respondeat superior*. With respect to negligent training and supervision, defendants argue that plaintiff has failed to raise a genuine issue of material fact as to whether the individual defendants were incompetent, whether NaphCare actually or constructively knew of that incompetence, or whether NaphCare knew or should have known of their propensity to engage in negligent conduct. With respect to plaintiff's § 1983 allegations, defendants argue that they are conclusory, NaphCare had valid written policies and procedures on inmate care, and plaintiff has not pointed to evidence demonstrating that NaphCare was aware of the customs or unwritten policies to which plaintiff refers for this claim. Finally, defendants argue that plaintiff cannot succeed on theories of failure to train or supervise because plaintiff has not shown that NaphCare was aware of inadequacies in its training of the individual defendants. Defendants maintain that plaintiff must present evidence of a history of prior constitutional violations to prevail on this claim.

---

[7] Defendants do not respond to this argument.

1. <u>State law claims</u>

Under Ohio law, "[t]he *respondeat superior* doctrine makes an employer or principal vicariously liable for the torts of its employees or agents[,]" *Auer v. Paliath*, 17 N.E.3d 561, 564 (Ohio 2014) (citation omitted), provided that the employee's tort was "committed within the scope of employment." *Id.* (citation omitted).  Defendants' only argument against this theory of liability is that plaintiff has not adduced evidence of the underlying tort.  For the reasons explained in part III.B. above, the Court disagrees and finds that summary judgment is not appropriate as to this claim.

Negligent hiring and supervision claims are generally evaluated using a five part test in Ohio:

> (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of the employee's incompetence; (4) the employee's act or omission caused the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee was the proximate cause of the plaintiff's injuries.

*Sitton v. Massage Odyssey, LLC*, 158 N.E.3d 156, 160 (Ohio Ct. App. 2020) (quoting *Evans v. Thrasher*, No. C-120783, 2013 WL 5864592, at *5 (Ohio Ct. App. Oct. 30, 2013)).  The proximate cause element is evaluated by reference to whether an employer knew or should have known of an employee's propensity to engage in tortious conduct.  *Id.* at 160-61.  Defendants argue that plaintiff has failed to raise a genuine issue of material fact as to elements two, three and five.

The evidence plaintiff refers to in support of its deliberate indifference and medical negligence claims against defendants Rice and Spiers also raises a genuine issue of material fact regarding their competence for purposes of element two of this claim.  (*See also* Doc. 128-12 at PAGEID 3422 (Defendant Rice's discharge notice citing alleged misconduct since November

2017 including, *inter alia*, "[i]ncomplete charts for alcohol detox[,]" "[i]ncomplete" and "incorrect" documentation, and "[n]ot placing patients on detox[.]")). Defendants argue otherwise by reference to the individual defendants' professional schooling and certifications with the Ohio Board of Nursing. While schooling and certification are certainly relevant to competence, the evidence cited by plaintiff raises a genuine issue of material fact as to the individual defendants' competence under the circumstances of this case.

Similarly, as to the third and fifth elements, defendants suggest that the individual defendants' education and licensure insulated NaphCare from any knowledge of their incompetence. Plaintiff, however, refers to evidence that NaphCare was aware of defendant Rice's incompetence prior to Mr. Marti's death. (*See* Doc. 128-16 at PAGEID 3549 (November 7, 2017 email ("You must answer this question when someone reports drug use."); PAGEID 3553 (November 10, 2017 email ("It is very important to answer the [detox-related] question below [or] it will not prompt a comprehensive detox and this person will not get added to detox.")). Plaintiff also refers generally to evidence cited in support of its § 1983 arguments against NaphCare—that NaphCare had customs, unwritten policies, and training deficiencies that invited incompetence (e.g., allowing LPNs to act beyond the scope of their licenses and placing intoxicated prisoners in holding cells). (*See* Mendel Rep., Doc. 112-3 ("Unless an LPN has substantial correctional experience . . . it is easily foreseeable that mistakes will be made, and adverse outcomes will occur.")). This evidence is discussed in more detail *infra*, and the Court agrees that it raises a genuine issue of material fact regarding whether NaphCare had constructive knowledge of the individual defendants' incompetence, and whether it was foreseeable that the individual defendants would be likely to engage in tortious conduct. Summary judgment should be denied as to this claim.

28

2.  <u>Section 1983</u>

In *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978), the Supreme Court held that a government entity may be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent an official policy, inflicts the injury. . . ." *Id.* at 694.  For a successful *Monell* claim, plaintiff must demonstrate "(1) that a violation of a federal right took place, (2) that the defendants acted under color of state law, and (3) that a municipality's policy or custom caused that violation to happen." *Bright v. Gallia Cnty.*, 753 F.3d 639, 660 (6th Cir. 2014) (citing *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008)).  A municipality may be held liable where it was the "moving force" behind the alleged constitutional deprivation. . . ." *Monell*, 436 U.S. at 694.

A plaintiff may establish an entity's liability under § 1983 by making one of the following demonstrations: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Osberry v. Slusher*, 750 F. App'x 385, 397 (6th Cir. 2018) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).  In addition to official policies, *Monell* contemplated liability that flows from both written and unwritten policies or customs, provided that they are "persistent and widespread. . . ." *Monell*, 436 U.S. at 691 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167 (1970)).

Both failure to train and failure to supervise claims require a showing of deliberate indifference.  *See Amerson v. Waterford Twp.*, 562 F. App'x 484, 490 (6th Cir. 2014) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)) (failure to train), and *Mize v. Tedford*, 375

29

F. App'x 497, 500 (6th Cir. 2010) (failure to supervise)). *Cf. North v. Cuyahoga Cnty.*, 754 F.

App'x 380, 385 n.2 (6th Cir. 2018) (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 365-66

(6th Cir. 1993) for the proposition that "the deliberate indifference test is used to analyze failure-

to-train claims but not affirmative policy or custom claims"). Deliberate indifference, in turn,

"*typically* requires proof that the municipality was aware of prior unconstitutional actions by its

employees and failed to take corrective measures." *Amerson*, 562 F. App'x at 490 (citing *Miller

v. Calhoun Cnty.*, 408 F.3d 803, 815 (6th Cir. 2005)) (emphasis added).

a. *Affirmative policy or custom claim*

The Court finds that plaintiff has proffered evidence sufficient to raise a genuine issue of

material fact with respect to its *Monell* claim based on NaphCare's customs or unwritten

policies. First, plaintiff has adduced evidence that it was customary for LPNs to use discretion in

the areas of nursing protocols, documentation, and consultation of advanced providers that—in

effect—allowed LPNs to operate outside the scope of their licensure. Nurse Perdikakis oversees

NaphCare's medical and mental health services at HCJC—including administration, operations,

personnel, and compliance. (Perdikakis Dep., Doc. 85 at PAGEID 1347, 1349). Nurse

Perdikakis testified that LPNs have discretion as to whether or not to implement protocols or call

a provider, even when there are obvious indicators of an injury related to a protocol (e.g., a

"goose egg" or "gash" on an individual's head). (*Id.* at PAGEID 1480-84, 1496). Defendant

Spiers testified that it was "up to the . . . LPN to make a decision as to whether [the LPN] will

follow a nursing protocol or call a doctor." (Doc. 87 at PAGEID 1963). Defendant Rice

testified that she did not use nursing protocols very often (Doc. 86 at PAGEID 1762-63) and was

advised to use her "judgment as to whether to initiate protocols[.]") (*id.* at PAGEID 1760).

Former NaphCare LPN Boal testified that she would look to nursing protocols if she "personally

thought there was an issue. . . ."  (Doc. 98 at PAGEID 2728).  Nurse Perdikakis also indicated that

LPNs had discretion as to what medical information to document.  (Doc. 85 at PAGEID 1495).  (*See*

*also* Boal Dep., Doc. 98 at PAGEID 2691-92 (explaining that LPNs used their discretion as to

whether or not to document visits with inmates)).  Dr. Mendel opined on this custom or

unwritten policy:

> [Nurse Perdikakis] testified that nurses did not have to consult protocols and were
> expected to use their discretion. . . .  This is a dangerous instruction when faced
> with serious medical conditions.
>
> . . . .
>
> NaphCare allowed LPNs at the jail to use discretion to evaluate patients without
> use of nursing protocols or guidance from advanced level providers, thus
> permitting LPNs to make patient care decisions outside their scope of practice.

(Doc. 112-3 at PAGEID 3110).  (*See also* Raore Rep., Doc. 112-5 at PAGEID 3128 (explaining

that the individual defendants' failure to consult nursing protocols contributed to Mr. Marti's

death)).

Relatedly, defendants do not dispute that the individual defendants were the only two

medical staff at HCJC on the night of Mr. Marti's death or that LPNs staffed intake.  (*See*

Perdikakis Dep., Doc. 85 at PAGEID 1496 (there is "no set level" of experience needed to staff

intake).  Dr. Mendel opined that NaphCare's use of LPNs at intake "created obvious risks to

patients in the jail" because their "skill set [is] not suited to the complexity of intake screening

without considerable experience and careful training."  (Doc. 112-3 at PAGEID 3106-07).  In

addition, as noted above, LPNs are prohibited from supervising nursing practice.  (*See* Scopes of

Practice, Doc. 107-1 at PAGEID 2891).  Defendant Rice testified, however, that it was not

uncommon for defendant Spiers (a fellow LPN) to act as her supervisor, including the night of

Mr. Marti's death.  (Doc. 86 at PAGEID 1647).

A reasonable jury could conclude that NaphCare had a custom or unwritten policy of allowing LPNs to operate outside the scope of their practice.  Plaintiff has adduced evidence that NaphCare LPNs had discretion regarding whether to use nursing protocols, which in turn left documentation and consultation with advanced providers a matter of LPN discretion.  In addition, NaphCare's staffing policies practically forced LPNs to operate beyond the scope of their licenses.

Second, plaintiff has adduced evidence that NaphCare had a custom or unwritten policy of failing to follow applicable protocols and guidelines in the context of intoxicated prisoners. Plaintiff points to NaphCare's protocol related to intoxication, withdrawal, and detoxification, which directed staff to obtain alcohol or drug use history "as an integral part of the intake/booking procedure to identify and manage any intoxication or withdrawal symptoms." (Doc. 128-6 at PAGEID 3372).  The protocol goes on to note that "[i]ndividuals at risk for progression to more severe levels of withdrawal are kept under *constant observation by health care staff*[,]" inmates that appear intoxicated "will be referred to health care staff[,]" and "[a]ll initial and ongoing assessments will be documented in TechCare. . . ."  (*Id.*).  This is consistent with HCJC's policy regarding detoxification, which states that "[a]ny inmate thought to be at risk of detoxification problems shall be placed under medically directed supervision immediately" and leaves medical staff in charge of the housing and protocol decisions.  (Doc. 103-1).

Despite the above, plaintiff has pointed to evidence that a different but widespread policy was in place.  Defendant Rice testified that it was "very common" for individuals to be sent to holding cells to sleep without any plan for regular monitoring.  (Doc. 86 at PAGEID 1821, 1826-27).  (*See also* Crawford Dep., Doc. 80 at PAGEID 716-20 (explaining that intoxicated prisoners

were regularly placed in holding cells, and that the decision to seek further medical evaluation was generally left to deputy supervisors as opposed to medical staff); Spence Dep., Doc. 88 at PAGEID 2191-94 (explaining that detainees would be put in holding cells to sleep off intoxication without prior initial medical screening or other assessment for bodily injury); Rice Interview, Doc. 109-1 at PAGEID 3043-44 (explaining that she did not take Mr. Marti's vitals because it "kind of happens" that arrestees would "come in and go straight to a cell because they're intoxicated."); Spiers Dep., Doc. 87 at PAGEID 2004 (If someone coming through intake is "too intoxicated to participate in their booking process, they will be put in a holding cell until they can participate in that.")).  Nurse Perdikakis confirmed that despite the formal intoxication policies, there was no expectation at HCJC that LPNs would either observe or refer intoxicated individuals to another health care provider.  (Doc. 85 at PAGEID 1524-25).  Plaintiff's expert, Dr. Mendel attributed Mr. Marti's death to "NaphCare nurses' failure[] . . . to monitor suspected intoxication. . . ."  (Doc. 112-3 at PAGEID 3111).

A reasonable jury considering the evidence above could conclude that NaphCare had a custom or unwritten policy on the handling of intoxicated inmates distinct from its written policies.  Summary judgment on plaintiff's affirmative policies or customs claim is not appropriate.

### b. *Failure to train/supervise claim*

Defendants next argue that plaintiff has not established a *Monell* claim related to inadequate training or supervision, which requires proof that "1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the [NaphCare]'s deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir.

2006).   Defendants' position is largely premised on their belief that plaintiff is required to establish that NaphCare was aware of a pattern of similar constitutional violations to meet the deliberate indifference prong of this claim.  In certain scenarios, however, such a pattern is not necessary in order to show deliberate indifference.

In *Shadrick v. Hopkins Cnty., Ky.*, an inmate's mother filed a civil rights action against a private, correctional health care provider after her son suffered an infection while in custody that resulted in his death.  805 F.3d 724, 729 (6th Cir. 2015).  The court in *Shadrick* explained that "'a single violation of federal rights, accompanied by a showing that [the correctional health care company] has failed to train its employees to handle recurring situations present[s] an obvious potential' for a constitutional violation."  *Id.* at 739 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997)).  The court reasoned:

> [The correctional health care company]'s administrators knew that the LPN nurses interacted with dozens of inmates presenting a wide and recurring range of medical conditions that required timely and accurate diagnosis and treatment. . . . [A] reasonable jury could find that the potential risk of the commission of constitutional torts by LPN nurses who lack the essential knowledge, tools, preparation, and authority to respond to the recurring medical needs of prisoners in the jail setting is so obvious that [the correctional health care company]'s failure to provide adequate training and supervision to those nurses constitutes deliberate indifference to the risk.

*Id.* at 739-40.

The court in *Shadrick* found LPN training inadequate because LPNs and their supervisors were largely unable to substantively explain the written policies that governed their practice or the content of their training.  *See id.* at 740-41.  The court also noted that "[the correctional health care company's president] pointed to the [correctional health care company's] policies and treatment protocols as proof of instruction, yet she candidly admitted that [the correctional health care company] allowed LPN nurses to use the policies and protocols in their discretion. . . ."  *Id.*

34

at 741.  The court also relied on expert testimony.  *Id.* (citing *Russo v. City of Cincinnati*, 953

F.2d 1036, 1047 (6th Cir. 1992) ("Especially in the context of a failure to train claim, expert

testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of .

. . training procedures.")).

Discussing whether the correctional health care company's conduct was deliberately

indifferent, the court in *Shadrick* emphasized that the president of the correctional health care

company "fail[ed] to enforce . . . policies and treatment protocols[,]" which "produced LPN

nurses who were ignorant of the constitutional standards governing their medical practice in the

jail setting."  *Id.* at 742-43.  The court in *Shadrick* also cited the correctional health care

company's conduct after the death, noting that there was no evidence of an investigation into

whether its nurses' conduct contributed to the death or discipline related thereto.  *Id.* at 743.

From there, the *Shadrick* court easily concluded that the inadequate training or supervision

caused or was closely related to the death based on a series of events with substantial similarities

to the facts at bar.  *See id.* at 743-44 (deputy jailers suspected serious medical issues, an LPN

admitted the decedent without an initial medical examination or consultation with a doctor, and

the decedent received virtually no medical observation or treatment between his jail admission

and death).

Like *Shadrick*, plaintiff here has raised a genuine issue of material fact as to each of the

failure to train/supervise elements.  Plaintiff's expert, Dr. Mendel, opined that the LPN skill set

is "not suited for the complexity of intake screening without considerable experience and careful

training" and that it was "easily foreseeable that mistakes will be made[] and adverse outcomes

will occur" by placing an LPN in jail intake screening role.  (Doc. 112-3 at PAGEID 3107).  Dr.

Mendel also opined that "NaphCare set up a system that . . . was deficient in training,

supervision, and staff allocation[,]" and "NaphCare's training and supervision of Rice, Spiers, and nursing staff were inadequate, and created obvious risks to patients in the jail, including Mr. Marti, and failed to meet applicable standards of care." (*Id.* at 3106, 3108).

Nurse Perdikakis testified that LPNs receive "on-the-job training" and take "NaphCare University" courses (*see, e.g.*, Perdikakis Dep., Doc. 85 at PAGEID 1461, 1488), but she was often unable to actually describe LPN training in any substantive detail. (*See, e.g.*, *id.* at PAGEID 1390 ("A. I believe there is a training on [NaphCare's policy manual].  Q. What does the training consist of?  A. I don't recall.  . . .  A. Again, I don't recall what is all involved with the training of NaphCare University."); PAGEID 1560 ("I would have to review the training in NaphCare University").  Overall, a reasonable jury could conclude that Nurse Perdikakis's testimony reflects an unwillingness to "t[ake] responsibility to train LPN nurses at [HCJC] or to provide them with appropriate supervisory oversight to avoid violation of the constitutional rights of confined inmates to adequate medical treatment for their serious medical needs." *Shadrick*, 805 F.3d at 742.

As to defendant Rice in particular, she had not completed NaphCare University prior to being placed at the intake desk.  (Perdikakis Dep., Doc. 85 at PAGEID 1599).  Defendant Rice had been trained on the job for a total of 36 hours (three shifts)—which did not include any training dedicated to treatment of intoxicated inmates.  (Doc. 86 at PAGEID 1696-98).  Only after she was first staffed at intake and after Mr. Marti's death did defendant Rice complete the following tutorials: "Alcohol Detox and CIWA-Ar[,]"  "Documentation[,]" "Nursing Protocols[,]" "Techcare 101: Tutorials" (Doc. 128-8 at PAGEID 3881-83), and "When Should a Patient go to the ER?" (Doc. 128-7 at PAGEID 3377).  The latter of these tutorials includes an overview of high risk patients (such as those with alcohol in their system), and how such patients

36

should be evaluated using the Glasgow Coma Scale. (Doc. 86 at PAGEID 1741, 1744-45; *see also* Raore Rep., Doc. 112-5 at PAGEID 3127 (the Glasgow Coma Scale is critical to identifying traumatic brain injuries)). Emails between defendant Rice and Nurse Perdikakis prior to Mr. Marti's death demonstrate the former's performance deficiencies related to charting and intoxication protocols. (*See* Doc. 128-16 at PAGEID 3549 (November 7, 2017 email ("You must answer this question when someone reports drug use."); PAGEID 3553 (November 10, 2017 email ("It is very important to answer the [detox-related] question below [or] it will not prompt a comprehensive detox and this person will not get added to detox.")).

Neither defendant Rice nor Spiers was disciplined in connection with Mr. Marti's death (Perdikakis Dep., Doc. 85 at PAGEID 1591, 1599). (*See also* Rice Interview,[8] Doc. 109-1 at PAGEID 3050-51 (Defendant Rice did not otherwise give an interview or statement following Mr. Marti's death); Spiers Dep., Doc. 87 at PAGEID 2108-2110 (Defendant Spiers did not participate in and was not aware of any NaphCare meetings, reviews, or investigations regarding Mr. Marti's death). *See Shadrick*, 805 F.3d at 743 (finding that conduct post-constitutional violation was relevant to the deliberate indifference analysis).

In sum, "a reasonable jury could find that [NaphCare] was deliberately indifferent to the need to train and supervise its LPN nurses to provide adequate medical care to inmates, especially in view of the obvious risk that the Constitution could be violated without such training and supervision." *Id.* at 741. Plaintiff need not demonstrate a pattern of constitutional violations to establish deliberate indifference because the violation at issue here is a "highly predictable consequence of a failure to equip [LPNs] with specific tools to handle recurring situations." *Id.* at 739 (quoting *Brown*, 520 U.S. at 409). Finally, plaintiff's expert testimony

---

[8] This interview occurred March 25, 2018—several months after Mr. Marti's death.

raises a genuine issue of material fact regarding whether NaphCare's failure to train or supervise its LPNs was at least closely related to (if not caused) Mr. Marti's death.  (*See* Doc. 112-3 at PAGEID 3111 ("Renato Marti's unnecessary prolonged suffering and premature death were attributable to the conduct of . . . of NaphCare.").

E.  <u>Punitive damages</u>

In Ohio, punitive damages may be awarded where "the defendant possessed . . . a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm[,]" which connotes "extremely reckless behavior revealing a conscious disregard for a great and obvious harm."  *Cabe v. Lunich*, 640 N.E.2d 159, 162 (Ohio 1994) (quoting *Preston v. Murty*, 512 N.E.2d 1174, 1175 (Ohio 1987)).  "[A]ctual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross."  *Villella v. Waikem Motors, Inc.*, 543 N.E.2d 464, 467 (Ohio 1989), *holding modified on other grounds by Moskovitz v. Mt. Sinai Med. Ctr.*, 635 N.E.2d 331 (Ohio 1994).  The policy behind punitive damages in Ohio is both punishment and deterrence.  *Id.* (citing *Preston*, 512 N.E.2d at 1176).  Under federal law, punitive damages may be warranted when a defendant's conduct "involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).

The Court has already determined that plaintiff has raised a genuine issue of material fact regarding defendants' deliberate indifference to Mr. Marti's right to due process under the Fourteenth Amendment.  Plaintiff's punitive damages claim should therefore be presented to the trier of fact.

**IT IS THEREFORE RECOMMENDED THAT:** Defendant's motion for summary judgment (Doc. 91) be **DENIED**, and oral argument is not "essential to the fair resolution of the case."  S.D. Ohio Civ. R. 7.1(b)(2).

Karen L. Litkovitz
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ESTATE OF RENATO MARTI,                         Case No. 1:19-cv-980
      Plaintiff,                                  Barrett, J.
                                                                        Litkovitz, M.J.

      vs.

DELPHINE NICHOLE RICE, *et al.*,
      Defendants.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), WITHIN 14 DAYS after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.  This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

WITHIN 14 DAYS after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).