# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| ESTATE OF RENATO MARTI, | Case No. 1:19-CV-980 |
| Plaintiff, | Judge Michael R. Barrett |
| v. | |
| DELPHINE NICHOLE RICE, et al., | **ORDER** |
| Defendants. | |

This matter is before the Court on the Magistrate Judge's Report & Recommendation ("R&R") of January 10, 2023. (Doc. 129). Proper notice was afforded to the parties, *see United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); Fed. R. Civ. P. 72(b), and Defendants Delphine Nichole Rice, Jason Spiers, and NaphCare, Inc., have timely objected, (Doc. 140).

For the following reasons, the Court will overrule Defendants' objections, accept and adopt the R&R, and deny Defendants' motion for summary judgment.

I. **BACKGROUND**[1]

On November 19, 2017, at approximately 3:50 a.m., Cincinnati police officers responded to a call about an unknown man (Renato Marti), who was knocking on an

---

[1] This action stems from the death of Renato Marti while he was in custody at the Hamilton County Justice Center ("HCJC"). The following factual background is drawn from the R&R and the facts therein are undisputed unless otherwise noted.

1

apartment door that was not his. At the time, the officers suspected that Marti was intoxicated, arrested him for disorderly conduct, and took him to HCJC. Marti did not resist arrest. Defendants state that Marti was not answering questions, but one of the arresting officers testified that Marti responded to some of her questions appropriately and in English. The officers arrived at HCJC with Marti at approximately 5:00 a.m., at which point one of them remarked that Marti had a head injury, suspecting that "he must have fell."

Deputy Michael Crawford processed Marti, and during the approximately 10-minute-long process, Marti appeared to be unstable and losing his balance. Crawford attempted to complete an Initial Intake Health Screening Form, but Marti was not responsive. Crawford then enlisted the help of a Spanish-speaking colleague, Deputy Hernandez, who ultimately completed the screening form. The form included the "yes or no" questions: (1) "Recent head trauma?" and (2) "Do you have any open cuts/wounds/bite marks?" It also included an area for the screener to circle applicable observations, including (1) "Is the prisoner unconscious or disoriented?" and (2) "Does the prisoner appear to be intoxicated[?]" Hernandez indicated "no" for all questions and noted no observations.

Crawford asked Rice, a Licensed Practical Nurse (LPN), to examine Marti's head injury at the search wall, which she did for about fifteen seconds. Rice testified that she observed dried blood on a quarter-sized abrasion on Marti's head. Rice also observed balance issues and lethargy, but she did not determine whether Marti was confused or had slurred speech, examine his pupils, take vitals, or check for orientation to person, place, and time.

Rice concluded that Marti was likely intoxicated and decided that he did not need to go to the emergency room—indicating to deputies that they could continue the intake process. After the search wall, Marti was sent to a holding cell. Defendants state that the supervising officer on duty made the decision to do so, but Sgt. Christopher Henn's testimony does not confirm this. Marti did not undergo a medical receiving screening prior to being taken to the holding cell. Rice did not document her observations, complete any nursing protocols (including those related to intoxication), contact any supervisor, or take any other actions related to Marti prior to the end of her shift, which was at 7:00 a.m. that morning. There is no testimony or other evidence showing any actions taken by any individual toward Marti until sometime after 7:30 p.m. that evening.

The parties disagree over who initiated the next contact with Marti. Defendants assert that Rice initiated contact after returning on November 19, 2017, for her next 7:00 p.m. to 7:00 a.m. shift. Plaintiff asserts that Deputy Kristi Mulla discovered at around 8:00 p.m. that Marti had not yet been given a housing assignment, realized Marti was not responsive, and notified Deputy Randal Spence and Sgt. Henn; and only then did someone ask Rice to check on Marti.

Hulla, Spence, and Henn saw blood in Marti's holding cell and Hulla noticed blood on his head. Marti was not agitated and did not respond verbally or with body language. During this second interaction with Marti, Rice observed but did not otherwise physically examine him or perform the receiving screening. Rice noticed a change in Marti's mental status and no longer thought that he was intoxicated, but she did not take his vitals or check his eyes, reflexes, or gait. Rice suggested that Marti be "sent upstairs." The parties

dispute what this meant, but several deputies felt Marti's condition warranted medical attention and transported him to the medical unit by wheelchair.

At approximately 8:15 p.m. that evening, Mulla and Spence arrived at the medical unit with Marti. Spiers, an LPN, was the only medical staff member available at the unit. Mulla communicated to Spiers that Marti had blood on his head and was not acting normally. Spiers cleaned Marti's head wound with saline solution and observed that Marti seemed to be clenching his eyes shut. Marti was nonverbal throughout the encounter.

Spiers concluded that Marti had a non-serious abrasion on his head because it was not actively bleeding, and Marti could look at him and follow basic directions. Without speaking to any other medical provider, Spiers cleared Marti and told the deputies to take him to the mental health unit. Spiers knew that there would be no medical staff on duty in the mental health unit until the next day, and he did not administer any medication to Marti, bandage his head wound, arrange follow-up care, take vitals, complete nursing protocols, or perform a mental health screening. Spiers also never communicated with Rice or a supervisor about Marti. Shortly after his encounter with Marti, Spiers learned from Mulla that there was still no receiving screening in Marti's file.

Marti arrived at the mental health unit at around 8:30 p.m. that evening, where Deputies Christopher Speer and Doug Besl would soon be working the third shift from 11:00 p.m. to 7:00 a.m. There was no mental health nursing staff on the unit, and because there was no indication that Marti was suicidal, he was to be checked every thirty minutes. Medical staff did not communicate to Speer and Besl how Marti had come to be housed in the mental health unit. Marti never communicated with Speer or Besl, but he did occasionally push on the door and press the intercom several times.

4

Speer and Besl noted nothing abnormal in their checks until around 3:00 a.m. the next morning, at which point Besl noted that Marti was laying in an awkward position. The same was true at approximately 4:40 a.m. Shortly after 5:00 a.m., Besl discovered that Marti was not breathing. Besl called an emergency code, and responders attempted to resuscitate Marti. They were unsuccessful and Marti was pronounced dead at approximately 7:50 a.m. on November 20, 2017. An autopsy identified the cause of death as skull fracture, epidural hemorrhage, subdural hemorrhage, and contrecoup cerebral contusions due to blunt impact of head.

After being interviewed by internal investigators, Spiers entered a late note into the medical record regarding Marti, which made no mention of a head injury, nonverbal presentation, or inability to ambulate. NaphCare never interviewed Spiers about Marti's death, nor did it interview or take any statement from Rice. NaphCare also did not discipline Rice or Spiers in connection with Marti's death.

Marti's estate brought the underlying action against Rice, Spiers, and NaphCare, alleging, *inter alia*, that they were deliberately indifferent to Marti's objectively serious medical needs. After the parties conducted extensive discovery, Defendants moved for summary judgment. The Magistrate Judge then produced a thorough R&R in which she concluded that Defendants were not entitled to summary judgment on any fronts.

II. **SUMMARY JUDGMENT STANDARD**

Magistrate Judges are authorized to decide both dispositive and non-dispositive matters pursuant to 28 U.S.C. § 636 and Federal Rule of Civil Procedure 72. When objections are made to a Magistrate Judge's R&R on a dispositive matter, the Court "must determine de novo any part of the magistrate judge's disposition that has been properly

objected to." Fed. R. Civ. P. 72(b)(3). After review, the Court "may accept, reject, or modify the recommended decision; receive further evidence; or return the matter to the magistrate judge with instructions." *Id.*; *see also* 28 U.S.C. § 636(b)(1).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (noting that a fact is "material" only when its resolution affects the outcome of an action, and a dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). The Court views the evidence and draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the moving party has satisfied its initial burden of showing the absence of a genuine issue of material fact, the nonmoving party may not rest on the mere allegations in the pleadings, but must instead put forth specific facts showing that there is a genuine issue for trial. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

III. **ANALYSIS**

As a preliminary matter, Defendants note that they do not challenge the Magistrate Judge's conclusion "that material issues of fact preclude summary judgment on Plaintiff's negligence claims against LPNs Rice and Spiers and, by extension, Plaintiff's negligence claim against NaphCare on a theory of *respondeat superior*." (Doc. 140, PageID 3743). The Court will therefore look only to the constitutional claims against Rice and Spiers, the *Monell*[2] claims against NaphCare, and the issue of punitive damages.

---

[2] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

### a. Constitutional Claims Against Rice and Spiers

"[P]retrial detainees have a constitutional right to be free from deliberate indifference to serious medical needs under the Due Process Clause of the Fourteenth Amendment." *Greene v. Crawford County*, 22 F.4th 593, 605 (6th Cir. 2022). To defeat summary judgment in this context, Plaintiff must present evidence from which a reasonable jury could find that (1) Marti had an objectively serious medical need; and (2) Defendants' action or lack of action was intentional (not accidental) and Defendants either (a) acted intentionally to ignore Marti's serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to Marti. *Id.* at 607; *Brawner v. Scott County*, 14 F.4th 585, 596-97 (6th Cir. 2021); *see also Britt v. Hamilton County*, No. 21-3424, 2022 U.S. App. LEXIS 3852, at *7-8 (6th Cir. Feb. 10, 2022) ("This is an objective inquiry, as *Brawner* and *Greene* note, one that asks whether the defendants acted recklessly in response to a danger, 'even though a reasonable official' in their position would have known about an 'excessive risk.'").

Defendants do not clearly dispute the Magistrate Judge's conclusion that there exists "a genuine issue of material fact that Mr. Marti suffered from an objectively serious medical need."[3] (Doc. 129, PageID 3620). They instead argue generally that the Magistrate Judge erred in finding a genuine issue of material fact as to whether Rice and Spiers failed to provide adequate medical care and acted with deliberate indifference to Marti's medical needs. Defendants further contend that "as a matter of law, exercising basic discretion does not amount to deliberate indifference." (Doc. 140, PageID 3774).

---

[3] In any event, Defendants failed to respond to Plaintiff's on-point summary judgment evidence presenting "a neurosurgeon's opinion that the delay in assessing Mr. Marti's head injury caused his death." (Doc. 129, PageID 3620).

But Defendants misunderstand. The Magistrate Judge was not suggesting that any exercise of discretion will, as a rule, lead to a finding of deliberate indifference. Rather, the Magistrate Judge correctly recommended denying summary judgment on these claims because Plaintiff presented evidence from which a jury could conclude that reasonable healthcare providers with the same access to the same information as Rice and Spiers would have understood that Marti's medical needs subjected him to an excessive risk of harm.

The Magistrate Judge found that "Plaintiff has presented evidence that defendant Rice knew the serious risks associated with head injuries and intoxication, yet she failed to take a series of actions within her license and duty to mitigate those risks." (Doc. 129, PageID 3624). As to Spiers, the Magistrate Judge noted that he "did not use a head injury nursing protocol, even though he did not know the cause of Mr. Marti's head injury and knew that injury onset timing can be critical to related care." (*Id.*, PageID 3626). Although Defendants continue to assert that the facts show "*at most* . . . a 'degree of incompetence which does not rise to the level of a constitutional violation,'" (Doc. 140, PageID 3777), they fail to meaningfully dispute the Magistrate Judge's determination that the comprehensive evidence presented by Plaintiff, (*see* Doc. 114, PageID 3171-73, 3179-84), presents genuine issues for trial.

    a. *Monell* **Claims**

Private corporations such as NaphCare, which perform traditional state functions like the provision of medical services to inmates, can act under color of state law for the purposes of *Monell* liability. *Rouster v. County of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014). To prevail, Plaintiff must generally show either "(1) the existence of an illegal official

policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Here, Plaintiff first argued that "NaphCare policies, practices, and customs at [HCJC] led to Marti's death," and "NaphCare was aware of the persistent pattern of its LPNs failing to properly screen and document patient medical issues and was on notice that the practices of its LPNs could result in constitutionally deficient medical care." (Doc. 114, PageID 3189-90). In their objections, Defendants direct the Court's attention to NaphCare's "comprehensive policies that meet or exceed nationally recognized standards." (Doc. 140, PageID 3745). But the inquiry does not end at written policies. Indeed, as the Magistrate Judge noted, "*Monell* contemplated liability that flows from both written and unwritten policies or customs." (Doc. 129, PageID 3634); *see Jackson v. City of Cleveland*, 925 F.3d 793, 830 (6th Cir. 2019) (noting that a government or entity "may be liable under *Monell* for a policy of permitting constitutional violations regardless of whether the policy is written").

In its response to Defendants' objections, Plaintiff asserts that "unwritten policies of permitting delays in monitoring and basic screening of new arrivals with suspected intoxication, placing excessive and improper reliance on LPNs, and permitting [LPNs] to make medical assessments outside of the limits of their licenses, inevitably led to the . . . violation of patients' constitutional rights." (Doc. 141, PageID 3797-98). Defendants take issue with the Magistrate Judge's conclusion that Plaintiff "has proffered evidence sufficient to raise a genuine issue of material fact with respect to its *Monell* claim," (Doc.

9

129, PageID 3635), but their argument is simply not persuasive. This is precisely the type of dispute that must go before a jury, and summary judgment is therefore unsuitable. *See, e.g.*, *Abdiasiis v. Lewis*, No. 2:20-CV-3315, 2022 U.S. Dist. LEXIS 127456, at *27-30 (S.D. Ohio July 18, 2022) (a case—in this District and with a similar fact pattern—in which the court found "sufficient evidence to create a genuine issue as to whether NaphCare's [unwritten] policies led to inadequate assessments and treatments causing [the plaintiff] injury").

Likewise, summary judgment is not appropriate for Plaintiff's claim that NaphCare failed to properly train and supervise its LPNs. "To succeed on a failure-to-train claim, a plaintiff must show: '(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.'" *Howell v. NaphCare, Inc.*, 67 F.4th 302, 320 (6th Cir. 2023) (quoting *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). Here, Defendants argue that the Magistrate Judge erred because Plaintiff cannot show "evidence of systemic training deficiencies." (Doc. 140, PageID 3756). But as Plaintiff counters, "this is not a precise statement of the law." (Doc. 141, PageID 3799).

The Magistrate Judge correctly applied the relevant standard, particularly in light of Plaintiff's proffered expert testimony that "NaphCare set up a system that . . . was deficient in training, supervision, and staff allocation," and "NaphCare's training and supervision of Rice, Spiers, and nursing staff were inadequate and created obvious risks to patients in the jail, including Mr. Marti, and failed to meet applicable standards of care." (Doc. 129, PageID 3640-41). Just as the mere presence of official written policies does

not necessarily defeat a policy-related *Monell* claim, so too does the mere absence of deficiencies in formal training fail to necessarily defeat a training and supervision-related claim. Therefore, because Marti's death was "a 'highly predictable consequence of a failure to equip [LPNs] with specific tools to handle recurring situations,'" (*Id.*, PageID 3642) (quoting *Shadrick v. Hopkins County*, 805 F.3d 724, 743 (6th Cir. 2015)), Plaintiff has demonstrated a genuine issue of fact precluding summary judgment.

### b. Punitive Damages

Finally, due to the genuine disputes of material fact surrounding the issue of deliberate indifference, the Magistrate Judge concluded that any punitive damages claims should be presented to the trier of fact. Although Defendants generally contest that conclusion in their objections, they do not present any new facts or law that speak to the Magistrate Judge's findings. And to the extent that Defendants seek to raise new arguments related to punitive damages in their objections, the Court will not consider them. *See Morgan v. Trierweiler*, 67 F.4th 362, 367-68 (6th Cir. 2023).

### IV. CONCLUSION

Having conducted careful de novo review of the R&R, as well as the underlying evidence and pleadings in the record, the Court **OVERRULES** Defendants' objections, and **ACCEPTS** and **ADOPTS** the R&R, (Doc. 129), in full for the reasons stated therein. In accordance with the R&R, Defendants' motion for summary judgment, (Doc. 91), is **DENIED**.

**IT IS SO ORDERED.**

                                                */s/ Michael R. Barrett*
                                               Michael R. Barrett
                                               United States District Judge